**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **BROKER GENIUS INC.,** | | |
| | **Plaintiff,** | **Case 1:17-cv-08627-SHS** |
| **v.** | | |
| **GUINIO VOLPONE,** <br> **RAY VOLPONE,** <br> **DREW GAINOR,** <br> **STUART GAINOR,** <br> **VOLPONE SOFTWARE LLC,** <br> **GAINOR SOFTWARE, LLC,** <br> **SEAT SCOUTS LLC and** <br> **EVENT TICKET SALES LLC,** | | |
| | **Defendants.** | |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

**NESENOFF & MILTENBERG, LLP**
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500

**THE LAW OFFICES OF JEFFREY LICHTMAN**
11 E. 44th Street, #501
New York, New York 10017
212-581-1001

**THE ESSES LAW GROUP, LLC**
750 Third Avenue, 9th Floor
New York, New York 10017
212-673-3160

**HICKLEY & HEISENBERG LLP**
880 Third Avenue, Suite 13
New York, New York 10122
212-845-9094

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii-v

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 2

ARGUMENT .................................................................................................................... 5

    A. The Motion to Dismiss Standard ........................................................................ 5

    B. There is No Basis for Broker Genius to Pierce the Corporate Veil .................. 6

    C. Broker Genius Has No Basis to Assert a Breach of Contract Action Against
       Defendants Guinio Volpone and Event Ticket Sales ........................................... 9

    D. Broker Genius' Unfair Competition Claim Under New York Law Fails ........ 11

    E. Broker Genius' Conversion Claim Fails .......................................................... 14

    F. Broker Genius' Tortious Interference With Business Relations Claim Fails ... 17

    G. Broker Genius' Unjust Enrichment Claim Must be Dismissed ....................... 21

    H. Broker Genius' Breach of the Implied Covenant of Good Faith and Fair
       Dealing Must Be Dismissed ............................................................................... 22

    I. Broker Genius Fails to Allege a Claim for Attorney's Fees ............................. 23

    J. Broker Genius Fails to Allege a Claim for Punitive Damages ......................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

*Abelman v. Shoratlantic Development Co.,*
   153 A.D.2d 821, 545 N.Y.S.2d 333 (2nd Dept. 1989)............................................. 9

*Abernathy-Thomas Eng'g Co. v. Pall Corp.,*
   103 F. Supp.2d 582 (E.D.N.Y.2000) .................................................................... 11

*Andrews v. Cerebrus Partners,*
   271 A.D.2d 348 (1st Dept. 2000)......................................................................... 22

*Ashcroft v. Iqbal,*
   556 U.S. 662, 129 S. Ct. 1937 (2009) ..................................................... 5, 6, 11, 19

*Atmospherics, Ltd. Hansen,*
   269 A.D.2d 343, 702 N.Y.S.2d 385 (2d Dep't 2000) .......................................... 11

*Bazak Int'l Corp v. Tarrant Apparel Grp.,*
   347 F. Supp. 2d 1 (S.D.N.Y. 2004)...................................................................... 22

*Bell Atl. Corp v. Twombly,*
   550 U.S. 544 (2007)................................................................................ 5,6,11,19

*Benham v. eCommision Sols., LLC,*
   118 A.D.3d 605 (1st Dep't 2014) ........................................................................ 22

*Bonanni v. Straight Arrow publishers, Inc.,*
   133 A.D.2d 585, 520 N.Y.S.2d 7 (1st Dept. 1987)................................................ 9

*Bongo Apparel, Inc. v. Iconix Brand Group.,*
   18 Misc.3d 1108(A), 856 N.Y.S.2d 22, 2009 WL 41341 (N.Y. Sup. Ct. 2008) .. 12

*Broker Genius, Inc. v. Zalta,*
   17-cv-2099 (SHS)(Dec. 4, 2017) .......................................................................... 6

*Carvel v. Noonan,*
   3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004) ...................... 17, 18,19

*Clark Street Wine and Spirits v. Emporos Sys. Corp.,*
   754 F. Supp.2d 474 (E.D.N.Y. 2010) ................................................................. 16

*Colavito v. N.Y. Organ Donor Network, Inc.,*
   8 N.Y.3d 43 (2006) ............................................................................................. 14

*Computer Associates, Inc. v. Simple.com, Inc.*,
　　621 F. Supp.2d 45 (E.D.N.Y. 2009) ................................................. 12

*Corsello v. Verizon N.Y., Inc.*,
　　18 N.Y.3d 777 (2012) ...................................................................... 21

*Galopy Corp. Int'l v. Deutsche Bank, AG*,
　　No. 151766/2015, 2016 WL 4398456
　　(Sup. Ct., N.Y. Cty. Aug. 18, 2016) ............................................... 22

*Garrity v. Lyle Stuart, Inc.*,
　　40 N.Y.2d 354 (1976) ...................................................................... 24

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
　　50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1990) ........................ 17, 18

*Harris v. Provident Life and Acc. Ins. Co.*,
　　310 F.3d 73 (2d Cir. 2002) ............................................................... 22

*Hopper Assocs., Ltd. v. AGS Computers, Inc.*,
　　74 N.Y.2d 487 (1989) ...................................................................... 23

*Hyperlync Techs, Inc. v. Verizon Sourcing LLC*,
　　2016 WL 42721 (Sup. Ct. N.Y. Cty 2015) ...................................... 15, 16

*JFK Holding Co. LLC v. City of New York*,
　　98 A.D.3d 273 (1st Dept. 2012) ....................................................... 23

*Lawati v. Montague Morgan Slade Ltd.*,
　　102 A.D.3d 427, 961 N.Y.S.2d 5 (1st Dept. 2013) .............................. 10

*Logan Advisors, LLC v. Patriarch Partners, LLC*,
　　63 A.3d 440 (1st Dept. 2009) ........................................................... 23

*Luv n' Care, Ltd. v. Mayborn USA, Inc.*,
　　898 F. Supp.2d 634 (S.D.N.Y. 2012) ............................................... 11

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*,
　　127 A.D.3d 48 (1st Dept. 2015) ....................................................... 24

*Matter of Morris v. New York State Dept. of Taxation and Finance*,
　　82 N.Y.2d 135, 603 N.Y.S.2d 807 (1992) ...................................... 8, 9

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
　　87 A.D.3d 287 (1st Dept. 2011) ....................................................... 23

