UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------

BROKER GENIUS, INC.

                                        Plaintiff,

        -against-                                              17-cv-8627 (SHS)

GUINIO VOLPONE, RAY VOLPONE,                                   <u>OPINION & ORDER</u>
DREW GAINOR, STUART GAINOR,
VOLPONE SOFTWARE LLC, GAINOR
SOFTWARE LLC, SEAT SCOUTS LLC, and
EVENT TICKET SALES LLC

                                        Defendants.

--------------------------------------------------------------

SIDNEY H. STEIN, U.S. District Judge.

    Broker Genius is a technology company serving ticket brokers on the
secondary ticket market.  Its product, AutoPricer v.3 ("AutoPricer"), is a web
application that enables secondary-market ticket brokers to dynamically and
automatically price their inventory of tickets.  Through contractual Terms of
Use, Broker Genius customers are granted a conditional license to use the
AutoPricer application.  Defendant Drew Gainor, a former Broker Genius
customer, is the cofounder of defendant Seat Scouts LLC ("Seat Scouts"),
whose Command Center product competes with AutoPricer.  Broker Genius
has sued Gainor, Seat Scouts, and others, alleging that Gainor improperly and
in violation of the Terms of Use used the knowledge and information he
gained while he was a Broker Genius customer to develop Command Center.

    Broker Genius now moves pursuant to Federal Rule of Civil Procedure
65 to preliminarily enjoin defendants from using and selling Command
Center.  Broker Genius grounds its motion in its claims for breach of contract
and unjust enrichment.

    For the reasons set forth below, the Court finds that the Terms of Use,
which Gainor entered into, prohibited him from creating a product that was
derived from AutoPricer, and that Broker Genius is likely to prevail on its

claim that Gainor breached that contract when he developed Command Center by deriving it from AutoPricer. The Court also finds that Broker Genius will suffer irreparable harm if an injunction does not issue. Accordingly, Broker Genius's motion for a preliminary injunction is granted.[1]

# I. PROCEDURAL HISTORY

## A. Related Cases

Prior to instituting this action, Broker Genius brought two other actions making substantially identical claims against two other companies: NRZ Entertainment LLC and Select Seats LLC.

In the first action (the "NRZ" action), Broker Genius sought a preliminary injunction based on its trade secrets claim alone. *See Broker Genius, Inc. v. Zalta et al.*, 280 F. Supp. 3d 495, 510, 511 n.6 (S.D.N.Y. 2017). A TRO issued on March 23, 2017, and a preliminary injunction hearing was held over the course of three days in June, resulting in a denial of the preliminary injunction and a finding that Broker Genius had not sufficiently maintained the confidentiality of its secrets so as to enable it to benefit from trade secret protection. *Id.* at 498. At the same time, the Court noted that the facts of that case very strongly suggested that the defendants there had breached the contractual user agreements. *Id.* at 510-13. Shortly after that Opinion issued, the parties in the NRZ action resolved all of the claims. *See* Stipulation of Dismissal with Prejudice, Broker Genius, Inc. v. Zalta et al., No. 17-Cv-2099, Jan. 10, 2018, ECF No. 172.

In the second action, a TRO issued against Select Seats LLC on November 8, 2017. Order to Show Cause for Prelim. Inj. and TRO, Broker Genius, Inc. v. Berry et al., No. 17-Cv-8511, Nov. 8, 2017, ECF No. 10. The parties stipulated to dismiss that action shortly thereafter. Stipulation of Dismissal with Prejudice, Broker Genius, Inc. v. Berry et al., No. 17-Cv-8511, Nov. 22, 2017, ECF No. 25.

---

[1] In reaching its conclusions, the Court did not consider Broker Genius's submissions which were the subject of defendants' letter dated January 12, 2018. (ECF Nos. 103-06.)

## B. This Action

This action was initiated against Drew Gainor and Seat Scouts LLC on November 7, 2017. Gainor is the cofounder of Seat Scouts LLC, a Nebraska limited liability company that came into existence in March of 2017, shortly after Gainor stopped using Broker Genius's product. (Second Amended Complaint ("SAC") ¶¶ 12, 43, ECF No. 108.) Gainor maintains an ownership interest in Seat Scouts through a chain of entities. (SAC ¶¶ 8, 12.) Through two amended complaints, Broker Genius added six defendants.[2] (*See* SAC; First Amended Complaint, ECF No. 43.)

The current complaint asserts the following claims: (1) breach of contract (as to defendants Gainor, Guinio Volpone, and Event Ticket Sales LLC); (2) unfair competition; (3) conversion; (4) tortious interference with business relationships; (5) unjust enrichment; and (6) breach of the implied duty of good faith and fair dealing (as to defendants Gainor, Volpone, and Event Ticket Sales).[3] (SAC ¶¶ 55-100.)

After hearing argument from all parties, the Court issued a TRO on November 9, 2017. (Order to Show Cause for Prelim. Inj. and TRO ("Order to

---

[2] The defendants added are: Guinio Volpone, Ray Volpone, Stuart Gainor, Volpone Software LLC, Gainor Software LLC, and Event Ticket Sales LLC. Gainor Software LLC and Volpone Software LLC are fifty percent co-owners of Seat Scouts LLC, registered in Nebraska; Drew and Stuart Gainor are fifty percent co-owners of Gainor Software LLC, registered in North Carolina; Guinio and Ray Volpone are fifty percent co-owners of Volpone Software LLC, registered in Nebraska; and Guinio Volpone is the owner of Event Ticket Sales, LLC, a Nebraska limited liability company that employs Gainor. (SAC ¶¶ 8-15.) Broker Genius is a Delaware corporation with a principal place of business in Valley Stream, New York. (SAC ¶ 3.)

[3] The Court has supplemental subject matter jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(a), because the original complaint asserted claims arising under federal law. (*See* Complaint, ECF No. 1.) The federal claims were voluntarily dismissed, (*see* Stipulation, Feb. 20, 2018, ECF No. 109), but not until after the preliminary injunction motion was fully briefed and a hearing had taken place over the course of five days. Accordingly, in the interest of "fairness [and] judicial efficiency," the Court shall exercise its supplemental jurisdiction over the remaining, state law claims. *Mauro v. S. New England Telecomms., Inc.*, 208 F.3d 384, 388 (2d Cir. 2000); *see* 28 U.S.C. § 1367(c)(3).

Show Cause"), Nov. 9, 2017, ECF No. 8.) The TRO did not enjoin defendants from marketing or selling their product, but it did enjoin them from violating the contractual Terms of Use. (*Id.* at 2-3.)

Broker Genius now moves for a preliminary injunction; that motion is expressly based on its breach of contract and unjust enrichment claims. (*See generally* Pre-Hr'g Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Pre-Hr'g Mem."), ECF No. 72; Post-Hr'g Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Post-Hr'g Mem."), ECF No. 90.) A fact hearing on this motion was held over the course of five days in December 2017 and January 2018, during which the parties proffered witnesses and documentary evidence. The Court's findings of fact and conclusions of law are as follows.

## II. BACKGROUND

### A. Broker Genius's Lengthy and Expensive Development of AutoPricer

The Court summarized Broker Genius's history and development of AutoPricer in its opinion in the NRZ action:

> Broker Genius, Inc., is a software company that specializes in developing software products and services to help automate the pricing of tickets in secondary markets. The secondary market for tickets for sporting events, concerts, and theater performances is a multi-billion dollar industry in which ticket brokers purchase tickets from ticket sellers (e.g., Ticketmaster) in the primary market and then resell to consumers through online exchanges (e.g., StubHub).
>
> Broker Genius was founded in 2013 by Shmuel ("Sam") Sherman, who had previously worked as a ticket broker on the secondary market and currently serves as the company's CEO. Sherman testified that he started Broker Genius in order to build a software product that would allow brokers to "implement the strategies" they had already been using to price tickets manually, but "within a user interface in which the user could engage . . . with the software dynamically and

have the ability to change [his or her] strategy very quickly." Sherman recognized that brokers did not only need an automatic pricing solution, but that they also needed a user interface that would enable them to efficiently "analyze the market" in order to define and price their inventory against comparable listings. At the time of Broker Genius's founding in 2013, no other software offered these capabilities.

Sherman and plaintiff's expert, Dr. Eric Koskinen, testified that because Broker Genius was creating a type of product that did not already exist in the marketplace, it spent considerable time creating its own roadmap for the functions the software should perform and refining its user interface through trial and error and responses to customer feedback. Accordingly, Broker Genius created multiple iterations of its product over the course of two years; it released the first version in September 2013 and did not launch the version at issue in this case—AutoPricer v.3—until July 2015. This development process necessitated an investment of over $4 million.

*Zalta*, 280 F. Supp. 3d at 499 (citations omitted).

Broker Genius generates its revenue based on the volume of sales its users price through AutoPricer. (Ellman Test., Prelim. Inj. Hr'g Tr. ("Tr.") 66-67, ECF Nos. 93-102; Sherman Test., Tr. 305-06; Email from Gainor to Ellman at 5, May 27, 2016, PX-97.) As of the preliminary injunction hearing, Broker Genius had approximately 170 clients. (Sherman Aff. ¶ 20, ECF No. 72, Ex. 1.)