*Mighty Midgets, Inc. v. Centennial,*
    47 N.Y.2d 12 (1979) ........................................................................... 23

*MLB Advanced Media, L.P. v. Big League Analysis, LLC,*
    2017 WL 6450546 (N.Y. Cty. Dec. 18, 2017) ...................................... 15

*Morgan v. A Better Chance, Inc.,*
    70 A.D.3d 481 (1st Dept. 2010) .......................................................... 11

*NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,*
    87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996) ............ 17, 18, 20

*Paulino v. Conooco, Inc.,*
    No. 14-cv-5145, 2015 WL 4895234, at *4 (E.D.N.Y. Aug. 17, 2015) ............... 22

*Retropolis, Inc. v. 14th St. Dev. LLC,*
    17 A.D.3d 209 (1st Dept. 2005)
    (citing New York Limited Liability Company Law § 609 and § 610) .................. 7

*Rivkin v. Coleman,*
    978 F. Supp. 539 (S.D.N.Y. 1997) ....................................................... 22

*Rocanova v. Equitable Life Assurance Society of the United States,*
    83 N.Y.2d 603 (1994) .......................................................................... 24

*Schroeder v. Pinterest Inc.,*
    133 A.D.3d 12 (1st Dept. 2015) ...................................................... 12, 13

*Sheinberg v. 177 E. 77,*
    248 A.D.2d 176, 670 N.Y.S.2d (1st Dept. 1998) ................................... 8

*Sheridan Broad Corp. v. Small,*
    19 A.D.3d 331, 798 N.Y.S.2d 45 (1st Dept. 2005) ................................. 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) .............................................................................. 5

*The Jones Group Inc. v. Zamaza,*
    2014 WL 2472102 (N.Y. Supp. Apr. 9, 2014) ..................................... 16

*Thyroff v. Nationwide Mut. Ins. Co.,*
    8 N.Y.3d 283 (2007) ...................................................................... 14, 15, 16

*TNS Holdings v. MKI Sec. Corp.,*
    92 N.Y.2d 335, 680 N.Y.S.2d 45 (1st Dept. 2005) ............................... 8

_Trust v. Kummerfeld,_
    153 Fed.Appx. 761 (2nd Cir. 2005) ........................................................................ 9

Defendants Guinio Volpone, Ray Volpone, Drew Gainor, Stuart Gainor, Volpone Software LLC, Gainor Software LLC, Seat Scouts LLC, and Event Ticket Sales, LLC (collectively, the "Defendants") submit this Memorandum of Law in support of their Motion to Dismiss Plaintiff Broker Genius' Second Amended Complaint for failure to state a cause of action upon which relief can be granted.

## PRELIMINARY STATEMENT

Broker Genius' Second Amended Complaint (ECF 108), filed on February 15, 2018, finally acknowledges what Seat Scouts and Drew Gainor, the original defendants in this action, argued from the beginning: Broker Genius' trade secret and copyright infringement claims were specious. While Broker Genius has finally abandoned these claims, it continues to use the courts to drive its competitors from the market for automated web-based ticket pricing software and services. Recognizing the inherent difficulty in proving Drew Gainor entered into a contract with Broker Genius, let alone breached it, Broker Genius recharactizerizes its case yet again. This time Broker Genius asserts that any person or entity that directly or indirectly owns an interest in Seat Scouts is liable for the conduct described in the Second Amended Complaint. To that end, Broker Genius has now sued Drew Gainor's father Stuart, who together with Drew allegedly own Gainor Software LLC, and Guinio Volpone's father Ray, who together with Guinio allegedly own Volpone Software LLC. Broker Genius alleges that Gainor Software LLC and Volpone Software LLC are the owners of Seat Scouts. Broker Genius added these individuals and entities to its state law claims for unfair competition, conversion, tortious interference with business relations, unjust enrichment, and breach of the implied covenant of good faith and fair dealing while adding Guinio Volpone and Event Ticket Sales, LLC to its breach of contract claim.

As will be demonstrated below, Broker Genius' Breach of Contract Claim as it pertains to Guinio Volpone and Event Ticket Sales, and its Unfair Competition, Conversion, Tortious Interference, Unjust Enrichment, and Breach of the Implied Covenant of Good Faith and Fair Dealing claims fail as a matter of law because Broker Genius failed to articulate plausible theories of recovery in support of these claims. Separately, Broker Genius had no factual basis to add as defendants Drew Gainor and Guinio Volpone's fathers (Stuart Gainor and Ray Volpone) or the limited liability companies each family allegedly formed to invest in Seat Scouts. These individuals and entities were not involved in the conduct giving rise to Broker Genius' causes of action in its Second Amended Complaint and are named in that document solely to harass, annoy, and intimidate. Broker Genius decision to name these defendants months after it filed suit should be viewed for what it is—an attempt to use the legal system to coerce the Defendants to abandon their efforts to compete with Broker Genius in the market for automated ticket pricing software and services. Broker Genius has already been denied a patent for its Auto Pricer software. It should not be allowed to obtain the functional equivalent of patent protection by abusing the legal process. Accordingly, and for the reasons described below, Broker Genius' Second Amended Complaint, except for its breach of contract claim against Drew Gainor, should be dismissed.

## FACTUAL BACKGROUND

The Court is intimately familiar with the facts giving rise to the dispute between the parties having conducted a preliminary injunction hearing in December 2017 and January 2018 regarding Broker Genius' breach of contract claim. As a result, the Defendants will briefly summarize the facts below based on the allegations of Broker Genius' Second Amended Complaint, which for purposes of this motion only must be accepted as true.

2

Broker Genius alleges that it developed an automated ticket pricing program known as Auto Pricer to assist ticket resellers in automating the pricing of their ticket inventory.  Cmp. ¶25.  Broker Genius claims that their technology is a pioneering product and service for the secondary ticket market and industry, which took over four years to develop.  Cmp. ¶¶23-24. Broker Genius claims that its Auto Pricer product allows resellers to make 33-40% higher returns by lowering operational costs and increasing profits.  Cmp. ¶26.  Broker Genius claims to have invested substantial labor, skills, and expenditures over the years in developing Auto Pricer and in acquiring and building relationships with clients based on several "indispensable" factors including Auto Pricer's "pioneering technology."  Cmp. ¶27.