**B.   The Contract at Issue: The Terms of Use**

Broker Genius requires that each of its users assent to its contractual terms of use when the user creates an account. Two versions of the terms of use are at issue in this case – the first is the version that was effective in May of 2016 (the "Original Terms of Use," PX-3), and the second is the version that became final on June 6, 2016 (the "Updated Terms of Use," PX-15). According to Broker Genius, new users were not able to register as customers

and obtain access to AutoPricer unless they ticked a checkbox assenting to the Original Terms of Use on the Broker Genius website during the registration process. (Sherman Aff. ¶¶ 13, 15.) Existing Broker Genius customers were subsequently asked to assent to the Updated Terms of Use beginning on July 7, 2016. (Sherman Test., Tr. 289.) After that date, users were confronted with a pop-up dialog box each time they would log in to the site, which required them to assent to the Updated Terms of Use in order to use AutoPricer. (Ellman Test., Tr. 63-64; Sherman Test., Tr. 290.)

The Original Terms of Use and the Updated Terms of Use are identical in all respects relevant to this litigation. Accordingly, this Opinion refers simply to the "Terms of Use" except where the distinction is relevant. The Terms of Use contain a section titled "Ownership of Data, Content and Grant of Conditional License," which provides in relevant part as follows:

> We [i.e., Broker Genius] grant you a limited, conditional, no-cost, non-exclusive, non-transferable, non-sub-licensable license to view or use this Site or Apps and its Content as permitted by these Terms, as a condition precedent, you agree that you will not:
>
> . . .
>
> Reproduce, modify, display, publicly perform, distribute or create derivative works of the Site or Apps or the Content; . . . .

(Terms of Use at 3-4.)[4]

---

[4] "Content" is defined under the Terms of Use as: "The Site or Apps and all data, text, designs, pages, print screens, images, artwork, photographs, audio and video clips, and HTML code, source code, or software that resides or is viewable, submitted or otherwise discoverable on the Site or Apps." (Terms of Use at 3.) "Site, Services or Apps" is defined under the Terms of Use as: "[T]he Broker Genius Site, related websites, applications, mobile platforms, services, tools, modules, integrated application sites and remote services, servers, and services residing on servers owned and/or operated by third parties." (Terms of Use at 1.) As relevant here, the "Site or Apps and its Content" is Broker Genius's AutoPricer product.

The contractual provision at issue in this case is the explicit prohibition against "distribut[ing] or creat[ing] derivative works of" AutoPricer.

### C.   Gainor's Prior Knowledge and Experience in the Industry

Defendant Drew Gainor testified that he had eighteen years of experience in the ticket industry, beginning in college when he started a business called Source4tickets.com.  Source4tickets had five or six employees and various websites that sold tickets.  (Gainor Test., Tr. 383.)  Gainor continued building Source4tickets after he graduated in 2003, and also began developing a product called Concierge Live, a platform that, according to Gainor, is "currently used by Fortune 500 companies to manage their tickets."  (Gainor Test., Tr. 384.)

Around August 2006, Source4tickets merged into National Event Company, where Gainor continued to oversee the development of Concierge Live, and also built the first website for Ultimatefan.com, a website that sold "fan experiences and travel," according to Gainor.  (Gainor Test., Tr. 385-86.)

Gainor testified that he left National Event Company and started Ticket Evolution around 2010 to develop products "on behalf of the ticket industry." (Gainor Test., Tr. 386-87.)  At Ticket Evolution, Gainor "had [his] hand in everything," and worked on two specific Ticket Evolution products:  Core, and an "auto-uploader."  (Gainor Test., Tr. 387-88, 390-97, 429-30.)

Around March of 2015, Gainor left Ticket Evolution and, after "decompressing," took a job with defendant Event Ticket Sales, a ticket brokerage company, to help expand its ticket inventory.  (Gainor Test., Tr. 428-29.)  As of the date of the preliminary injunction hearing, Gainor was still employed by defendant Event Ticket Sales.  (Gainor Test., Tr. 429.)

### D.   Gainor's Relationship with Broker Genius

On May 23, 2016, Gainor contacted Sherman via LinkedIn, seeking information about becoming a Broker Genius customer.  (LinkedIn Conversation Between Gainor and Sherman, May 23, 2016, PX-125; Gainor Test., Tr. 465.)  At that time Gainor was working as a ticket broker with Event Ticket Sales.  (Gainor Test., Tr. 428-29.)

Sherman replied to Gainor's LinkedIn message immediately, and they agreed that Zak Ellman, Broker Genius's Vice President of Sales, would follow up with Gainor. (LinkedIn Conversation Between Gainor and Sherman.) Gainor subsequently signed up for a free 30-day trial with Broker Genius on May 26, 2016, during a phone call with Alex Berrick, then Broker Genius's Customer Success Coordinator. (Email from Gainor to Ellman at 3, PX-97; Berrick Test., Tr. 138.)

Broker Genius alleges – but defendants dispute – that Gainor assented to the Terms of Use when he registered on May 26, 2016. Although all users were required to accept the Terms of Use in order to register, Gainor alleges that his registration was in fact completed by Broker Genius's Berrick during their phone call – that is, that Gainor provided Berrick with his registration information (e.g. name, email, password) over the telephone, and Berrick completed the registration process on Gainor's behalf, including assenting to the Terms of Use. (Gainor Test., Tr. 467.) Although no Broker Genius witness could specifically recall how Gainor registered, their consistent testimony was that Gainor's explanation was inconsistent with important company policy and training. However, a time stamp that recorded Gainor's purported assent and a simultaneous auto-generated email failed to rebut Gainor's explanation, as Sherman admitted that these would have been the same even if it were Berrick who actually entered Gainor's email address and ticked the box assenting to the Terms of Use. (Sherman Test., Tr. 344.) The Court need not, and does not, decide whether Gainor accepted the Terms of Use in May of 2016, because it finds that, in any event, he did accept them two months later. (*See infra*, § V.A.)

Gainor began using AutoPricer shortly after he registered, and he continued using it to price tickets until at least the end of 2016. (Sherman Test., Tr. 304-05, 359-60; Gainor Test., Tr. 453, 455.) At a minimum, Gainor used AutoPricer during those seven months to price his inventory of Minnesota Vikings tickets. (Gainor Test., Tr. 425.)

During this period, Broker Genius asked its customers to assent to the Updated Terms of Use. (Sherman Test., Tr. 289.) Broker Genius alleges – and defendants again dispute – that Gainor assented to the Updated Terms of Use on July 7, 2016. (Ellman Test., Tr. 65.) At the hearing, defendants did not

offer any proof in support of their position, and in fact Gainor was able to continue using AutoPricer after the July 7 update. (Gainor Test., Tr. 424-25, 453.)

Gainor made no further use of AutoPricer in 2017, (Sherman Test., Tr. 304-05; Gainor Test., Tr. 455), although he was still able log in to and view his account until April 27, 2017, when it was disabled, (Sherman Test., Tr. 304-05, 359-60).

### E. Defendants' Development of Command Center

Gainor concedes that the idea to develop an autopricer came to him as a direct result of his experience as a Broker Genius customer who used the AutoPricer product. (Gainor Test., Tr. 436.) According to Gainor, this idea came to him in early January 2017, and he began to lay out a "first draft" of his ideas for an autopricer in a digital notepad. (Gainor Test., Tr. 435; *see* Gainor Evernote titled "Auto-Pricer," Jan. 8, 2017, PX-18.) On January 8, 2017, while he still had the license to use Broker Genius's AutoPricer, he emailed his business partner, defendant Guinio Volpone, that he "want[ed] to build [an autopricer] more than ever! After this weekend, I think we can build the best pricing view/Auto pricer in the industry!" (Email from Gainor to Volpone, Jan. 8, 2017, PX-11.) The next week, Gainor was sketching mockups and creating coding tasks in a project management tool. (Gainor wireframes, Jan. 15, 2017, PX-19; Gainor Pivotal Tracker entries, Jan. 14-15, 2017, PX-145.)

At some point in 2016, talks had developed between Gainor and a company called Seat Metrics about a potential partnership to develop a separate autopricing product that Seat Metrics was already developing (Gainor Test., Tr. 486:24-25), and which Gainor had been beta testing since September of that year (Email from Panzer to Gainor, Sept. 18, 2016, PX-9). On February 10, 2017, Gainor turned down the proposed partnership, explaining that he was "working on a suite . . . that is way more than an auto-pricer." (Email from Gainor to Volpone, Feb. 10, 2017, PX-10.)

By late February of 2017, Gainor was talking about hiring an engineer to begin writing code for an autopricer product (Email from Sosinski to Gainor, Feb. 27, 2017, PX-51), and in March, Gainor and Volpone incorporated Seat

Scouts LLC (Gainor Test., Tr. 487), presumably as the vehicle to market and profit from Command Center. According to Gainor, coding began on May 31 or June 1, 2017 (Gainor Test., Tr. 422, 543), and they had an initial version of Command Center up and running within a few weeks (Gainor Test., Tr. 434).

Approximately one month later, Seat Scouts posted information about its forthcoming autopricer product on its website, and announced it in a marketing email blast. (Email from Panzer to Gainor, July 13, 2017, PX-12; Email from Brett to Sherman, July 13, 2017, PX-89; Gainor Test., Tr. 423.) From September to the middle of October, the product was in beta testing (Gainor Test., Tr. 423, 443, 551), and Command Center was officially launched during a webinar on November 1, 2017, (Gainor Test., Tr. 551-52).

###   F.   Similarities and Differences Between Plaintiff's AutoPricer and Defendants' Command Center

Broker Genius and defendants both retained well-credentialed experts to review AutoPricer and Command Center and render an opinion at the preliminary injunction hearing as to whether defendants derived their product from AutoPricer. In his written report, Broker Genius's expert, Dr. Eric Koskinen, concluded that "it is highly likely that software architectures/components within Command Center were derived from software architectures/components within AutoPricer v3." (Expert Report of Prof. Eric Koskinen ("Koskinen Report") 5, Dec. 13, 2017, PX-16.) Unsurprisingly, defendants' expert, Marina Martin, came to the opposite conclusion in her written report: "Command Center . . . did not originate, in whole or in part, from AutoPricer v3, and in fact many of the alleged derivations are the result of common industry knowledge and/or common technology best practices and patterns." (Report of Marina Martin ("Martin Report") 4, Dec. 15, 2017, DX-Q.)