Broker Genius claims that prior to demonstrating Auto Pricer on a trial basis subscription, creating an account, and accessing/using Auto Pricer, it requires prospective clients to agree to Broker Genius' Terms of Use, which restricts and prohibits unlawful uses of Broker Genius' proprietary products and services.  Cmp. ¶¶31-32.  According to Broker Genius, the Terms of Use prohibit prospective and active clients from "deriv[ing] data to determine Broker Genius functionality, user information, aggregate statistics on Broker Genius' performance, or the performance of integration partners."  The Terms of Use also allegedly prohibit prospective and active clients from, among other things, modifying, adapting, reverse engineering, decompiling, or disassembling any portion of the Broker Genius website or its applications.  Cmp. ¶33.  The Terms of Use also allegedly provide that clients are "responsible for the confidentiality and use of [their] username and password, and for all activities (including commercial transactions) that are conducted through [their] account."  Clients are also allegedly prohibited from transferring or selling access to their accounts.  Cmp. ¶34.  Finally, Broker Genius alleges that its technology

cannot be easily duplicated by others and that this provides Broker Genius with a competitive advantage over other entities that may seek to compete with it.  Cmp. ¶35.

Broker Genius alleges that on or about May 26, 2016, defendant Drew Gainor, acting for himself and for the benefit of defendants Guinio Volpone and Event Ticket Sales, signed up for and created an account with Broker Genius to use Auto Pricer, and in the process accepted Broker Genius' Terms of Use.   Cmp. ¶36.   Broker Genius also alleges that Drew Gainor accepted Broker Genius' updated Terms of Use on behalf of himself and Guinio Volpone and Event Ticket Sales on July 7, 2016.  Cmp. ¶37.  According to Broker Genius, the Terms of Use constituted a contract pursuant to which Drew Gainor, Guinio Volpone, and Event Ticket Sales agreed that they would not reverse engineer, decompile, or dissemble any portion of Broker Genius' products and services, or reproduce, distribute, or create distributive works of Auto Pricer.  Cmp. ¶38.  Broker Genius alleges that it provided extensive and personalized training to Drew Gainor on the use of Auto Pricer and that Gainor used an Event Ticket Sales email address when communicating with Broker Genius.  Cmp. ¶39.

Broker Genius alleges that the Defendants without authorization reverse engineered, decompiled, and disassembled Broker Genius' Auto Pricer product and user interface in violation of Broker Genius' Terms of Use to create seatscouts.com, a competing website that also offers an auto pricer product.  Cmp. ¶¶47-51.  They also allege that Broker Genius lost at least two clients to Seat Scouts because of the Defendants' actions.  Cmp. ¶50.  Broker Genius further alleges that the Defendants are jointly and severally responsible for the actions and omissions alleged in the Second Amended Complaint because they collectively and/or individually assisted, participated in, or otherwise encouraged the actions described in the Complaint.  Cmp. ¶¶53-54.  Broker Genius further alleges that each Defendant aided and abetted

the other Defendants in the development of the Seat Scouts website.  Broker Genius' allegations against defendants Ray Volpone, Stuart Gainor, Volpone Software LLC, and Gainor Software LLC appear to be based solely on their direct and indirect ownership interest in defendant Seat Scouts, LLC.

Based on these facts, Broker Genius asserts six causes of action:

1. Breach of Contract as to Defendants Guinio Volpone, Drew Gainor, and Event Ticket Sales.
2. Unfair Competition Under New York Law for Misappropriation of Skills and Expenditures against all Defendants.
3. Conversion under New York law against all Defendants.
4. Tortious Interference with Business Relationships Under New York law against all Defendants.
5. Unjust Enrichment under New York Law against all Defendants.
6. Breach of the Implied Covenant of Good Faith and Fair Dealing under New York law against defendants Guinio Volpone, Drew Gainor, and Event Ticket Sales.

The Defendants now move to dismiss those claims.

## ARGUMENT

### A.  The Motion to Dismiss Standard

For a complaint to survive a motion to dismiss based on Rule 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  While the *Iqbal* plausibility standard is not a "probability requirement," it requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007).

5

However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions [;] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S. Ct. at 1949. Even when a claim is plead in the alternative, a party must still sufficiently allege the elements of that alternative theory to avoid dismissal. *See generally Twombly,* 550 U.S. 544 (2007).  As will be demonstrated below, Broker Genius' Second Amended Complaint fails to satisfy these standards.

## B.  There is No Basis for Broker Genius to Pierce the Corporate Veil

Broker Genius' theories of liability have changed repeatedly since it filed its first iteration of its complaint in November 2017.  In December 2017, on the eve of the Preliminary Injunction Hearing, Broker Genius filed a First Amended Complaint adding as defendants Guinio Volpone and Event Ticket Sales under the theory that Volpone is an owner of Seat Scouts and that Event Ticket Sales was his alter ego.  On February 15, 2018, Broker Genius amended its complaint once again, this time abandoning its misappropriation of trade secret and copyright claims that it had brought under federal law.  Those claims formed the backbone of its initial efforts to obtain a preliminary injunction and force Seat Scouts out of business, and were for all intents and purposes rejected by this Court in its decision in the NRZ case.  *Broker Genius, Inc. v. Zalta,* 17-cv-2099 (SHS)(Dec. 4, 2017).

Recognizing that its effort to force Seat Scouts out of business (or at least abandon its Command Center product), Broker Genius opted to name each person and entity that directly or indirectly owned an interest in Seat Scouts in an effort to pierce the corporate veil surrounding Seat Scouts.  Broker Genius, however, has failed to assert any allegations that would justify taking such a radical step.  Broker Genius' allegations against these newly named defendants are

premised on the assertion that Stuart Gainor, Drew Gainor's father, invested in Gainor Software LLC and Gainor Software LLC is allegedly a 50% owner of Seat Scouts. Cmp. ¶¶7-8, 12. Ray Volpone, Guinio Volpone's father, is named because he is allegedly an owner of Volpone Software LLC.  Volpone Software is allegedly the other member in Seat Scouts.  Cmp. ¶¶5, 11-12.  Broker Genius then argues that Drew Gainor and Seat Scouts acted as the alter ego of each of these newly added defendants, as well as Event Ticket Sales and Guinio Volpone.  Broker Genius' Second Amended Complaint, however, lacks any allegations to support these outlandish claims.