Dr. Koskinen found that AutoPricer and Command Center are markedly similar in numerous respects, and grouped the similarities into two categories. First, he found that both have an overall architecture and a User

Interface/User Experience ("UI/UX")[5] that are optimized for secondary-market ticket brokers to price their tickets dynamically and automatically through the creation of pricing rules. (Koskinen Report 12; *see also id.* at 7 ("These systems are dynamic in that they react to changing market conditions and they are automatic in that they can change ticket prices without requiring the user to continually specify the new price.").) The overall architecture that is common to both products consists of a web-based application that acts as an intermediary between point-of-sale ticket inventory systems ("POS" systems) and ticket exchange systems, applying dynamic automatic pricing rules.

The UI/UX that is common to both products consists of a "cascading flow of widgets" that enables users to create, monitor, and update the dynamic automatic pricing rules. (Koskinen Report 12.) At the preliminary injunction hearing, the Court observed Dr. Koskinen's demonstration of the "cascade" that a user proceeds through when creating the user's individualized pricing rules in AutoPricer and Command Center. In both products, the user begins by selecting from a list of ticketed events. That allows the user to view her or his current inventory of tickets to that event, and select the ticket for which the user will create a pricing rule. The user can also select a group of tickets or a season ticket so as to create a rule that will apply to multiple tickets at once. Next, the user navigates to a particular zone, section, and row within the event venue[6] to select one or more reference tickets – called "comparables," or, more colloquially, "comps" – to compete against. The pricing rule will refer to the comps in setting the price of the user's ticket.[7]

---

[5] According to Dr. Koskinen, UI/UX describes, collectively, "the way [an] application operates and interacts with [a] user." UI describes "the entirety of the interactions between the user and the software application," including the application's "look-and-feel." UX describes how a user feels about whether an application "suits [the user's] needs and . . . permits [the user] to accomplish [a] desired task." (Koskinen Report 6-7.)

[6] In both Command Center and AutoPricer a user has the option of selecting the zone, section, and row, by clicking on an interactive map – although the way a user engages with the map is slightly different in each product (clicking in AutoPricer versus hovering in Command Center). (Martin Test., Tr. 577-78.)

[7] Ticket brokers in the secondary market use "comps" to set pricing because no two tickets are exactly alike – "you're selling a particular seat in a particular venue on a

Finally, the user sets the criteria by which the pricing rule will dynamically and automatically set the ticket price, based on the designated comps and other criteria such as "splits."[8]  (*See* Koskinen Test., Tr. 174-212; Koskinen Report, Exs. C & D; Martin Report 16-23.)

In the second category of similarities, Dr. Koskinen found that the individual widgets within the cascade are similar.  More specifically, he found that both products consist of essentially the same collection of six components – the "widgets" – and that the components interrelate with each other and with external systems in essentially the same way, and also have internal characteristics that are substantially similar.  (Koskinen Report 14.)  As defined by Dr. Koskinen, these components are: (1) Events List Widget, (2) Inventory List Widget, (3) Zones/Sections/Rows Widget, (4) Price By Comps Widget, (5) Seasons Widget, and (6) Groups Widget.  (Koskinen Report 14-23.)  In both products, the Events List Widget displays the name, date and time, venue, and number of tickets in the user's inventory, and also permits the user to search the list using terms and filters; Command Center has additional information such as event tags, number of rules, and cost.  The other widgets have essentially comparable similarities and differences across the two products.

Together, these widgets interoperate "to combine data from multiple sources . . . to allow users to create rules for dynamic automatic pricing" through an effective UI/UX.  (Koskinen Report 14-15.)  In his report, Dr. Koskinen identified specific similarities in each widget's internal and inter-widget behavior.

Dr. Koskinen identified one additional similarity apart from the two categories: both products employ a particular means of addressing the "scalability" issue – that is, how to add more and more users and inventory without compromising the functionality of the product.  Scalability is of particular importance where, as here, the applications depend on their ability

---

particular date and nobody else has that seat for sale [in] that venue on that date." (Koskinen Test., Tr. 264-65.)

[8] "Splits" allow the user to designate what size blocks of tickets to compete against – for example, a rule might refer only to single tickets, or pairs of adjacent tickets, or four-packs, etc.  (Koskinen Test., Tr. 199.)

to communicate pricing updates to and from external systems, and such systems impose limits on the frequency with which external applications (such as AutoPricer and Command Center) can communicate with them. Furthermore, secondary ticket market brokers who cannot update their prices frequently enough to keep up with the market are at a competitive disadvantage.  (Koskinen Report 13.)

Here, both products address scalability the same way: They prioritize updates based on how soon the ticketed event will take place – that is, prices for a ticket to an event next week will update more frequently than prices for a ticket to an event next month.  Both products have essential elements in common, including that they sort their tickets into exactly four tiers depending upon how far away in days the event is, and those four tiers are set at comparable, albeit not identical, intervals.  (Koskinen Report 13.)

Ms. Martin found that the similarities identified by Dr. Koskinen are either innocent or immaterial – as discussed more fully below.  Primarily, defendants assert that the similarities are obvious, that they were known in the industry prior to or independent of Broker Genius's AutoPricer, or that they are attributable to Gainor's own industry experience.

In addition, Ms. Martin focuses on differences between the products, two of which merit discussion here.[9]  First, upon logging in to AutoPricer, a user views all of the widgets on a single screen.[10]  As the user continues to use AutoPricer, the widgets remain viewable in one place as the user navigates between the different widgets.  By contrast, a user who logs in to Command

---

[9] One additional difference that the Court does not find to be relevant is how the programs are coded, either through source code written in different programming languages, or through the integration of different open-source components.  (Martin Report 6, 8.)  This difference is not probative because there is no allegation that defendants accessed or utilized AutoPricer's source code.

[10] The whole screen might not be immediately visible, depending on the size of the user's computer display, but all of the widgets are immediately viewable by simply scrolling up or down.  (Koskinen Test., Tr. 253-54.)

Center views only the Events List Widget.[11]  As the user continues to use Command Center, each widget opens in a new screen that occupies the entire browser window, such that only one widget is viewable at a time.  (Martin Report 9-12; Martin Test., Tr. 576.)

Second, AutoPricer has separate Zones/Sections/Rows and Price By Comps Widgets, whereas Command Center integrates them into a single widget.  (Martin Report 40.)

### G. Defendants' Marketing and Sales of Command Center and its Impact on Broker Genius

Defendants market Command Center to an audience that includes the existing clients of Broker Genius.  (*See, e.g.*, Email from Brett to Sherman, PX-89.)  Broker Genius alleges that as a result, it has suffered five types of losses, all of which are attributable to the fact that in their view – and, allegedly, their customers' – Seat Scouts "offer[s] an identical product to [AutoPricer] at a fraction of the cost."  (Ellman Test., Tr. 67.)  User rates for Command Center are about a quarter of what they are for AutoPricer.  (Sherman Test., Tr. 301; Sherman Aff. ¶ 26.)

First, Broker Genius alleges that, as of the date of the preliminary injunction hearing, five to ten clients had left Broker Genius in favor of Seat Scouts.  (Ellman Test., Tr. 68; Sherman Test., Tr. 305; Sherman Aff. ¶ 24.)  Second, at least eight clients have shifted a portion of their inventory from AutoPricer to Command Center, reducing the total inventory they price with AutoPricer (Ellman Test., Tr. 67; Sherman Test., Tr. 305), thereby reducing Broker Genius's revenue, which is based on inventory volume.  Third, Broker Genius has had to renegotiate its pricing agreements with an unspecified number of clients in order to entice them to continue using AutoPricer and not Command Center.  (Ellman Test., Tr. 66, 72; BG-SS 4602-4604 ("Damages Chart") at 1, PX-87.)  Fourth, ten to fifteen prospective clients have opted against signing up with Broker Genius in favor of Seat Scouts, and other existing clients have opted not to deepen their engagement with Broker

---

[11] To be precise, a Command Center user has to first click "Command Center" after logging in to the Seat Scouts website.  (Martin Report 11-12.)  This is a trivial difference.

Genius. (Ellman Test., Tr. 66, 68, 73; Sherman Test., Tr. 305; Damages Chart at 2, PX-87; Sherman Aff. ¶ 24.) Fifth, Broker Genius's reputation and goodwill have suffered because of a resulting perception that Broker Genius "rip[s] [its customers] off" due to its higher prices, when in fact the reason that defendants are able to charge such low rates for Command Center is that they avoided significant development costs by improperly copying Broker Genius's product. (Sherman Test., Tr. 301-02; Sherman Aff. ¶¶ 25-27.)

According to Broker Genius, its losses continue to mount as defendants continue to market and license their product. (Sherman Test., Tr. 301.) According to Broker Genius, if the preliminary injunction enjoining defendants from marketing and selling Command Center is not granted, additional clients will enter the market with inexpensive copycat products improperly derived from AutoPricer, and that Broker Genius will be "out of business within a period of months." (Sherman Test., Tr. 306; Sherman Aff. ¶ 22.)