Broker Genius's claims are nothing more than an new line of attack in Broker Genius' scorched earth attempt to force Seat Scouts out of business, this time by attempting to pierce the corporate veil the protects the owners of Seat Scouts and every other limited liability company and corporation in the United States from personal liability absent an abuse of complete disregarding of the corporate form which has not been alleged and did not occur.  Seat Scouts is a Nebraska Limited Liability Company, and Broker Genius' theory of liability is expressly prohibited by section 21-129 of the Nebraska Limited Liability Company Law.  That statute provides in pertinent part:

> (a) The debts, obligations, or other liabilities of a limited liability
> company, whether arising in contract, tort, or otherwise:
> (1) are solely the debts, obligations, or other liabilities of the
> company; and
> (2) do not become the debts, obligations, or other liabilities of a
> member or manager solely by reason of the member acting as a
> member or manager acting as a manager.

Nebraska Revised Statute 21-129.  The New York courts routinely enforce the corresponding provision found in the New York Limited Liability Company Act.  *See Retropolis, Inc. v. 14th*

*St. Dev. LLC,* 17 A.D.3d 209, 210 (1st Dept. 2005) (citing New York Limited Liability Company Law § 609[1] and *see also* § 610[2]).

Ultimately, a party seeking to pierce the corporate veil bears a heavy burden. *Sheridan Broad Corp. v. Small,* 19 A.D.3d 331, 332, 798 N.Y.S.2d 45 (1st Dept. 2005); *TNS Holdings v. MKI Sec. Corp.,* 92 N.Y.2d 335, 339, 680 N.Y.S.2d 45 (1st Dept. 2005). To pierce the corporate veil, the party must show that: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Matter of Morris v. New York State Dept. of Taxation and Finance,* 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807 (1992). Claims that are based on piercing the corporate veil are not warranted where the pleader "ha[s] not alleged with the requisite 'particularized statements detailing fraud or other corporate misconduct,' facts that would warrant piercing the corporate veil …, especially since '[a]n inference of abuse does not arise … where a corporation was formed for legal purposes or is engaged in a legitimate business." *Sheridan Broad Corp.,* 19 A.D.3d at 332 (dismissing piercing claims where plaintiffs failed to allege particularized facts "that would establish that individual defendant, through his domination, 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against [plaintiffs] such that a court in equity will intervene'"); *TNS Holdings,* 92 N.Y.2d at 340 (dismissing claim where plaintiffs failed to show that even if there were domination, that the control resulted in the fraud or wrong complained of); *Sheinberg v. 177 E.*

---

[1] "Neither a member of a limited liability company, a manager of a limited liability company managed by a manager or managers nor an agent of a limited liability company (including a person having more than one such capacity) is liable for any debts, obligations or liabilities of the limited liability company or each other, whether arising in tort, contract or otherwise, solely by reason of being such member, manager or agent or acting (or omitting to act) in such capacities or participating (as an employee, consultant, contractor or otherwise) in the conduct of the business of the limited liability company."

[2] "Parties to actions. A member of a limited liability company is not a proper party to proceedings by or against a limited liability company,  except where the object is to enforce a member's right against or liability to the limited liability company."

*77,* 248 A.D.2d 176, 177, 670 N.Y.S.2d 19 (1st Dept. 1998) (claims dismissed because they were not supported by particularized statements detailing fraud or other corporate misconduct); *Abelman v. Shoratlantic Development Co.,* 153 A.D.2d 821, 823, 545 N.Y.S.2d 333 (2nd Dept. 1989); *Bonanni v. Straight Arrow Publishers, Inc.,* 133 A.D.2d 585, 587, 520 N.Y.S.2d 7 (1st Dept. 1987). Moreover, a claim for piercing the corporate veil does not constitute a cause of action independent of that against the corporation. *Morris,* 82 N.Y.2d at 141; *Trust v. Kummerfeld,* 153 Fed.Appx. 761 (2nd Cir. 2005).

 Based on the foregoing, the claims against Stuart Gainor, Gainor Software LLC, Guinio Volpone, Ray Volpone, Volpone Software LLC, and Event Ticket Sales should be dismissed.

### C. Broker Genius Has No Basis to Assert a Breach of Contract Action Against Defendants Guinio Volpone and Event Ticket Sales.

Broker Genius' first cause of action seeks to recover breach of contract damages from Drew Gainor, Guinio Volpone, and Event Ticket Sales. Cmp. ¶ 56. Broker Genius argues that Drew Gainor agreed to Broker Genius' terms of use when he signed up and allegedly created an account with Broker Genius to use its Auto Pricer product on May 26, 2016. Cmp. ¶36. As detailed at the Preliminary Injunction hearing, Gainor denies setting up the account and testified that Broker Genius created the account for him and therefore he never accepted the Terms of Use. Thus, there was no contract between Gainor and Broker Genius. Gainor acknowledges, however, that for purposes of this motion, Broker Genius' allegations are treated as true. Accordingly, Gainor does not move to dismiss Broker Genius' Breach of Contract cause of action as it pertains to him.

Broker Genius also contends that when Gainor accepted the Terms of Use he was also acting on behalf of Guinio Volpone and Event Ticket Sales. Cmp. ¶¶36-37. Broker Genius' outlandish allegations are proven false by the agreement submitted by Plaintiff (Ex. 1), which is

a Terms of Use that states that "your use of the Broker Genius site," and "By visiting or using the Site, Services or Apps or using Broker Genius Apps, you expressly agree to these Terms"  It is not alleged that any of the parties other than Mr. Gainor used the site, or agreed to any terms of use.

Moreover, the Complaint is devoid of the any allegations from which agency could be based, required factual support and premised solely on an unsubstantiated allegation that Gainor communicated with Broker Genius using an email address of drew@eventticketsales.com.  Cmp. ¶39.  This allegation is directly contradicted by the email exchange between Broker Genius' Zak Ellman and Drew Gainor on May 26, 2016, which was sent to Gainor's email address dgainor@me.com.