## III. STANDARD FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies" and courts have cautioned that it should be "used with great care." *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985). Injunctions "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc. et al.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

In the Second Circuit, "[a] party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (alteration omitted) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)); *see also Am. Civil Liberties Union v. Clapper et al.*, 785 F.3d 787, 825 (2d Cir. 2015);

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

## IV. IRREPARABLE HARM

"[I]rreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc. et al.*, 60 F.3d 27, 38 (2d Cir. 1995). Where an injury "can be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable injury may be found as a matter of law." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 426 (2d Cir. 2004) (quotation marks omitted).

Broker Genius seeks a preliminary injunction based on its breach of contract claim and its unjust enrichment claim. For the reasons that follow, the Court finds that Broker Genius has shown irreparable harm with respect to its breach of contract claim, but that it cannot show irreparable harm with respect to its unjust enrichment claim as a matter of law.

### A. Breach of Contract

Although "specific relief is not the conventional remedy for breach of contract," it is well accepted that certain breach of contract claims present a threat of imminent loss that cannot be compensated at trial, and so "there is certainly no ironclad rule against its use." *Register.com*, 356 F.3d at 404.

In particular, "irreparable harm through loss of reputation, good will, . . . business opportunities," or loss of customer relationships can justify injunctive relief on a breach of contract claim. *Register.com*, 356 F.3d at 404; *O.D.F. Optronics Ltd. et al. v. Remington Arms Co. et al.*, No. 08-Cv-4746, 2008 WL 4410130, at *8 (S.D.N.Y. Sept. 26, 2008); *see also Tom Doherty Assocs.*, 60 F.3d at 38 ("hold[ing] that a loss of prospective goodwill can constitute irreparable harm" justifying injunctive relief based on a breach of contract); *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 130 (S.D.N.Y. 2000) (finding that a "breach of contract . . . in a manner that is directly competitive with [plaintiff's] core . . . business . . . threatens imminent injury to the economic value of the goodwill and reputation associated with [plaintiff's] product," justifying injunctive relief); *Norcom Elecs. Corp. v. CIM USA Inc. et*

*al.*, 104 F. Supp. 2d 198, 209 (S.D.N.Y. 2000) (finding evidence of irreparable harm and granting preliminary injunction on breach of contract claim).

Broker Genius has credibly demonstrated that if an injunction does not issue, it will continue to incur loss of reputation, good will, business opportunities, and customer relationships. Specifically, Broker Genius affirms that existing customers and inventory have transferred their business to Seat Scouts, resulting in revenue losses; potential customers are choosing Seat Scouts over Broker Genius, resulting in lost opportunities for revenue growth; and a perception is developing in the industry that Broker Genius "rips off" its customers, resulting in losses to its reputation and good will. (*See* Ellman Test., Tr. 66, 68, 72-73; Sherman Test., Tr. 301-02, 305-06; Sherman Aff. ¶¶ 22, 24-27; Damages Chart at 1-2; *see generally* § II.G, *supra*.) None of this is surprising given that the parties agree that AutoPricer and Command Center are competitive products and the latter is available to customers at much lower prices than the former.

Defendants argue that a substantial infusion of investor capital into Broker Genius belies its claim that Command Center poses an existential threat. (Defs.' Post-Prelim. Inj. Hr'g Mem. ("Defs.' Post-Hr'g Mem.") 21, ECF No. 89.) However, the Court need not find that a threat is existential where there is credible evidence of loss to reputation, good will, business opportunities, and customer relationships, which cannot be compensated by money damages. Moreover, defendants' argument is necessarily shortsighted – a single cash infusion would at most forestall the inevitable if Broker Genius is losing its primary source of revenue to a low-cost copycat product.

Defendants also argue that Broker Genius failed to connect its alleged losses to the existence of any specific Command Center feature that was derived from AutoPricer. Because the Court finds that the Command Center product is derivative as a unit – not limited to particular features or components (*see infra*) – this argument is unavailing.

The Court therefore concludes that Broker Genius has shown that, with respect to the breach of contract claim, it will be irreparably harmed if defendants are not enjoined from marketing and selling Command Center.

## B. Unjust Enrichment

Unjust enrichment is an equitable claim for money. An unjust enrichment claim "can serve as the basis for a preliminary injunction *freezing assets*," under circumstances where "the defendant took steps to frustrate a future judgment or that the defendant is or imminently will be insolvent." *Shaoxing Bon Textiles Co. v. 4-U Performance Grp. LLC et al.*, No. 16-Cv-6805, 2017 WL 737315, at *2-3 (S.D.N.Y. Feb. 6, 2017) (emphasis added) (quoting *Sterling Ornaments Pvt. Ltd. v. Hazel Jewelry Corp. et al.*, No. 14-cv-8822, 2015 WL 3650182, at *1 (S.D.N.Y. June 10, 2015)); *see also Shamrock Power Sales, LLC v. Scherer et al.*, No. 12-Cv-8959, 2016 WL 6102370, at *5 (S.D.N.Y. Oct. 18, 2016).

Broker Genius does not seek an injunction freezing defendants' assets, and there are no allegations with respect to defendants' financial stability or lack thereof. Therefore, its request for a preliminary injunction cannot succeed on the basis of that claim.

## V. LIKELIHOOD OF SUCCESS ON THE MERITS

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (quoting *Abdul Wali et al. v. Coughlin et al.*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruling on other grounds recognized by*, *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003)).

The Court finds that Broker Genius is likely to succeed on its breach of contract claim. Specifically, the Court finds that it is highly likely that Broker Genius can show that Gainor assented to the Updated Terms of Use and that defendants breached the Updated Terms of Use by creating and distributing a derivative work of AutoPricer, *viz*, Command Center.

## A. Gainor Assented to the Contract

The contracts at issue in this case are the Original Terms of Use and the Updated Terms of Use, which are identical in all respects relevant to this litigation. Both Terms of Use agreements were contained within a clickwrap

agreement on the Broker Genius website that required users to expressly assent and made the contents of the agreement viewable by following a hyperlink. As such, the agreements are enforceable so long as they provided "reasonably conspicuous notice of the existence of contract terms" and required an "unambiguous manifestation of assent to those terms." *Meyer v. Uber Techs., Inc. et al.*, 868 F.3d 66, 74 (2d Cir. 2017) (alterations omitted) (quoting *Specht et al. v. Netscape Commc'ns Corp. et al.*, 306 F.3d 17, 35 (2d Cir. 2002)); *see Broker Genius, Inc. v. Zalta et al.*, 280 F. Supp. 3d 495, 521 (S.D.N.Y. 2017).

Evidence that a user continued to access a website when the user would not have been able to but for manifesting assent to the provisions of a clickwrap agreement, together with record evidence of the user's assent, is sufficient to demonstrate unambiguous manifestation of assent – even if the party has no recollection of clicking. *See Eslworldwide.com, Inc. v. Interland, Inc. et al.*, No. 06-Cv-2503, 2006 WL 1716881, at *2 (S.D.N.Y. June 21, 2006); *see also Plazza et al. v. Airbnb, Inc.*, No. 16-Cv-1085, 2018 WL 583122, at *7 n.19 (S.D.N.Y. Jan. 26, 2018) (finding that failure to recall assent to a clickwrap agreement "does not create a meaningful dispute of fact"); *Kutluca et al. v. PQ N.Y. Inc. et al.*, 266 F. Supp. 3d 691, 702 (S.D.N.Y. 2017) ("[W]hether or not [the users] remember [assenting to the clickwrap agreement], the evidence demonstrates that [the users] could not have proceeded to use the [software] . . . unless they accepted the [agreement], which renders [their] failing memories irrelevant." (citations omitted)); *Zalta*, 280 F. Supp. 3d at 504 n.3.

For the reasons that follow, the Court finds that Broker Genius can show that Gainor assented to the Updated Terms of Use on July 7, 2016.[12]

### 1. *The Original Terms of Use*

According to Broker Genius and its three employees who testified at the hearing, all new customers are required to assent to the Terms of Use upon

---

[12] Accordingly, it is unnecessary to determine whether Broker Genius can likely show that Gainor also assented to the Terms of Use on May 26, 2016. *See Centrifugal Force, Inc. v. Softnet Commc'n, Inc. et al.*, No. 08-Cv-5463, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) (finding it irrelevant whether defendant assented to initial clickwrap license, where the evidence established assent to updates).

creation of their Broker Genius accounts as part of the registration process, which occurred on the Broker Genius website. (Ellman Test., Tr. 40; Berrick Test., Tr. 133; Sherman Test., Tr. 285; Pl.'s Pre-Hr'g Mem. 10.) The new customers manifested their assent to the Terms of Use by ticking a checkbox, and they were unable to complete their registration unless the checkbox was ticked. (Sherman Aff. ¶¶ 13, 15.) The assent was recorded by Broker Genius in a spreadsheet with the user's email address and a timestamp and a server automatically generated three identical emails to: (1) Broker Genius's vice president of sales, (2) "sales@brokergenius.com," and (3) the email address the new user entered during registration. (Sherman Aff. ¶ 15; Email from Brokergenius to Ellman, May 26, 2016, PX-5; Ellman Test., Tr. 48-49; Sherman Test., Tr. 287.) Part of the registration process was a phone call between the new user and a Broker Genius employee; if the new user had not yet completed the steps to create the account including assenting to the Terms of Use, the new user would be required to do so during the phone call. (Ellman Test., Tr. 52.)

Broker Genius claims this is exactly what occurred in Gainor's case. Although none of the Broker Genius witnesses specifically recalled Gainor's registration, their consistent – albeit self-serving – testimony was that any departure from the normal process would have been at odds with important company policy and training if it permitted a customer to circumvent agreeing to the Terms of Use. (Berrick Test., Tr. 139-40; Ellman Test., Tr. 83-85.)