Even if one were to assume for the sake of argument that Gainor did use an eventticketsales.com email address to communicate with Broker Genius, the use of that address does not mean that he was acting on behalf of Event Ticket Sales or had the authority to bind Event Ticket Sales or Guinio Volpone.  Every day thousands of individuals make personal purchases on websites such Amazon.com and eBay using a business email address.  No one would suggest that those purchases belong to that person's employer when all other indicia of ownership, such as the method of payment, indicate that the purchase was made on an individual basis.  Yet, Broker Genius bases its entire breach of contract claim against Guinio Volopone and Event Ticket Sales on the alleged use of an eventticketsales.com email address.  It is simply an absurd theory, and the Court should outright reject it.  *See, e.g., Lawati v. Montague Morgan Slade Ltd.,* 102 A.D.3d 427, 430, 961 N.Y.S.2d 5 (1st Dept. 2013) ("The allegations that Rigby had used the law firms' letterheads and email addresses to communicate with plaintiffs are insufficient to show that the firms had control over Rigby in the matter, or that Rigby had acted

with the firms' knowledge and consent."); *Morgan v. A Better Chance, Inc.,* 70 A.D.3d 481, 482 (1st Dept. 2010) ("The conduct of an agent may be attributed to the principal for jurisdictional purposes where the agent engaged in purposeful activities in this state in relation to the transaction at issue for the benefit of and with the knowledge and consent of the principal and the principal exercised some control over the agent in the matter.").

Moreover, the language of Broker Genius' Terms of Use proves that there is no basis for its breach of contract claim as it pertains to Guinio Volpone and Event Ticket Sales.   The Terms of Use in the Account Registration section specifically provides that "[y]our account username and password are personal to you," "[y]ou may not transfer or sell access to your account," and "you may not use another user's account without that user's permission."   Each of these phrases demonstrates the sole intention of the Terms of Use is to bind the individual signing up, not for his employer, friends, or family.   Accordingly, under *Iqbal* and *Twombly*, Broker Genius' breach of contract claim against Guinio Volpone and Event Ticket Sales should be dismissed.

### D.  Broker Genius' Unfair Competition Claim Under New York Law Fails

Broker Genius' Second Cause of Action asserts a claim for Unfair Competition under New York law based on the Defendants' alleged misappropriation of Broker Genius' skills and expenditures.[3]   "A plaintiff asserting an unfair competition claim under New York common law must also show that defendant acted in bad faith."   *Luv n' Care, Ltd. v. Mayborn USA, Inc.,* 898 F. Supp.2d 634, 643 (S.D.N.Y. 2012).   "While there is no complete list of activities which

---

[3] If the predicate to Broker Genius' unfair competition claim is trade secret misappropriation, the unfair competition claim is duplicative of the trade secret claim.  *Abernathy-Thomas Eng'g Co. v. Pall Corp.,* 103 F. Supp.2d 582, 599-600 (E.D.N.Y.2000) (treating misappropriation of trade secrets and unfair competition as stating a single cause of action when an unfair competition claim is based on wrongful disclosure of proprietary information); *Atmospherics, Ltd. v. Hansen,* 269 A.D.2d 343, 702 N.Y.S.2d 385, 386 (2d Dep't 2000) (affirming judgment as a matter of law at close of plaintiff's case for misappropriation of trade secrets and unfair competition when no rational jury could conclude that plaintiff's information constituted trade secrets).  .

constitute unfair competition under New York law, the essence of an unfair competition claim is that one may not act in bad faith to misappropriate the skill, expenditures, and labor of another." *Bongo Apparel, Inc. v. Iconix Brand Group, Inc.,* 18 Misc.3d 1108(A), 856 N.Y.S.2d 22, 2009 WL 41341 (N.Y. Sup. Ct. 2008).   However, "[n]ot every act, even if taken in bad faith, constitutes unfair competition."   Rather, a plaintiff must show more than commercial unfairness. *Computer Associates, Inc. v. Simple.com, Inc.,* 621 F. Supp.2d 45, 53 (E.D.N.Y. 2009).   Bad faith" is defined as a showing of fraud, deception, or an abuse of a fiduciary or confidential relationship. *Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 30 (1st Dept. 2015).   Broker Genius' misappropriation of skills and expenditures claim does not satisfy these requirements and should be dismissed.

As a threshold matter, Broker Genius treats all Defendants as if they were a single entity. As detailed in Point B above, Broker Genius has no factual basis to assert claims against defendants Guinio Volpone, Ray Volpone, Volpone Software LLC, Stuart Gainor, and Gainor Software LLC, who are named solely because they are direct or indirect owners of Seat Scouts. Broker Genius' claims against these entities are thus too attenuated to succeed.   *Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 30-31 ( 1st Dept. 2015).   With respect to the allegations against Drew Gainor and Seat Scouts, Broker Genius' Second Amended Complaint is devoid of any plausible allegations to support a claim that they acted in bad faith.   Gainor and Seat Scouts are engaged in the classic form of free market competition—building a better product in an area where the technology and concepts are well known and certainly not novel.   Yet, Broker Genius makes that argument after being denied a patent in an effort to achieve sole control over the market for automated ticket pricing.   Moreover, Broker Genius does not allege, and therefore concedes that it did not have a fiduciary relationship with Gainor or Seat Scouts.   Cmp. ¶¶ 62-68.

The First Department's decision in *Schroeder v. Pinterest Inc.* is eerily similar to this case. In *Schroeder*, the plaintiff, Theodore Schroeder and two companies founded by him alleged that defendants Brian Cohen, New York Angels, Inc., and Pinterest, Inc., stole and illegally used Schroder's confidential ideas, technology, and business plans to develop the website Pinterest.com. According to plaintiffs, Schroeder conceived of a novel web application that would allow Internet users to share information about themselves by posting interests, ideas, and pictures to their interface boards. The plaintiff's concepts were different from then existing social network sites such as Facebook, MySpace, and Friendster. Schroeder and two friends embarked on the project and later invited Cohen, an investor and self-proclaimed "entrepreneurial mentor" to join the group, with Cohen serving as the Chairman and Chief Executive Officer of the entity formed by Schroeder. *Schroeder*, 133 A.D.3d at 16-17.

The plaintiffs claimed that after learning about Schroeder's ideas, technology, and business plans, Cohen absconded with them, joined Pinterest, and implemented those ideas there. When Plaintiffs later learned that Cohen played a material role in the first stages of the development of the Pinterest website, they sued Cohen and Pinterest alleging, among other things, that they misappropriated the plaintiffs' skills and expenditures to develop the Pinterest website. The motion court dismissed this claim as it pertained to Pinterest. The First Department affirmed that decision finding that plaintiffs' assertion that "bad faith is established merely because Pinterest may have known that the ideas given to them by Cohen were not his own" was insufficient to establish a claim for misappropriation of skills and expenditures. *Id.* at 31. In contrast, the claims against Cohen were not dismissed because there were sufficient allegations that he breached the fiduciary duty he owed to plaintiffs stemming from his employment with the plaintiffs, and thus acted in bad faith. *Id.* at 31.