Defendants claim that the Broker Genius employee created Gainor's account for him during or in advance of their phone call – including entering Gainor's email address and assenting to the Terms of Use. (Defs.' Pre-Hr'g Mem. 16-17, ECF No. 70; Defs.' Post-Hr'g Mem. 12-13.) In addition, defendants' expert, Ms. Martin, found that the then-existing code permitted a user to create an account without assenting to the Terms of Use. (Martin Test., Tr. 610-11.) Defendants also suggest that a contemporaneous email where Ellman sent Gainor the unencrypted password for Gainor's new account supports their view that someone at Broker Genius must have been involved in creating Gainor's account. (Defs.' Post-Hr'g Mem. 12-13.) Ellman testified in reply that, at the time, Broker Genius's software permitted select

administrators, including him, to view customer passwords without encryption. (Ellman Test., Tr. 59-60, 110-11.)

Because of the conflicting evidence, and because the Court finds in any case that Gainor assented to the Updated Terms of Use – which are identical to the Original Terms of Use in all respects relevant to this litigation – the Court draws no conclusions as to whether Gainor assented to the Original Terms of Use.

### 2. *The Updated Terms of Use*

The Terms of Use were updated on June 6, 2016 (Updated Terms of Use, PX-15), and users were invited to assent to the Updated Terms of Use beginning on July 7, 2016 (Sherman Test., Tr. 289). This invitation arrived in a pop-up window that alerted users to the fact of the update, and permitted them to assent by entering their full name and email address and clicking a button. (Ellman Test., Tr. 63-64; Sherman Test., Tr. 290.) The assent was recorded in a spreadsheet with the user's name, email address, and a timestamp (Email from Crystal to Ellman, Mar. 14, 2017, PX-90), and the server automatically generated a confirmation email to the email address provided (*e.g.*, Email from Brokergenius to Grudzinski, July 7, 2016, DX-A; Email from Brokergenius to McNee, July 7, 2016, DX-B; Email from Brokergenius to Agarwal, July 7, 2016, DX-C; Email from Brokergenius to Assaf, July 7, 2016, DX-D). After July 7, 2016, no Broker Genius customer was able to use AutoPricer until that customer assented to the Updated Terms of Use. (Ellman Test., Tr. 63-64; Sherman Test., Tr. 290.)

In Gainor's case, the timestamp indicates that he assented to the Updated Terms of Use on July 7, 2016, at 12:56 p.m. (Email from Crystal to Ellman at 2, PX-90.) Although Gainor testified that he did not recall assenting (or not assenting) to the Updated Terms of Use (Gainor Test., Tr. 472-73), the fact that he continued using AutoPricer after July 7 was undisputed, and defendants did not offer any theory for how Gainor was able to maintain his access if he had not assented to the Updated Terms of Use. Notably, Ms. Martin formed no opinion as to whether the then-existing code would have permitted a user to continue using AutoPricer without assenting to the Updated Terms of Use (Martin Test., Tr. 612), as she did with respect to the Original Terms of Use (Martin Test., Tr. 610-11). Therefore, the Court finds it is more likely than not

that Gainor could not have continued using AutoPricer after July 7 unless he had assented to the Updated Terms of Use.

Because Gainor did in undisputed fact continue to use AutoPricer after July 7, and because Broker Genius's records reveal that Gainor clicked to accept the Updated Terms of Use on July 7, the Court finds that Broker Genius can likely show that Gainor did in fact assent to the Updated Terms of Use on that date. *See Eslworldwide.com*, 2006 WL 1716881, at *2.

## B. The Terms of the Contract

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."[13] *Terwilliger v. Terwilliger et al.*, 206 F.3d 240, 245 (2d Cir. 2000) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). The interpretation of a contract is a question of law for the court unless the contract is ambiguous, in which case "interpretation of the contract becomes a question of fact for the finder of fact and extrinsic evidence is admissible." *Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613, 618 (S.D.N.Y. 2001) (finding contract unambiguous in decision on motion for preliminary injunction), *aff'd*, 283 F.3d 490 (2d Cir. 2002). "Determining whether a contract provision is ambiguous is a question of law to be decided by the court." *Id.*

Here, the parties have not suggested that the Terms of Use are ambiguous. Nor have they directed the Court to any extrinsic evidence of the contract's meaning. The Court therefore follows the parties' lead, comfortable that the relevant language of the Terms of Use is sufficiently "unequivocal" "so as to give effect to the intention of the parties." *Terwilliger*,

---

[13] Broker Genius cites New York law in its discussion of the breach of contract issue. (Pl.'s Pre-Hr'g Mem. 17-18; Pl.'s Post-Hr'g Mem. 3.) Defendants do not cite any alternative contract law, and do not dispute Broker Genius's application of New York law. Accordingly, the Court applies New York law. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000); *A.W. Fin. Servs., S.A. v. Empire Res., Inc. et al.*, No. 07-Cv-8491, 2010 WL 3825726, at *3 (S.D.N.Y. Sept. 30, 2010).

206 F.3d at 245.  Since the Terms of Use are unambiguous, it is for the Court to interpret them as a matter of law.  *Random House*, 150 F. Supp. 2d at 618.

The contractual provision at issue is the prohibition against "distribut[ing] or creat[ing] derivative works of the Site or Apps or the Content," that is, AutoPricer.  (Updated Terms of Use, PX-15.)  The parties agree that this provision is not a noncompetition clause and that the contract does not otherwise contain one.  (Sherman Test., Tr. 361.)  This means that the Terms of Use do not preclude Broker Genius customers from competing against Broker Genius; they only preclude the creation of a competitive product that is derived from AutoPricer.

As for how to interpret the contractual term "derived," both sides apply the same definition from the Merriam-Webster Dictionary: "something that originates from something else."  (Koskinen Report 4; Martin Report 4.)  Beyond that, the parties have not favored the Court with any view, argument, or authority on how the Court should interpret the contract in this breach of contract case.[14]

---

[14] Although federal copyright law has a well settled framework for determining whether one computer program is derived from another, it does not necessarily follow – and neither party asserts – that the parties here intended to import that copyright law framework into the prohibition against creating and distributing derivative works in the Terms of Use.  Indeed, since the provision does not limit itself to copyrighted – or even copyrightable – elements, it may offer Broker Genius a broader scope of protection.  Furthermore, Broker Genius expressly grounds its motion for a preliminary injunction on its breach of contract and unjust enrichment claims – not any copyright claim.  Although defendants' briefs argue that Command Center is not a "derivative work" under federal copyright law (Defs.' Pre-Hr'g Mem. 18-27; Defs.' Post-Hr'g Mem. 28-41), they offer no justification for why that standard supplants contract law in this breach of contract case.  It appears that they may be mistakenly relying on the NRZ case, where the Court found that the provision at issue here "essentially tracks the language of the Copyright Act of 1976."  *Zalta*, 280 F. Supp. 3d at 522 (alterations omitted).  (*See* Defs.' Pre-Hr'g Mem. 18; Defs.' Post-Hr'g Mem. 28 n.7.)  If so, defendants' reliance is misplaced, as the Court's finding there was evidence supporting its conclusion that the provision was not a functional *confidentiality clause* – not that the provision imported the copyright law framework to govern its terms.

Nonetheless, it is "unequivocal," *Terwilliger*, 206 F.3d at 245, that if a later-created product is derived from an earlier product, two things will be true. First, the two products, or elements therein, will be *similar*. Similarity, of course, is a matter of degree.

Second, the commonalities present in the later-created product will be *traceable* to the earlier one. Evidence that common elements were already known to the industry generally or to a defendant specifically is circumstantial evidence that a later-created product is *not* traceable to an earlier one, despite the presence of commonalities. Defendants' briefs go much further, presuming that the existence of "prior art," as that term is used in patent law, *precludes* a finding that a later-created product is derivative of an earlier one. (*See* Defs.' Pre-Hr'g Mem. 22-25; Defs.' Post-Hr'g Mem. 30-39.) If that were true, the contractual prohibition against derivative works would be a nullity whenever a user *could have* created a work based on prior art, even if it is *actually* derivative. Although this may be accurate as a matter of patent or copyright law, *see Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706 (2d Cir. 1992), defendants do not assert that the Terms of Use imported this rigid limitation, and a reasonable reading of the word "derive" does not include one.

For instance, a businessperson seeking a competitive advantage might be motivated to snoop around a competitor's product – he might even pose as a customer in order to acquire information that would be otherwise

---

The Court also notes that neither party raised the jurisdictional issue of whether Broker Genius's breach of contract claim is preempted by the federal Copyright Act. *See Forest Park Pictures et al. v. Universal Television Network, Inc.*, 683 F.3d 424 (2d Cir. 2012). The U.S. Court of Appeals for the Second Circuit has identified three "qualitative differences between [certain] contract claim[s] and a copyright violation claim," and concluded that such contract claims are not preempted. *Id.* at 431. One of the enumerated "qualitative differences" is present here: the instant claim is "a breach of contract claim [that] asserts rights only against the contractual counterparty, not," as in a copyright claim, against "the public at large." *Id.* (citing *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996)). *Cf. Centrifugal Force*, 2011 WL 744732, at *8. This Court concludes that there is federal jurisdiction over Broker Genius's breach of contract claim.

inaccessible to him.[15]  If the faux customer then used what he learned to develop his own competitive product, the latter would clearly be traceable to the earlier product, no matter whether the common elements also resembled "prior art."