13

The claims against Gainor are akin to the claims against Pinterest.  Even if one were to assume that Gainor entered into a contract with Broker Genius, that contract would not create a fiduciary duty or give him access to Broker Genius' code.  Simply seeing or using Broker Genius' website does not result in a misappropriation claim any more than Pinterest talking with an executive of a competitor would result in Pinterest becoming liable for unfair competition through the misappropriation of skills and expenditures.  Accordingly, Broker Genius' unfair competition through the alleged misappropriation of skills and methods should be dismissed.

### E.  Broker Genius' Conversion Claim Fails

Broker Genius' third cause of action sounding in conversion is another example of its overreaching in pursuing Drew Gainor and anyone related to him.  In alleging conversion, Broker Genius argues that the Defendants "without authorization, assumed and exercised an unlawful right of ownership over Broker Genius' proprietary technology and substantial skill and expenditures to the exclusion of Broker Genius' rights therein."  Cmp. ¶ 70.  In effect, Broker Genius argues that the Defendants stole their technology.  Yet, Broker Genius concedes that it continues to market and provide its Auto Pricer technology to potential and existing customers. That concession is fatal to Broker Genius' conversion claim.

To establish a claim for conversion, a plaintiff must establish two key elements.  First, the plaintiff must establish a possessory right or interest in the property.  Second, plaintiff must establish defendant's dominion over the property or interference with it in derogation of plaintiff's right.  *Id*. at 50.  *Colavito v. N.Y. Organ Donor Network, Inc.,* 8 N.Y.3d 43, 49-50 (2006).  The cases interpreting this second prong have repeatedly held that a conversion claim must be predicated on the plaintiff's loss of the ability to exercise at least some of its ownership rights in the subject property.  *See, e.g., Thyroff v. Nationwide Mut. Ins. Co.,* 8 N.Y.3d 283, 292 (2007)(confirming that intangible assets, such as computer records, could be converted as long as

the party claiming conversion could demonstrate that it was deprived of the use of the records); *Hyperlync Techs, Inc. v. Verizon Sourcing LLC,* 2016 WL 42721 (Sup. Ct. N.Y. Cty 2015).

Justice Shirley Werner Kornreich's recent decision in *MLB Advanced Media, L.P. v. Big League Analysis, LLC, 2017 WL 6450546* (N.Y.Cty. Dec. 18, 2017), illustrates the inherent infirmity of Broker Genius' argument. In that case, MLB Advanced Media ("MLB") and Big League Analysis ("BLA") entered into a business relationship to develop a suite of your-oriented baseball services on webites operated by MLB and certain affiliates (the "MLB parties"). During the parties' relationship, BLA provided certain confidential information (principally a binder of documents turned over at a meeting, which BLA alleged the MLB parties used to develop a competing product. The binder was returned, but BLA alleged that the information in it was kept and used. BLA asserted a series of claims, including a cause of action for conversion.

In dismissing BLA's conversion claim, Justice Kornreich held that BLA had not alleged and could not allege that it had been deprived of its ability to exercise at least some of its ownership rights in the subject property. *Id*. at *3. In reaching this conclusion and dismissing the conversion claim, Justice Kornreich explained that:

> BLA was not deprived of its ability to use its confidential information, it has not stated a claim for conversion. There is no controlling authority that suggests that a defendant may be held liable for conversion if it wrongfully possesses a copy of documents when the originals are in plaintiff's possession. In such a case, there simply is no derogation of plaintiff's ability to access or exploit its property.

Id. at *5.

In reaching this conclusion, Justice Kornreich distinguished the Court of Appeals decision in *Thyroff*. The records in *Thyroff* consisted of personal files that had been stored on a computer that Thyroff had leased from Nationwide Insurance. When the computer lease ended,

15

Nationwide took possession of the computer and refused to give Thyroff access to the records. Thyroff claimed that the records could not be replaced. *MLB,* at *3. In contrast, BLA could "not allege[] that [it was] deprived of access to [its] information." *Id*. ("*Thyroff* did not purport to abrogate the requirement that plaintiff plead interference [to] its rights in the converted property" citing *Hyperlync Techs, Inc. v. Verizon Sourcing LLC,* 2016 WL 42721 (Sup. Ct. N.Y. Cty 2015)).

Broker Genius' claims suffer the same infirmities as BLA's claims in the *MLB* decision. By its own admission, it is still actively marketing and deploying its Auto Pricer technology. The Defendants have not deprived or deleted Broker Genius' computer files. Thus, this case is distinguishable from *Thyroff*. As a result, Broker Genius has not been deprived of its technology and cannot demonstrate the requisite deprivation to support a conversion claim. *Id*. at *3; *see also Hyperlync Techs., Inc. v. Verizon Sourcing LLC, 2016 WL 642721 at *5 (Sup. Ct., NY Cty. 2015)("*Here, unlike in Sporn, Hyperlync does not allege that Defendants wrongfully possessed and denied them their right to a tangible piece of property. Rather, Plaintiffs allege that Defendants converted Hyperlync's 'intellectual property.' Even if the kind of data alleged to have been converted here, the Phone Cloner app materials, may be subject to a conversion claim, Plaintiffs have not alleged that they were deprived of access to their information. Thus, Plaintiffs conversion claim must be dismissed."); *Clark Street Wine and Spirits v. Emporos Sys. Corp.,* 754 F. Supp.2d 474, 484 (E.D.N.Y. 2010)("the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question … to the exclusion of the plaintiff's right"); *The Jones Group Inc. v. Zamaza,* 2014 WL 2472102 at *19 (N.Y. Sup. Apr. 9, 2014)(same).

16

### F.  Broker Genius' Tortious Interference With Business Relations Claim Fails

Broker Genius' fourth cause of action attempts to assert a claim for tortious interference with business relationships.  To prove such a claim, Broker Genius must establish the following elements:  (a) a business relationship with a third-party; (b) that the Defendants' interfered with those business relationship; (c) the Defendants acted with the sole purpose of harming Broker Genius or was using wrongful means; and (d) the Defendants' actions resulted in injury to Broker Genius' business relationships.  *See Guard–Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1990); Carvel v. Noonan, 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004)*; *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc., 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996))*.  "Wrongful means" include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.  Wrongful means does not, however, include persuasion alone although it is knowingly directed at interference with a contract.  *See Guard-Life,* 50 N.Y.2d at 191.