A company seeking to prevent such behavior is certainly entitled to require its customers to assent to a noncompetition agreement.  However, such an agreement would be broader than the Terms of Use here, as it would preclude customers from competing at all, even with a product that was not derivative.[16]  Since the right to compete is clearly valuable, there would have been a cost to Broker Genius had it imposed a noncompetition agreement on its customers.  Correspondingly, there would have been a cost to Broker Genius's customers had Broker Genius agreed to forego a covenant against derivative works altogether, since the right to create such works has value as well.

The bargain struck by the parties here was right in the middle.  In exchange for payment and, *inter alia*, a promise not to create or distribute derivative works – but not a promise not to compete – Gainor received a license to use AutoPricer.  It is not for the Court to second guess that bargain, but to apply it to the facts of this case to determine whether the contract was breached.

---

[15] In her book, *Business Efficiency for Dummies*, defendants' expert Marina Martin recommends just this practice to readers.  (Martin Test., Tr. 666-67 ("[When gathering information about competitors,] you can learn much of what you want to know about their processes by simply calling up and pretending to be a customer.  If you feel this is dishonest, know that they have almost certainly called you posing as a customer before.  It's an incredibly common practice and in most cases it's relatively harmless.  One should also sign up (under an anonymous e-mail address) for your competitors' mailing lists, demos, and other online materials.  Knowledge is power here!") (quoting Marina Martin, *Business Efficiency for Dummies* (2012)).)

[16] Of course, if traceability could be inferred from the customer's mere access to the earlier product, then a covenant against creating derivative works would be, for all practical purposes, the same as a covenant not to compete.  That is not the case here, where the evidence of traceability goes well beyond Gainor's mere access to AutoPricer.

**C. Command Center Was Derived from AutoPricer in Breach of the Contract**

When Gainor assented to the Updated Terms of Use, he specifically agreed not to "distribute or create derivative works of" Broker Genius's AutoPricer. This precluded Gainor from distributing or creating a work that was substantially *similar* to AutoPricer if the similarities were also *traceable* to AutoPricer. After assenting to the Terms of Use and using AutoPricer, Gainor, with the other defendants, created and distributed their product, Command Center. For the reasons that follow, the Court finds that Broker Genius is likely to succeed in showing that Command Center is substantially, even surprisingly, similar to AutoPricer, and the similarities are traceable to AutoPricer, and that, as a result, Command Center is derivative of AutoPricer in violation of the Terms of Use.

### 1. Command Center Is Extraordinarily Similar to AutoPricer

The substantial and pervasive similarities between Command Center and AutoPricer are essentially undisputed, and for good reason: the similarities, described earlier, are undeniable. Any differences between the two products are vastly outweighed by the extensive similarities in design and functionality.

As described earlier, Dr. Koskinen grouped the key similarities into two broad categories, and the Court finds that framework useful. The multitudinous ways in which the products are similar reflects countless decisions, large and small, by the developers, which collectively resulted in a web application particularly optimized for secondary-market ticket brokers to price their tickets dynamically and automatically through the creation of pricing rules.

The first category of similarities is the overall architecture of the two products and their UI/UX. The architecture is the same in each product, and the UI/UX is substantially similar. The common architecture consists of a web-based application that acts as an intermediary between POS systems and ticket exchange systems, applying dynamic automatic pricing rules. The common UI/UX consists of the particular cascading flow of widgets that

enables users to create, monitor, and update the dynamic automatic pricing rules. *See supra*, § II.F.

The second category of numerous similarities is the widgets in each product's cascade, which are identical in function and substantially similar in the features they contain. They also interrelate with each other and with external systems in essentially the same way, and have internal characteristics that are substantially similar. *See supra*, § II.F.

Dr. Koskinen described a third similarity as well: both products employ the same means of addressing the scalability problem. *See supra*, § II.F.

Defendants do not primarily contend that AutoPricer and Command Center are not similar. Instead, they set forth nonculpable explanations for the pervasive similarities. Those explanations are addressed in the next section of this Opinion.

To the extent defendants do argue that there are differences between AutoPricer and Command Center, the most important difference highlighted by defendants is that everything takes place in AutoPricer on a single page, whereas in Command Center, each widget has its own page. However, as Dr. Koskinen testified at the hearing, "the overall flow that you see of how the different widgets interact is the same in both AutoPricer and Command Center," and "that's a more important factor than whether something is on one page or the same page or a different page." (Koskinen Test., Tr. 222.) The Court agrees.

Another difference described by Ms. Martin is that whereas AutoPricer has separate widgets for Zones/Sections/Rows and Price By Comps, Command Center integrates them into a single widget. Although this is a nontrivial difference in the UI/UX between the two products, it is minor compared to the products' substantial similarities.

Other differences that defendants point to are even less consequential, including that a user clicks on the interactive map in AutoPricer but hovers over the map in Command Center, and the fact that a Command Center user has to click on the words "Command Center" after logging in to the Seat

Scouts website but does not have to click on the word "AutoPricer" on the Broker Genius website. *See supra*, § II.F.

In sum, the similarities identified by Broker Genius are not limited to any particular features or components, but go to the heart of the two products. As a result, the Court finds a strong likelihood that Broker Genius can show that Command Center is substantially similar to AutoPricer.

### 2. The Similarities in Command Center Are Traceable to AutoPricer

The critical issue before the Court is whether the overarching similarities in Command Center are in fact traceable to AutoPricer. The governing contract requires the Court to consider whether Gainor *actually* derived Command Center from AutoPricer – not simply whether he *could have* derived it based on his access, nor whether he *could have* developed it independently based on the state of his, and the industry's, knowledge.

There is ample circumstantial evidence of copying by Gainor even though there is no direct evidence of copying.

Mindful of the fact that Broker Genius "need not show that success is an absolute certainty" to obtain a preliminary injunction, but "need only make a showing that the probability of [its] prevailing is better than fifty percent," the Court finds that Broker Genius has more than met its burden here, for the reasons that follow. *Eng*, 849 F.2d at 82 (quoting *Abdul Wali*, 754 F.2d at 1025).

i. Gainor had access to AutoPricer and utilized that access in his business to price tickets

Gainor's purposeful access to and attentive and repeated use of AutoPricer is undisputed. He testified at the preliminary injunction hearing that he began using AutoPricer in May of 2016 and used it until the end of December 2016, when the Minnesota Vikings season ended. (Gainor Test., Tr. 424-25, 453.) In order to price and monitor his tickets during that period, Gainor was necessarily interacting with AutoPricer's six widgets and proceeding through its cascade. Gainor's use of AutoPricer's architecture, UI/UX, widgets, and other features, enabled him to learn which aspects he thought worked well, whether or not his intent at that time was to develop

his own competitive product.  On September 18, 2016, Gainor even made a note to himself listing certain features of AutoPricer that he viewed as effective, in the course of beta testing the Seat Metrics product for Seat Metrics.  (Gainor Evernote titled "Seat Metrics," Sept. 20, 2016, PX-8; Gainor Dep. 45-47, Dec. 12, 2017, PX-1.)

Sherman testified that Gainor's account permitted Gainor to continue accessing AutoPricer even after he stopped using it, and that his access was not cut off until his account was disabled on April 27, 2017, (Sherman Test., Tr. 304-05, 359-60), although, there was no evidence that Gainor accessed AutoPricer in 2017, (Sherman Test., Tr. 359-60).

> ii.  Gainor's access to and use of AutoPricer was followed immediately by his rapid development of Command Center

The short – essentially nonexistent – interval between Gainor's access to and use of AutoPricer, on one hand, and his initial steps toward developing the product that became Command Center, on the other, is further circumstantial evidence that the similarities in Command Center are derived from AutoPricer.

Gainor did admit that he used AutoPricer until the end of 2016.  (Gainor Test., Tr. 424-25, 453.)  The next week – on January 8, 2017 – Gainor created what he admitted constituted his "first draft" of defendants' Command Center product.  (Gainor Evernote, PX-18; Gainor Test., Tr. 538.)  That "first draft" – in which the name "Command Center" is already present – described the specific primary elements that were also present in AutoPricer, including all six widgets:  "Event Listings," "Ticket Listings," "Select every zone, section and row in one click," "Comparable criteria," "Grouping," and "Apply rule to season tickets."  (Gainor Evernote, PX-18.)  Those same elements as well as others in the "first draft" were incorporated into the final Command Center product.  (Gainor Test., Tr. 538.)

One week after the first draft, that is, a mere two weeks after he stopped using AutoPricer, Gainor sketched mockups – or "wireframes" – for Command Center and created at least ten tasks in Pivotal Tracker, a project management tool used to assign and manage tasks for coders.  (Gainor

wireframes, PX-19; Gainor Pivotal Tracker entries, PX-145; Koskinen Report, Ex. E; Gainor Test., Tr. 499.)  Elements of the wireframes and tasks – such as attributes of pricing rules, event search fields, ticket grouping, and the interactive map – were also present in Broker Genius's AutoPricer.  In addition, the same elements and others in the wireframes and tasks found their way into the final Command Center product.

Dr. Koskinen testified that the first draft, wireframes, and Pivotal Tracker tasks indicate that, by the beginning of January, Gainor already "had a fairly clear idea about . . . what he wanted to build and [the] requirements for it." (Koskinen Test., Tr. 213-215.)  Notably, Ms. Martin neither reviewed these documents nor took them into consideration in forming her opinion that Command Center was likely not derived from AutoPricer.  (Martin Test., Tr. 637-38.)