Moreover, as the Court of Appeals explained in *Carvel*:

> the existence of competition may often be relevant because it provides an obvious motive for defendant's interference other than a desire to injure the plaintiff.  Competition by definition, interferes with someone else's economic relations.  Where the parties are not competitors, there may be a stronger case that the defendant's interference with the plaintiff's relationships was motivated by spite. But, as long as the defendant is motivated by legitimate economic self-interest, it should not matter if the parties are or are not competitors in the same marketplace.

*Carvel, 3 N.Y.3d at 191.*

As the Court of Appeals explained in *NBT Bancorp. Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614 (1996)*, tortious interference can take many forms, with the degree of

protection available being defined by the plaintiff's enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior. Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant.  *Id.* at 621 (citing cases).  The phrase "more culpable" has been interpreted as conduct on the part of a defendant that rises to the level of a crime or an independent tort.  "Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations" unless an exception to the general rule is applicable such as a situation in which the defendant engaged in conduct "for the sole purpose of inflicting intentional harm on plaintiffs." *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 190 (2004)*; NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,* 215 A.D.2d 990, 628 N.Y.S.2d 408 (3rd Dept. 1995)*, aff'd,* 87 N.Y.2d 614, 641 N.Y.S.2d 581 (1996).  Broker Genius' claims cannot satisfy these standards under any scenario.

Broker Genius' Second Amended Complaint, however, does nothing more than recite the elements of such a claim by stating in paragraph 80 that "[u]pon information and belief, Defendants' conduct was motivated solely by malice and/or to inflict injury on Broker Genius by unlawful means."  That unlawful means is nothing more than offering the competing website seatscouts.com.  Cmp. ¶78.4 and there are no allegations that the Defendants induced Broker

---

[4]Broker Genius does not assert that Defendants induced any Broker Genius clients to breach their contracts with Broker Genius.  That is a separate and distinct tort with different standards not applicable here. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183 (1980).  A plaintiff alleging tortious interference with business relations must show more culpable conduct on the part of a defendant than is required in a tortious interference with contract claim.  *Id.* at 621.

Genius' clients to breach existing contracts.  Casting an incantation built around the magic words of a tortious interference with business relations claims, however, does not discharge the pleading requirements under *Iqbal* and *Twombly*.  Broker Genius' claim does nothing more than recite the elements of a tortious interference claim and is utterly devoid of any facts that would justify a tortious interference with business relations claim.

The New York Court of Appeals decision in *Carvel Corp. v. Noonan,* 3 N.Y.3d 182 (2004), which rejected a claim of tortious interference with business relations, is particularly instructive.  In the *Carvel* matter, several Carvel franchisees sued in federal court complaining of the distribution of Carvel's products through supermarkets that competed with the franchisees.  Juries awarded damages to three of the franchisees on tort and contract claims, and Carvel appealed to the United States Court of Appeals for the Second Circuit.  That court certified the question of whether the franchisees had a valid tort claim for "interference with prospective economic relations."  The case arose from Carvel's decision in the early 1990s to start distributing its products in supermarkets as well as its traditional franchised store system.  Prior to this shift in focus, Carvel repeatedly told its franchisees that it had no plans to sell through supermarkets.  Carvel, however, changed its mind after a decline in sales.

To stem that tide, it adopted a "supermarket program."  That program called for sales to supermarkets by Carvel and by those franchisees that opted to take part in the program, with franchisees required to pay substantial license fees and to upgrade their stores to participate.  Most franchisees chose not to participate and from 1993 to 2000 as the supermarket program grew rapidly, many franchised stores went out of business.  Id. at 187.  The franchisees argued that Carvel's supermarket program was harmful to them on its face, and that the harm was exacerbated by the means of implementation, which included selling to supermarkets at bargain

19

prices, issuing coupons to customers that could be redeemed at supermarkets but not at the franchisees' stores, and printing those coupons on bags that Carvel required the franchisees to use in their stores. The franchisees and their expert witnesses testified that the supermarket program was not "consistent with the customary practices and standards in the franchise industry." *Id*.

The Court of Appeals rejected the franchisees claims of tortious interference with business relations finding that the franchisees failed to demonstrate that Carvel's conduct was criminal or independently tortious "for the sole purpose of inflicting intentional harm on plaintiffs." *Carvel*, at 190 (citing *NBT Bancorp Inc.*, 215 A.D.2d at 990). Rather, the Court of Appeals found that Carvel's motivation in interfering with the franchisees' relationships with their customers was normal economic self-interest. "Carvel wanted to reverse a period of business declines and make itself more profitable. It was not acting to hurt the franchisees; indeed, one of the franchisees' prize pieces of evidence is a statement of a Carvel executive, in colorful terms, that he was completely indifferent to the franchisees' fate." *Id*.

Broker Genius' claims are no different than the claims in *Carvel*, and Broker Genius' Second Amended Complaint is devoid of any allegations that would support its tortious interference claim. There are no allegations that the Defendants employed "wrongful means" or engaged in "culpable" conduct that would rise to the level of criminal conduct or was independently tortious. Broker Genius does not allege that the Defendants drove away any Broker Genius' customers by acts of physical violence nor do they allege that were lured away by fraud or misrepresentation. Similarly, there are no allegations that Defendants (unlike Broker Genius) harassed Broker Genius' customers with meritless litigation. These are the types of conduct that support a claim of tortious interference with business relations, and Broker Genius

has not, and cannot, assert a plausible theory to assert such a claim.  *Carvel*, 3 N.Y.3d at 192; *Guard-Life*, 50 N.Y. 2d at 191.  Accordingly, Broker Genius' tortious interference claim should be dismissed with prejudice.

### G.  Broker Genius's Unjust Enrichment Claim Must Be Dismissed

In its Fifth Cause of Action, Broker Genius' attempts to allege a claim for unjust enrichment by attempting to frame its harm in equitable terms.  To that end Broker Genius argues that Defendants "have been unjustly enriched to the detriment of Broker Genius' business expectancies" and "[t]he circumstances surrounding Defendants' acts are such that equity and good conscience require the disgorgement of Defendants' profits and a full restitution to Broker Genius for their unjust enrichment.  Cmp. ¶¶ 87, 91.  New York law, however, prohibits a plaintiff from maintaining an unjust enrichment claim that "simply duplicates, or replaces a conventional contract or tort claim."  *Corsello v. Verizon N.Y., Inc.,* 18 N.Y.3d 777, 790 (2012).