The Court credits Dr. Koskinen's testimony, and finds that it is further supported by other evidence in the record.  Most persuasive is Gainor's own testimony that the impetus for creating the first draft and the wireframes was his experience using AutoPricer.  (Gainor Test., Tr. 436.)  Although Gainor testified that it was AutoPricer's *shortcomings* that inspired him to create a better product, it is beyond belief that he considered only the elements in AutoPricer that he did *not* like, and ignored the ones he did, when listing requirements for his competitive product one week later.  On its own, this is strong evidence of traceability.

In addition, Gainor's January 8, 2017, email to defendant Guinio Volpone stating that Gainor "want[s] to build [an auto pricer] more than ever!" and that "[a]fter this weekend, I think we can build the best pricing view/Auto pricer in the industry!" permits an inference that the two had earlier discussions about developing a competitive autopricer – including while Gainor was using Broker Genius's product.  (Email from Gainor to Volpone, PX-11.)

After this, Command Center's development proceeded at a rapid clip. *See supra*, section II.E.  When Seat Scouts announced its forthcoming autopricer in July of 2017, Gainor's erstwhile partner at Seat Metrics noted (with apparent mistrust) the surprising speed with which Command Center had seemingly been developed.  (Email from Panzer to Gainor, PX-12

("[L]ooks like you built that pretty quickly.  It must have been in development while you were beta testing with us, no?").)

   iii. Defendants' incorporation of key elements of AutoPricer into Command Center was not the result of independent requirements engineering

  Requirements engineering is the process of "identifying all aspect[s] of" how a piece of software should operate, "including both the functional (e.g. features) and non-functional (e.g. performance, security, etc.) aspects." (Koskinen Report 24.)  Dr. Koskinen identified several hallmarks of requirements engineering in his expert report, including project management, wireframes, software version control, multiple releases, creation of source code, behavior tracking, analysis of feature requests, customer user studies, and A/B testing.  (Koskinen Report 30.)  Requirements engineering is especially critical when developing UI/UX, because "[u]sers don't always behave as expected so . . . it is difficult to know how to build software that interfaces humans with machines."  (Koskinen Report 29.)  This is true even where software is built by combining "readily available components." (Koskinen Report 29.)

  Dr. Koskinen "did not find evidence of any significant requirements engineering process that lead to the software requirements" set forth in Gainor's early documents – the first draft, the wireframes, and the Pivotal Tracker tasks.  (Koskinen Report 36-37; *see also* Koskinen Test., Tr. 216, 276; Gainor Dep. 199-200, PX-1.)  Those early documents, as already described, included key elements of AutoPricer that found their way into Command Center.  Dr. Koskinen also found no evidence of any user feedback of any kind whatsoever in the development of Command Center.  (Koskinen Test., Tr. 272.)  Notably, in forming her opinion that Command Center was not derived from AutoPricer, Ms. Martin did not consider the development process for Command Center nor did she review any documents pertaining to its development.  (Martin Test., Tr. 637.)  The Court considers that to be a fundamental flaw in Ms. Martin's analysis and resulting opinion.

  The lack of requirements engineering in defendants' development of Command Center is powerful evidence that the massive similarities in Command Center were not developed by defendants independently, but

were instead derived from AutoPricer. In other words, Gainor's access to, and use of, AutoPricer largely served as a substitute for what otherwise would be lengthy and expensive requirements engineering. (*See* Koskinen Test., Tr. 218.)

### iv. Gainor's access to competitors' products under false pretenses on other occasions

As set forth above, it was a violation of the Terms of Use to pose as a customer in order to gain entrance to AutoPricer and use the knowledge gained from that access to develop a competitive product. *Supra*, note 15 and accompanying text. Facts showing that Gainor had a general plan to access competitors' products under false pretenses in order to gain knowledge in the service of his own product is circumstantial evidence that he did so here, and that the similarities in Command Center are traceable to AutoPricer.[17]

The evidence presented at the preliminary injunction hearing described four events that permit an inference – which the Court indulges – of a plan by Gainor to access competitors' products under false pretenses, including Broker Genius's AutoPricer.

The first instance occurred on September 18, 2016, when Gainor was a Broker Genius customer. At that time, he was also beta testing the Seat Metrics autopricer and sending Seat Metrics feedback on its product. When he discovered a feature that was not working in the Seat Metrics product, he provided Seat Metrics with his Broker Genius login – itself a clear violation of the Terms of Use – in order for Seat Metrics to access AutoPricer to see how the feature worked there. (Email from Panzer to Gainor, PX-9.) Gainor was evasive on this topic (among others) at the hearing, testifying that the login he provided could just as likely have been a login for something other than Broker Genius. (Gainor Test., Tr. 480-82.) The Court does not credit this testimony, as the document he was testifying about itself most strongly suggests that the login he gave Seat Metrics was his login to access Broker

---

[17] *See* Fed. R. Evid. 404(b); *see also Carofino et al. v. Forester*, 450 F. Supp. 2d 257, 272 (S.D.N.Y. 2006); 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 404.22(5)(b) (Mark S. Brodin, ed., 2d ed. 1997).

Genius's AutoPricer. (Gainor Test., Tr. 480-82; Email from Panzer to Gainor, PX-9.)

The second instance occurred on January 8, 2017, one week after Gainor says he stopped using AutoPricer. On that day, as already described, Gainor prepared the list of requirements for his autopricer in the "first draft." (Gainor Evernote titled "Auto-Pricer," PX-18.) Emails show that on the very same day Gainor was also accessing the Seat Metrics autopricer and discussing its features with them as a beta tester. (Email from Gainor to Volpone, PX-11.) What is more, Gainor maintained his relationship with Seat Metrics – not only as a beta tester but as a potential partner to develop their autopricer – for another month, before withdrawing from the potential partnership. (Email from Gainor to Volpone, PX-10.)

The third instance occurred on September 10, 2017, after Gainor's Broker Genius account had been disabled. A Broker Genius sales employee contacted Gainor offering to demonstrate AutoPricer's new features, and Gainor forwarded the email to one of his developers at Seat Scouts. The developer replied that he would like to see AutoPricer, but that he "imagine[d] [the Broker Genius sales employee] would [not] be interested in spending time with us if he knew we were competitors." (Email from Gainor to Ellis, Sept. 10, 2017, PX-142.) Gainor agreed, writing that he had better go around them and obtain access to AutoPricer "through someone" rather than seek access form Broker Genius directly. (*Id.*; *see* Gainor Test., Tr. 543-44.)

The fourth instance occurred in October of 2017, after another employee at Seat Scouts did in fact obtain access to AutoPricer "through someone." On October 11, the employee wrote to a group including Gainor: "[By the way] I got access to Broker Genius." (Slack conversation, Oct. 11, 2017, PX-107; Gainor Test., Tr. 461.) According to Gainor, the person who provided access was a ticket broker who had just seen a Command Center demonstration. (Gainor Test., Tr. 456.) A few days later, Gainor and his employees at Seat Scouts did a screen share with the ticket broker, allowing them to see Broker Genius's AutoPricer in action. (Gainor Test., Tr. 456.)

At the hearing, Gainor testified that Command Center was already in the market by the time he and his employees viewed AutoPricer in the screen share, suggesting that nothing could have been derived from AutoPricer on

that occasion. (Gainor Test., Tr. 456.) The Court credits that testimony, and considers the evidence only as permitting an inference of a plan to access competitors' products under false pretenses in order to gain knowledge (e.g., market intelligence) helpful to defendants' product.

> v. Countervailing evidence that the similarities are not traceable to AutoPricer

The Court is not blind to the fact that there are similarities between Command Center and AutoPricer that may not be traceable to AutoPricer because the similar elements were obvious, were known in the industry independent of Broker Genius's AutoPricer, or were attributable to Gainor's own industry experience.

> (i) Similarities that were present in software that predated Command Center

For example, the widgets have analogues in other products: the Events List Widget, the Inventory List Widget, the ability to select zones, sections, and rows using an interactive map, the ability to apply changes to a group or season of tickets, and the ability to create automatic pricing rules that adjust tickets based on the secondary market, are present in some form within products developed prior to AutoPricer.

For example, Core, a product that Gainor himself developed in 2012 and 2013 while working at Ticket Evolution, was a POS system for brokers on the secondary ticket market. It included features similar to the Events List Widget, Inventory List Widget, and the ability to filter by zones, sections, and rows (including via an interactive map) to view comparable tickets. (Gainor Test., Tr. 392-97, 415-21, 426-28; Martin Test., Tr. 592-96.) A screenshot of the Core program reveals an events list and an inventory list similar to AutoPricer's. (*Compare* Martin Report 71 *with* Martin Report 32, 35.) Users of Core could also set rules to adjust prices by a flat dollar amount or a percentage – but not by reference to comparable tickets or other secondary-market criteria, and so, critically, it was not an "autopricer." (Gainor Test., Tr. 416-17.)

SeatTrax and goPricer are two further examples of computerized tools for ticket brokers, (*see* Archive of SeatTrax Website, Dec. 2012, DX-F; goPricer Detailed User Guide, Oct. 1, 2015, DX-I; Koskinen Test., Tr. 242-43; Sherman

Test., Tr. 320-27), but it is notable that like Core neither SeatTrax nor goPricer are autopricers, (Sherman Test., Tr. 309, 374; Gainor Test., Tr. 416-17; Martin Test., Tr. 665, 674). There was additional testimony about autopricers outside of the ticket industry – such as one used by merchants on Amazon, and others used in commoditized industries. (Sherman Test., Tr. 282.) However, Sherman persuasively explained that those autopricers price identical products against each other (e.g., barrels of oil, or 50-inch Panasonic televisions), not unique products like event tickets, which can only be priced against comparable tickets – and so necessarily require a distinct UI/UX. (Sherman Test., Tr. 282.)