Despite the apparent breadth of the elements of an unjust enrichment claims, its availability is limited.  As the Court of Appeals explained in Corsello:

> [U]njust enrichment is not a catchall cause of action to be used when others fail.  It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.  Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.  An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.

*Id*. (citations omitted).  This case does not present one of those "unusual situations."

First, to maintain an unjust enrichment claim, it must be the case that Defendants received something of value that rightfully belongs to Broker Genius—in this instance the alleged value of what it describes as its proprietary technology.  But, Broker Genius

21

simultaneously asserts that the only way Defendants obtained access to the technology was by Defendant Gainor signing up for a trial program on the Broker Genius website and agreeing to Broker Genius' Terms of Use.  This claim "necessarily sounds in contract," and should be dismissed as duplicative of Plaintiffs' breach of contract claim.  *Galopy Corp. Int'l v. Deutsche Bank, AG,* No. 151766/2015, 2016 WL 4398456, at *18 (Sup. Ct., N.Y. Cty. Aug. 18, 2016) (finding unjust enrichment claim "rise[s] and fall[s] with the alleged oral agreement" because "if [plaintiff's] contract is not proven, there is no basis for a reasonable finder of fact to conclude that equity mandates the $6 million be disgorged to [plaintiff]"), *aff'd,* 150 A.D.3d 416 (1ˢᵗ Dep't 2017).[5]

### H. Broker Genius's Breach of the Implied Covenant of Good Faith and Fair Dealing Must Be Dismissed.

Broker Genius' breach of the implied covenant of good faith and fair dealing claim as reflected in its Sixth Cause of Action must be dismissed because it is duplicative of the breach of contract cause of action Broker Genius asserted in its First Cause of Action.  It is well settled that New York law does not "recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Acc. Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002).  Thus, whereas here, a complaint alleges both a breach of contract and a breach of the implied covenant of good

---

[5] *See also Paulino v. Conooco, Inc.,* No. 14-cv-5145, 2015 WL 4895234, at *4 (E.D.N.Y. Aug. 17, 2015) (dismissing unjust enrichment claim where court could "conceive of no circumstance in which plaintiffs' breach of warranty claim would fail yet they still would be entitled, in equity and good conscience, to restitution from [defendant]"); *Bazak Int'l Corp. v. Tarrant Apparel Grp.,* 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) (dismissing unjust enrichment claim where plaintiff found "itself in a 'catch22'" because "[i]f a valid, enforceable contract existed between the parties, then [plaintiff] failed to state a claim for relief under the theory of unjust enrichment because, absent a contract, the benefit [defendant] garnered … was not at [plaintiff's] expense"); *Rivkin v. Coleman,* 978 F. Supp. 539, 544 (S.D.N.Y. 1997) (dismissing unjust enrichment claim because, in absence of partnership, there was "nothing unjust about any purported enrichment"); *Benham v. eCommission Sols.,* LLC, 118 A.D.3d 605, 607 1ˢᵗ Dep't 2014)("Plaintiff's unjust enrichment claim, which seeks precisely the same damages as her claim for breach of contract is indistinguishable from her claim for breach of contract."  (alterations and internal quotations omitted)); *Andrews v. Cerebrus Partners,* 271 A.D.2d 348 (1ˢᵗ Dept. 2000) (affirming dismissal of unjust enrichment claim "indistinguishable from the breach of contract claim.").

faith and fair dealing based on the same facts and seeks the same relief, the latter claim will be dismissed as redundant. *JFK Holding Co. LLC v. City of New York,* 98 A.D.3d 273 (1st Dept. 2012); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 87 A.D.3d 287 (1st Dept. 2011); *Logan Advisors, LLC v. Patriarch Partners, LLC,* 63 A.3d 440, 443 (1st Dept. 2009). Accordingly, the Court should dismiss Broker Genius' Sixth Cause of Action as being of its breach of contract claim.

### I.   Broker Genius Fails to Allege a Claim for Attorney's Fees

New York follows the so-called "American Rule" that a litigant is "not … allow[ed] … to recover damages for the amounts expended in the successful prosecution or defense of its rights." *Mighty Midgets, Inc. v. Centennial*, 47 N.Y.2d 12, 21-22 (1979). In New York, the right to recover attorneys'' fees "must be statutory or contractual." *See Hopper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 491 (1989) (an award of attorneys' fees to the prevailing party in a litigation must be "authorized by agreement between the parties, statute or court rule."). Broker Genius has not and cannot allege either a statutory or a contractual right. Its causes of action are all based on common law theories and there is statutory basis to recover attorney's fees under those theories. Moreover, while Defendants Drew Gainor, Guinio Volpone, and Event Ticket Sales dispute that Drew Gainor agreed to Broker Genius' Terms of Use, there can be no dispute that the Terms of Use do not provide for the recovery of attorney's fees in a dispute such as this. Accordingly, Broker Genius' demand for attorney's fees should be stricken with prejudice.

### J.  Broker Genius Fails to Allege a Claim for Punitive Damages

Similarly, and consistent with Broker Genius' extreme over reach is its generic demand for an award of punitive damages in the ad damnum clause to the Second Amended Complaint. The availability of punitive damages under New York law is severely limited and is expressly prohibited in breach of contract causes of action absent a showing of fraud evincing a "high degree of moral turpitude, and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations."  *Rocanova v. Equitable Life Assurance Society of the United States,* 83 N.Y.2d 603, 614 (1994).  As the Court of Appeals explained in *Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 358 (1976) the purpose of punitive damages "is not to remedy private wrongs but to vindicate public rights."  Thus, to be entitled to recover punitive damages, "a private litigant 'must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.'"  *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.,* 127 A.D.3d 48, 57 (1st Dept. 2015).

Based on these standards, it is readily apparent that Broker Genius' Second Amended Complaint is devoid of any allegations that would support an award of punitive damages. Accordingly, Broker Genius' demand for punitive damages should be stricken with prejudice.

## CONCLUSION

In light of the foregoing, Defendants respectfully request that their Motion to Dismiss be granted in its entirety.

Dated:  New York, New York
        March 15, 2018

NESENOFF & MILTENBERG, LLP
*Attorneys for Defendants*


By:/s/ *Andrew T. Miltenberg*
   Andrew T. Miltenberg
   Stuart Bernstein
   Jeffrey S. Berkowitz
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500