Defendants also pointed out that certain of AutoPricer's features were themselves developed using code from external sources, including open source code. (Martin Test., Tr. 560.)

This evidence of similarities to other software or sources lends some support to defendants' position that elements of Command Center are traceable to sources besides AutoPricer. For the most part, however, the piecemeal, element-by-element focus obscures the forest for the trees. For example, Broker Genius does not claim that the concept of an events list as instantiated in Command Center was derived from AutoPricer. Its claim relates to the functionality of the particular events list and – most importantly – the overall architecture and UI/UX, of which the events list is a part.

Ms. Martin's analogy to a house is instructive in this regard. "Each house has an architecture . . . . Each is likely to have basic building blocks (windows, a door, a driveway) even if the houses are made of entirely different materials, with different square footage and layouts and trim color." (Martin Report 13; *see also* Martin Test., Tr. 563, 663.) In Ms. Martin's view, "[o]ne house is not derived from or copying another house because it also shares basic house characteristics. Further, whether you make your front door out of a tree by hand or purchase a commodity door at Home Depot, you did not originate doors or door frames." (Martin Report 13-14.)

The opposite view is more reasonable to the Court. If two houses have identical rooms with many identical features and floorplans, that is strong circumstantial evidence that one house was derived from the other – particularly where the architect of the later-built house had resided in the earlier one. (*See also* Koskinen Report 28-29.)

                 (ii)  Gainor's prior knowledge and experience in the industry

It cannot be gainsaid that Gainor had exposure to the concept of an autopricer from prior employment.  (*See* Gainor Test., Tr. 431-32.)

For example, while Gainor was at Ticket Evolution in 2010 or 2011, that company developed an "auto-uploader," which included a feature that allowed brokers "to build a rule that either marked up or down their inventory by a flat dollar amount or a percentage."  (Gainor Test., Tr. 387-88, 390-91; DX-M.)  While there, he developed Core, but although he testified that he considered including an autopricing feature in that product, he rejected doing so.  (Gainor Test., Tr. 392-97, 417-20, 426-28.)

But importantly, Dr. Koskinen testified that even someone with 18 years of industry experience – as Gainor claimed to have had – would "still have to go through a process of figuring out how to make an effective user interface for an unprecedented piece of software," (Koskinen Test., Tr. 270), something that is lacking in the record of Gainor's development of Command Center.

               (iii) Elements that were logical or obvious

It is true that some commonalities between Command Center and AutoPricer would seem obvious to the lay observer.  Such commonalities include ordering an events list chronologically, displaying a user's inventory of tickets to a particular event when the user clicks – or hovers – on that event, allowing users to price tickets individually or as a group or by season, and allowing users to search tickets by event or venue.  (Koskinen Test., Tr. 161-62, 168-69, 176-77, 194-96.)

If something is truly obvious, that is strong circumstantial evidence that it is traceable to a person's own independent knowledge or intuition.  Of course, something may be so logical that it appears obvious but only in hindsight, belying important research and design choices made by its creator. Indeed, one purpose of a requirements engineering process – largely missing from the record here for Command Center – is to develop a UI/UX that appears to be casually intuitive from the standpoint of the client using the application.

Certain of the similarities between Command Center and AutoPricer are truly obvious, such as allowing users to search tickets by event or venue. In general, the similarities identified by defendants as "obvious" reflect logical design and coding choices made by Broker Genius. As Sherman noted at the hearing, "I would agree that if somebody went through the same process as Broker Genius in creating this technology over several years that eventually they surely would" make the same choices. (Sherman Test., Tr. 327; *see also* Sherman Test., Tr. 340 ("If by simple implementation you mean the process of going through a user interface prototyping, user experience prototyping, wire framing, architecture, etc., then, yes, it's simple.").)

### 3. *Weighing the Evidence: Command Center Was Derived from AutoPricer*

The Court concludes that it is highly likely that Broker Genius can ultimately succeed in showing that Command Center and AutoPricer have substantially similar overall architecture, UI/UX, and collection of widgets. The critical issue is whether those similarities are traceable to Broker Genius's AutoPricer.

Gainor's active use of AutoPricer allowed him an extended opportunity to test the system and gain knowledge about which aspects and elements worked well, and there is evidence that Gainor was indeed attentive to such things. (*See, e.g.*, Gainor Evernote titled "Seat Metrics," PX-8; Gainor Dep. 45-47, PX-1.) Furthermore, Gainor admitted that his experience with Broker Genius is what motivated him to build an autopricer himself. (Gainor Test., Tr. 436.) When Gainor eventually began setting his thoughts down about the autopricer that became Command Center, it was literally only one week after he stopped using AutoPricer, and it included elements that he had interacted with in AutoPricer, which then ended up in Command Center. (Gainor Test., Tr. 435; Gainor Evernote titled "Auto-Pricer," PX-18.) This permits an inference – which the Court makes – that Gainor used what he learned while he was a Broker Genius customer to develop his own competitive product. Indeed, it is very strong evidence that that is what in fact occurred.

This conclusion is supported by strong evidence that defendants did not undertake any requirements engineering at all before Gainor laid out his early drafts of Command Center – the drafts that incorporated key elements

from AutoPricer. The conclusion is also supported by evidence that suggests Gainor may have acted in accordance with an overall plan to reconnoiter competitors' products to derive his own; such a plan certainly encompassed a violation of the Terms of Use insofar as it involved the use of Broker Genius's AutoPricer. Even absent any such plan, though, the evidence is sufficient to support a conclusion that that is indeed what Gainor did in this case.

Evidence that the similarities were obvious, logical, or were also present in existing software on the market, is also relevant. Ultimately, however, this evidence it is of limited weight, as it overlooks the part of Broker Genius's case that relates to the overall architecture and UI/UX, of which the similarities are a critical part.

It is possible that Gainor's experience meant he could have built a product similar to Command Center without the knowledge he gained from having access to Broker Genius's AutoPricer product. However, the Court concludes that – more likely than not – that is not what in fact occurred here: the substantial weight of the evidence adduced over five hearing days and limned above suggests that it is considerably more likely than not that Gainor used the knowledge he gained while he was a Broker Genius customer to develop Command Center, and that the similarities between the two products are directly traceable to AutoPricer.

As a result, the Court concludes that it is highly likely that Broker Genius will ultimately succeed in showing that Gainor breached Broker Genius's Terms of Use by creating and distributing Command Center, a product that was directly and immediately derived from AutoPricer.

## VI. BALANCE OF HARDSHIPS & PUBLIC INTEREST

To succeed on its motion, Broker Genius must also demonstrate that the balance of hardships tips in its favor, and that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

The Court has already found that the evidence demonstrates a likelihood that Broker Genius will suffer loss of reputation, good will, business opportunities, and customer relationships, if an injunction does not issue.

Defendants identify, without elaboration, only one concrete harm if an injunction does issue: they will be "prevent[ed] from competing fully against [Broker Genius]." (Defs.' Pre-Hr'g Mem. 15.) Accordingly, the Court finds that the balance of hardships tips in Broker Genius's favor.

The public interest does not weigh particularly heavily in this dispute between two private parties. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 424 (2d Cir. 2004). Nonetheless, Broker Genius contends that an injunction would serve the public's interest in the enforcement of binding contracts, and defendants contend that an injunction would disserve the public's interest in free competition. Undoubtedly the public has interests in each, but the Court cannot say that the public interest is disserved by the issuance of an injunction in this case.

## VII. SCOPE OF THE INJUNCTION & SECURITY

Broker Genius asks the Court to enjoin defendants from continuing to make available its Command Center product. (Order To Show Cause at 1-2.) Broker Genius made the same request in connection with its application for a TRO. The Court denied that request (*id.* at 2-3), but did enjoin defendants from violating the Terms of Use agreement (*id.* at 3). Because the Court has now found it to be likely that the Command Center product was created and is distributed in violation of the Terms of Use agreement, the scope of the preliminary injunction must disable defendants from continuing to make Command Center available for use.[18]

The Court hereby increases the security to be posted by Broker Genius to $100,000. *See* Fed. R. Civ. P. 65(c).

## VIII. CONCLUSION & ORDER

Accordingly, for the reasons set forth above, Broker Genius's motion for a preliminary injunction is GRANTED, and defendants, and all persons in

---

[18] The injunction properly binds all defendants, even though the relevant contract was between Broker Genius and Gainor alone. Fed. R. Civ. P. 65(d)(2); *see Dino DeLaurentiis Cinematografica, S.p.A. v. D-150, Inc.*, 366 F.2d 373, 376 (2d Cir. 1966); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2956 (3d ed. 2017).

active concert or participation with them, are hereby enjoined during the pendency of this action:

(a) From using or providing or making available, whether by sale or otherwise, to any third party the Command Center video, product, and services, including providing further services to any now existing client or potential client using or training to use the Command Center product and services; and

(b) From destroying or disposing of any evidence or other materials, in any form, relating to this action and the issues raised herein, including, without limitation, all devices, electronic media, cloud storage, and all copies of any and all documents, media, and/or other materials, containing, identifying, describing, reflecting, or referencing Broker Genius's proprietary information and any and all documents, data and information which was obtained by defendants from, or by virtue of their relationship with, Broker Genius, including all current or archived media, emails, chats, texts, documents, electronic logs, metadata, storage, and directories; and

(c) From accessing, disclosing, making available to any person or entity, or using any of Broker Genius's proprietary information.

Broker Genius shall post security in the amount of $100,000 on or before May 14, 2018, at 5 p.m.

Dated: New York, New York

May 11, 2018

SO ORDERED:

Sidney H. Stein, U.S.D.J.