UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROKER GENIUS, INC.<br><br>                               Plaintiff,<br><br>-against-<br><br>SEAT SCOUTS LLC and DREW GAINOR,<br><br>                               Defendants. | Case 1:17-cv-08627-SHS<br><br>**DEFENDANTS' CORRECTED AMENDED ANSWER TO SECOND AMENDED COMPLAINT, COUNTERCLAIM AGAINST PLAINTIFF, AND JURY DEMAND** |

Defendants Seat Scouts LLC ("Seat Scouts") and Drew Gainor ("Gainor" and together with Seat Scouts, the "Defendants"), by and through their undersigned counsel, as and for their Answer to Plaintiff Broker Genius Inc.'s Second Amended Complaint (the "Complaint") state as follows:

1.      Defendants deny the allegations of paragraph 1 of the Complaint.

2.      Defendants deny the allegations of paragraph 2 of the Complaint.

3.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3 of the Complaint.

4.      Guinio Volpone was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 4 of the Complaint.

5.      Ray Volpone was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 5 of the Complaint.

6.      Defendants admit the allegations of paragraph 6 of the Complaint.

7.      Stuart Gainor was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 7 of the Complaint

8.      Gainor Software LLC was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 8 of the Complaint.

9.      Gainor Software LLC was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 9 of the Complaint.

10.     Volpone Software LLC was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 10 of the Complaint.

11.     Volpone Software LLC was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 11 of the Complaint.

12.     Defendants admit the allegations of paragraph 12 of the Complaint.

13.     Defendants admit the allegations of paragraph 13 of the Complaint.

14.     Event Ticket Sales LLC was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 14 of the Complaint.

15.     Event Ticket Sales LLC was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 15 of the Complaint.

16.     Event Ticket Sales LLC was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 16 of the Complaint.

17.     Defendants deny the allegations of paragraph 17 of the Complaint and note that the claims to which the allegations of paragraph 17 relate were dismissed pursuant to the Court's May 14, 2018 Opinion and Order.

18.     Defendants deny the allegations of paragraph 18 of the Complaint and note that the claims to which the allegations of paragraph 18 relate were dismissed pursuant to the Court's May 14, 2018 Opinion and Order.

19.     Defendants deny the allegations of paragraph 19 of the Complaint.

20.     Defendants admit the allegations of paragraph 20 of the Complaint.

21.     Defendants deny the allegations of paragraph 21 of the Complaint and note that certain of the claims to which the allegations of paragraph 21 of the Complaint relate were dismissed pursuant to the Court's May 14, 2018 Opinion and Order.

22.     Defendants deny the allegations of paragraph 22 of the Complaint and that certain of the claims to which the allegations of paragraph 22 of the Complaint relate were dismissed pursuant to the Court's May 14, 2018 Opinion and Order.

23.     Defendants deny the allegations of paragraph 23 of the Complaint.

24.     Defendants deny the allegations of paragraph 24 of the Complaint and refer to the underlying source code for its precise uses and functionality.

25.     Defendants deny the allegations of paragraph 25 of the Complaint and refer to the underlying source code for its precise uses and functionality.

26.     Defendants deny the allegations of paragraph 26 of the Complaint.

27.     Defendants deny the allegations of paragraph 27 of the Complaint.

28.     Defendants deny the allegations of paragraph 28 of the Complaint.

29.     Defendants deny the allegations of paragraph 29 of the Complaint, and states that they are without knowledge or information sufficient to form a truth as to the allegations contained in the first sentence of paragraph 29.

30.     Defendants deny the allegations of paragraph 30 of the Complaint.

31.     Defendants deny the allegations of paragraph 31 of the Complaint.

32.     Defendants deny the allegations of paragraph 32 of the Complaint.

33.     Defendants deny the allegations of paragraph 33 of the Complaint and refer to the Terms of Use for their precise terms and conditions.

34.     Defendants deny the allegations of paragraph 34 of the Complaint and refer to the Terms of Use for their precise terms and conditions.

35.     Defendants deny the allegations of paragraph 35 of the Complaint.

36.     Defendants deny the allegations of paragraph 36 of the Complaint.

37.     Defendants deny the allegations of paragraph 37 of the Complaint.

38.     Defendants deny the allegations of paragraph 38 of the Complaint.

39.     Defendants deny the allegations of paragraph 39 of the Complaint.

40.     Defendants deny the allegations of paragraph 40 of the Complaint.

41.     Defendants Guinio Volpone and Ray Volpone were dismissed as defendants pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, Defendants do not need to respond to paragraph 41 of the Complaint.

42.     Defendants deny the allegations of paragraph 42 of the Complaint and note that Volpone Software was dismissed as a defendant pursuant to the Court's May 14, 2018 Opinion and Order.

43.     Defendants deny the allegations of paragraph 43 of the Complaint except to admit that Seat Scouts is a Nebraska limited liability company and that its Certificate of Organization was filed on or about March 1, 2017.  Defendants refer to organizational documents for Seat Scouts for their precise terms and conditions.

44.     Defendants deny the allegations of paragraph 44 of the Complaint and refer to the message posted on "Shows On Sale" for its precise terms and conditions.

45.     Defendants deny the allegations of paragraph 45 of the Complaint and refer to the message posted on "Shows On Sale" for its precise terms and conditions.

46.     Defendants deny the allegations of paragraph 46 of the Complaint and note that defendants Guinio Volpone, Ray Volpone, Stuart Gainor, Volpone Software, and Gainor Software were dismissed as defendants pursuant to the Court's May 14, 2018 Opinion and Order.

47.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 47 of the Complaint.

48.     Defendants deny the allegations of paragraph 48 of the Complaint.

49.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 49 of the Complaint.

50.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 50 of the Complaint.

51.     Defendants deny the allegations of paragraph 51 of the Complaint.

52.     Defendants deny the allegations of paragraph 52 of the Complaint.

53.     Defendants deny the allegations of paragraph 53 of the Complaint.

54.     Defendants deny the allegations of paragraph 54 of the Complaint.

55.     Defendants repeat and reassert their responses to each and every allegation set forth in paragraphs 1 through 54 of the Complaint as if fully set forth herein.

56.     Defendants deny the allegations of paragraph 56 of the Complaint.

57.     Defendants deny the allegations of paragraph 57 of the Complaint.

58.     Defendants deny the allegations of paragraph 58 of the Complaint.

59.     Defendants deny the allegations of paragraph 59 of the Complaint.

60.     Defendants deny the allegations of paragraph 60 of the Complaint.

61.     Defendants deny the allegations of paragraph 61 of the Complaint and refer to the Court's May 14, 2018 Opinion and Order for its precise terms and conditions.

62.     Defendants repeat and reassert their responses to each and every allegation set forth in paragraphs 1 through 54 of the Complaint as if fully set forth herein.

63.     Defendants deny the allegations of paragraph 63 of the Complaint and refer to the Court's May 14, 2018 Opinion and Order for its precise terms and conditions.

64.     Defendants deny the allegations of paragraph 64 of the Complaint and refer to the Court's May 14, 2018 Opinion and Order for its precise terms and conditions.

65.     Defendants deny the allegations of paragraph 65 of the Complaint and refer to the Court's May 14, 2018 Opinion and Order for its precise terms and conditions.

66.     Defendants deny the allegations of paragraph 66 of the Complaint and refer to the Court's May 14, 2018 Opinion and Order for its precise terms and conditions.

67.     Defendants deny the allegations of paragraph 67 of the Complaint and refer to the Court's May 14, 2018 Opinion and Order for its precise terms and conditions.

68.     Defendants deny the allegations of paragraph 68 of the Complaint and refer to the Court's May 14, 2018 Opinion and Order for its precise terms and conditions.

69.     The claims contained in paragraphs 69 through 100 have been dismissed as to all defendants pursuant to the Court's May 14, 2018 Opinion and Order.  Accordingly, no response is required.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Defendants deny that Drew Gainor accepted the Terms of Use upon which Plaintiff's claims are based.  To the extent a jury finds to the contrary, the Terms of Use, and the restrictions contained therein which Broker Genius now seeks to enforce, represent an unenforceable contract of adhesion.

### THIRD AFFIRMATIVE DEFENSE

 Defendants deny that Drew Gainor accepted the Terms of Use upon which Plaintiff's claims are based.  To the extent a jury finds to the contrary, the Terms of Use, and the restrictions contained therein which Broker Genius now seeks to enforce, are unconscionable and therefore unenforceable.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred due to it having procured Defendant Gainor's acceptance of the Terms of Use through fraudulent means.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by virtue of its unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because it seeks to enjoin Defendants based on a product that Plaintiff no longer offers for sale.

## COUNTERCLAIMS AGAINST BROKER GENIUS

Defendant Seat Scouts LLC ("Seat Scouts"), by and through its undersigned counsel, as and for its Counterclaim against Broker Genius Inc. ("Broker Genius") states as follows:

1.      Counterclaim Plaintiff Seat Scouts LLC is a Nebraska Limited Liability Company with its principle place of business in Nebraska.

2.      Counterclaim Defendant Broker Genius is a Delaware Corporation with its headquarters located in New York State.

### Common Facts On Counterclaims

3.      Both Seat Scouts and Broker Genius are competitors in the provision of applications that assist ticket brokers in managing and selling their inventory.

4.      Broker Genius has engaged in a persistent promotional campaign that falsely identifies its own AutoPricer product as novel or technologically innovating, while simultaneously disparaging the products of its competitors, including Seat Scouts LLC, as being wrongfully obtained and copied.

5.      This advertising, made in various media, including in the course of interstate commerce, was intended to provide Broker Genius a competitive advantage over its competitors, including Seat Scouts LLC by falsely conveying to customers, such as the brokers, that its product is the result of innovation and novel technology created by Broker Genius.

6.      Such claims of inventorship over technology is both literally false, and also creates the false impression that competitors, such as Seat Scouts, have copied or are improperly

using trade secrets or proprietary technology derived from Broker Genius. Broker Genius has also made false claims about its technology being a trade secret, and that Broker Genius' technology is innovative.

7.     In sworn admissions made with the Court, Broker Genius has acknowledged that its supposed advances beyond existing ticker pricing products were "immaterial" and were "a distinction without a difference."

8.     Despite these admissions, as set forth below, Broker Genius continues falsely to claim its advancement of technology.

**Broker Genius' False Claims Of "Creating," "Inventing" Or "Pioneering" Dynamic Ticket Pricing "From Scratch"**

9.     Specific to the market for using ticket management programs to adjust prices based on the secondary market movements, Broker Genius has repeatedly and falsely claimed to have originated the concept of dynamic ticket pricing through which the user is able to identify relevant comparable tickets in the secondary market, and using those comparable tickets, apply price rules that dynamically update suggested ticket prices.

10.     To that end, using interstate communications, including its web site located at brokergenius.com, Broker Genius claims to have "invented" automated dynamic pricing technology:

> We invented automated dynamic pricing technology in the secondary market.
> Broker Genius pioneered pricing automation technology from scratch – and then rebuilt it again and again. 4 iterations, 40 developers and 5 years later, Broker Genius is still constantly innovating by harnessing the power of data.

https://brokergenius.com/about/

11.     This claim has been a central component of Broker Genius' marketing campaign since at least 2014.  In 2014, for example, Broker Genius posted the following advertisements on its official Twitter feed, claiming to have created the concept of dynamic pricing technology:



12.     In a November 9, 2017 Press Release, Broker Genius falsely described itself as a "New York-based pioneers of dynamic pricing technology for the secondary ticket market."

13.     That claim of having invented dynamic pricing technology continues.  As recently as in April 2018, Broker Genius repeated its false statements that it "invented dynamic pricing technology" on its Facebook page:



14.    Broker Genius and its founder, Shmuel Sherman, made similar statements about being "the pioneer of dynamic ticket pricing technology on the secondary market" on its Twitter feed in April 2018:



15.    Broker Genius promotes such misconception by communications with customers. In advertising, including on Mr. Sherman's Linkedin page, under the listing of "Patents," Mr. Sherman identifies a patent "filed" in July 2014:

> Patents
> United States
> Filed July 2014
>> System and methods of managing ticket inventory multiple ticket exchanges receive a selection of listing data relating to a set of tickets in a user's ticket inventory; identify, based on the listing

data and one or more predefined user preferences, a set of available ticket listings listed on a ticket exchange representing relative market with which to compare the listing data; determine a current market price and a future market price for the relative market; assess whether the future market price exceeds the current market price; and set a listing price based on the assessing step. The listing price is set relative to a reference price when the future market price does not exceed the current market price. The reference price is monitored for changes; and the listing price is dynamically adjusted as required to remain priced relative to the reference price.

16.     In fact, the claim to have invented anything, matched with the reference to the Patent filing, is materially misleading.  This referenced patent application has been rejected on multiple occasions by the United States Patent Office.

17.     The patent application sought protection for the dynamic automatic ticket pricing systems featured in Broker Genius' advertisements.

18.     Included in the application was the architecture by which the program communicates with the broker's Point of Sale system on one channel, while also communicating with the secondary market on another channel.



19.     The Patent claimed that Mr. Sherman had invented a pricing system by which the user could select one or more of its tickets in inventory, and then define a set of comparable tickets using rules ("predefined user preferences").  The claim also asserted invention of using automatic process to change the market price of the inventory based on movement of the secondary market comparable ticket set.

> [0011]   According to a first salient aspect of the invention, a method of managing ticket inventory on one or more ticket exchanges is disclosed. The method is performed by a server having memory, a processor, and one or more code sets stored in the memory and executable in the processor. The method includes the steps of receiving, at the processor, a selection of first listing data relating to a first set of one or more tickets in a user's ticket inventory; identifying, by the processor, based on the first listing data and one or more predefined user preferences, a set of available ticket listings listed on a first ticket exchange representing a first relative market with which to compare the first listing data; determining, by the processor, a current market price for the first relative market; determining, by the processor, a future market price for the first relative market; assessing, by the processor, whether the future market price exceeds the current market price; and setting, by the processor, a first listing price for the first set of one or more tickets on the first ticket exchange based on the assessing step.

20.     On September 9, 2014, the U.S. Patent and Trademark Office issued a determination based on the review of the patent examiner.

21.     The Patent and Trademark Office rejected Mr. Sherman's claim on three grounds: 1) the claims were abstract ideas "that are well understood, routine and conventional activities previously known to the pertinent industry, i.e., receiving input and making calculations," (2) the claims were prior art known to the public, and (3) that the process of combining input filters thereby "dynamically adjusting" the resulting data, was obvious.

22.     Mr. Sherman submitted arguments against the rejection, seeking to overcome the claim that the process, or any of its components individually, were not patentable.

23.     The Patent Office rejected those arguments on December 12, 2014.

24.     In June 19, 2015, Mr. Sherman sought a Request for Continued Examination, but on October 8, 2015 the Patent and Trademark Office issued a non-final rejection of the Patent.

25.     Paragraph 14 and 15 of the October 18, 2015 decision specifically concluded that Broker Genius' claims of using predefined user rules to automatically re-price tickets were not novel under 35 U.S.C. 103, as the process described by Broker Genius' patent would have been ascertainable by one of ordinary skill in the pertinent art.

26.     On April 8, 2016, Mr. Sherman sought to amend the Patent to claim a more limited set of claims in the patent application by withdrawing claims 11 and 22 of the application.

27.     On October 12, 2016 the Patent and Trademark Office issued a final decision rejecting Plaintiff's claim to have developed anything novel.  It rejected the patent claims both on the grounds that Plaintiff's concepts were too abstract under Section 101 of the Patent and Trademark Act, but equally importantly, on the grounds that the combination of features that Mr. Sherman sought to protect – allowing users to interact with data via user defined rules -- was obvious to anyone in the industry.

28.     The Patent and Trademark Office specifically rejected the contention that the limitations to the actual process used by Mr. Sherman modified the general state of knowledge and obviousness.  "Looking at the limitations as an ordered combination adds nothing that is not already present when looking at the elements taken individually." (Final Patent Rejection dated October 12, 2016 at p. 9).

29.     Most recently, on April 10, 2017, Mr. Sherman filed an amendment, amending claims 1, 4-5, 9-10, and 12-21.  Mr. Sherman also cancelled claims 11 and 22, and added a new claim 23.

30.     On January 8, 2018, the U.S. Patent and Trademark Office issued a final rejection, denying Mr. Sherman's claims, including his claim to have invented dynamic automatic ticket pricing.

31.     Specifically, the Office of Patent and Trademark determined that the claims to the process of filtering offerings in the secondary market to determine matching tickets against which to price was well known in the industry, stating:

([0125]).  Therefore, *Lester et al.* certainly teaches identifying a set of available tickets, said set of available tickets comprising at least one ticket having associated listing data corresponding to the first listing data and at least one ticket not included in the ticket inventory of the user.

**Broker Genius' Claims Of Inventing, Pioneering, Or Creating Dynamic Ticket Pricing Is False**

32.     Contrary to its claims in the commercial advertisement of its product, Broker Genius did not conceive, invent, or pioneer dynamic pricing technology for ticket selling, even on the secondary market. Its product, AutoPricer does not use any architecture or components that were not already known and utilized in the dynamic ticket pricing market.  Many of the features and concepts were taken directly from programs that Mr. Sherman utilized prior to founding Broker Genius in 2013.

33.     Prior to developing AutoPricer, Broker Genius, or its founder Mr. Sherman, utilized and accessed a series of products from Seat Trax, TicketEvolution's CORE, as well as

goPricer.com and others.  Mr. Sherman adopted the features Broker Genius now claims to have pioneered.

34.     One of the products used by Mr. Sherman prior to developing any product or founding Broker Genius was an autopricing product, Seat Trax.

**Broker Genius Did Not Create Dynamic Ticket Pricing**

35.     The concept of dynamic ticket pricing – programs that changing ticket prices based on changes in the secondary market – existed well before Broker Genius.  Digonex Technologies, Inc. was an early company to utilize dynamic ticket pricing, using the process at least as early as 2010.

36.     The dynamic ticket pricing development was the focus of many newspaper stories, including a 2012 ESPN feature about the growth of dynamic ticket pricing programs that monitored the secondary market (StuHub) and used pricing rules to dynamically update the price ticket pricing depending:

> Mike Clough, the Twins' director of ticket sales and service, often uses the term "demand-based" pricing when explaining the concept. Essentially, ticket prices will fluctuate based on demand.
> ……
> The algorithms in that software allow it to examine about 40 variables for every game on a team's schedule and come up with a suggested price for tickets in each section of the park.
>
> Among those variables are weather, historical sales trends, current standings, pitchers, the day of the week and the demand in the "secondary market" -- tickets resold by sites such as StubHub.

37.     Another company offering dynamic ticket pricing functions was Qcue.com.   At least as early as 2012, and upon information and belief dating back to at least 2002, Qcue.com offered dynamic pricing capabilities. As noted in the Forbes article,:

> Once tickets begin to move, dynamic pricing applies advanced analysis to adjust prices based on sales and other measures of shifting demand. The result is better scaling throughout the house and better variable pricing.

38.     In a further article in March 2, 2014 Crain's Detroit (retrievable at http://www.crainsdetroit.com/article/20140302/BLOG003/140309989/dynamic-ticket-pricing-means-stadium-seat-prices-are-adjusted-up-or) highlighted the role of dynamic ticket pricing by Digonex and Qcue in which prices are adjusted automatically based on demand on the secondary market, particularly StubHub.

> The ability to set prices based on real-time demand, using customized algorithms, is a growing trend in the sports industry over the past several years. Teams noticed the prices on the secondary market, on resale websites such as StubHub.com, and got into the act by investing in those companies and also by adopting the demand pricing model (which usually begins as variable pricing, or set prices for the expected popularity of an opponent).

39.     The article explains that, by using the secondary market to measure real-time demand, Qcue program analytics automatically adjusted ticket price based on movement of the ticket price in the secondary market:

> 3. When real-time demand data pricing begins Monday (March 3), the price of that ticket could go up, down or stay the same. The analytic software will tell the Tigers what the market demand is for that seat. It's up to the Tigers to change the price or not. Teams that use such pricing software determine when they want to use the demand data to change prices.

**Broker Genius Has Acknowledged That Automating The Re-Pricing Based On The Calculated Price Was Not Novel**

40.     As demonstrated in the preceding paragraphs, dynamic pricing, in which ticket prices are automatically calculated based on movement on the secondary market (*e.g.,* StubHub) was not created by Broker Genius, and existed years before Broker Genius was even created.

41.    Broker Genius did not conceive the additional step of automating the broadcast of that dynamic price adjustment to the market to actually "re-price" the ticket on the secondary market.  That process also existed prior to 2012.

42.    With respect to Mr. Sherman's claim that *automating* the repricing of tickets was a novel advancement of the existing pricing technology, the Patent and Trademark Office disagreed in rejecting Mr. Sherman's patent on January 8, 2018:

> In response to Applicant's argument, the Examiner respectfully disagrees.  *Sunshine et al.* discloses that in some instances, the software will ***automatically re-price inventory without user involvement***. Because sales can move rapidly, sometimes automatic re-pricing is preferred ([0186]).  Therefore, the Examiner is not persuaded by Applicant's argument.

43.    The Qcue.com dynamic ticket pricing system not only automatically calculated the suggested price, but also automatically broadcast the suggested prices into the market.  As described in its 2012 web page:

> While other pricing solutions require manual inputs that can take days to implement, Qcue's software helps organizations make thousands of prices changes in just minutes.
>
> Sophisticated algorithms analyze real-time sales data and other external factors to generate sales and revenue forecasts based on various price recommendations. Once approved, price changes are automatically pushed to ticketing systems which process the changes at the point of sale and across all channels.

44.    At least as early as 2012, another product, Seat Trax, provided users the ability to automatically and dynamically adjust the price of the broker's ticket inventory on the secondary market using the exact same process later "invented" by Broker Genius.

45.   As described in its 2012 web page, archived at https://web.archive.org/web/20121206033707/http://seattrax.com:80/seattrax.html Seat Trax used the same system architecture claimed by AutoPricer, one that matched the user's ticket inventory software with the event listing on the secondary market, specifically StubHub.

46.   Like AutoPricer, Seat Trax had a feature that provided the broker the ability to select the comparable tickets on StubHub using the Zone Trax menu (or, as called by Broker Genius, widget) against which to price its own inventory:

> The "Nucleus" of SeatTrax is our proprietary ZoneTrax mapping system. ZoneTrax allows you to quickly evaluate active inventory, comparable to your inventory. Every section in a stadium/arena is mapped using a two dimension value based on both "Zone" and "Section". All Zones are assigned a point value from (0 – 100), and all Sections within each Zone are also assigned a point value from (0 – 100) .  The premise of ZoneTrax is that sections within a zone many times have different resale value, and it is important to be able to isolate inventory that is equal to your active inventory for pricing/sales analysis. ZoneTrax also allows you to quickly identify the amount of active inventory that has equal or better ZoneTrax value, and is priced lower than your inventory.

47.   Like AutoPricer, Seat Trax allowed users to create pricing rules for an entire group of tickets, so that the user did not have to recreate that rule for each individual ticket.  This is described in Seat Trax's 2012 web page, showing the group functions:

• Event and Ticket Group selection boxes quickly isolate specific ticket groups to analyze.

48.   Like AutoPricer, Seat Trax broadcast the calculated value for the user's own listing onto StubHub. As described in its 2012 web page, Seat Trax allowed the user to "Update Price on StubHub directly from SeatTrax."

49.     The program also used the concept of tiering the communications with the secondary market information so that Seat Trax increased the frequency of the broadcast pricing updates as the event date approached.

> The SeatTrax engine crawls every active sporting event at StubHub and database's active listings and completed sales. As games become closer to game date, we crawl the event more often. As often as every 15 minutes starting the day prior to game day.

50.     A further product, StageFront, was, upon information and belief, a fully-automated ticket pricing product that both automatically and dynamically updated ticket prices, but also automatically broadcast those updates into the market.

51.     In the StageFront product, the user is able to automatically and continually calculate the value of a ticket and also automatically have that value pushed so that the ticket is repriced on the StubHub account.

52.     This occurs by the user selecting the comparable tickets on StubHub against which it wishes to calculate value, and create pricing rules to apply to the resulting bundle of selected comparable tickets.  Through this process, Stage Front continuously updates the calculated value as the underlying comparable tickets on the StubHub market.

53.     Upon information and belief, StageFront is a fully automated ticket pricer because it also transmits the calculated value immediately to the user's account and thereby updates prices at which the user's ticket is offered.

54.     Consequently, Broker Genius' claims of having pioneered this process are literally false.  They are also misleading to customers, who would assume from the description that Broker Genius is a superior product to other competitors, including Seat Scouts.

55.    In promoting AutoPricer, and distinguishing it from its prior Price Genius product, Broker Genius has claimed in advertisement the advance from manual pricing to autopricing.

56.    In filings made to the Court, Broker Genius has acknowledged that the advance from manual pricing to broadcasting that change automatically is negligible and insignificant.

**Broker Genius' False And Misleading Claims About Seat Scouts**

57.    Not only has Broker Genius made false claims about its own products, but also it has made false claims against Seat Scouts and its Command Center product.  Outside of the litigation process, Broker Genius' agents have as part of promotional activities, called the Command Center product a "copy-cat SaaS" product.  SaaS refers to Software as a Service. Specifically, on May 15, 2018 and continuing to this day, Broker Genius' agent, Pearl Cohen Zedek Latzer Baratz LLP has made the false assertion that Command Center is a "copy-cat SaaS" product taken from AutoPricer.  The false statement is published at https://pearlcohen.com/news/2018/05/15/ip-litigation-win-for-client-broker-genius/

58.    Broker Genius' claim that Command Center was a "copy-cat" program copied from AutoPricer is false, and also incorrectly conveys to consumers the idea that Seat Scouts engaged in improper and wrongful actions.

**The Individual Features Of Broker Genius' AutoPricer Were Not Copied By Mr. Gainor, But Were Copied By Broker Genius From Mr. Gainor's CORE product**

59.    The individual features that Broker Genius claims to have been copied were actually pre-existing components copied by Mr. Sherman from CORE.

60.    Mr. Sherman and Broker Genius also engaged with Ticket Evolution through which Mr. Sherman was able to see and utilize the features in its CORE product.

61.    Individual features were taken from CORE, including the ability to manipulate Event Lists and Inventory Lists.

62.    The CORE product also provided users the Event List Menu and Inventory List Menu by which users could search features in both their own inventory, and that in the secondary market.  Those menus included the ability to isolate particular groups of tickets in the secondary market to serve as comparable tickets from which to monitor the price movement.  That selection could be by using either zone/section and row selection, or by an interactive map.

63.    CORE also allowed the user to use that derived price to price their own tickets, either by percentages of price or by a flat amount.

64.    Broker Genius utilized the elements of these programs in developing AutoPricer, including the Event List menu, and the Inventory List menu.

65.    Broker Genius also has utilized features and elements from goPricer.com, which is another product that automatically and dynamically updated ticket prices.

**Pre-AutoPricer Architecture**

66.    goPricer contains the same architecture as AutoPricer, connecting to the broker's Point of Sale program through an API, and connecting to the secondary market, StubHub, through another API.

67.    Like AutoPricer, goPricer contains an Event and Inventory dashboard, and search features so that the broker is able to search the events by any combination of Event Name, Venue, City, Section, Row, and Date.

68.    Like AutoPricer, goPricer contains a Season dashboard, by which the user can select an entire season ticket package to which to apply its rules.

69.   Like AutoPricer, goPricer contained pricing rules, through which the broker is able to input a price manually, and determine what its profit would be, or, to create pricing rules that automatically adjust the price of the ticket based on movement of the comparable tickets on the secondary market.

70.   goPricer had automatic broadcast capabilities.  By choice, the adjusted price would be held for 60 seconds before it was pushed into the user's Point of Sale, from where it would be adjusted on StubHub (as shown in the below portion of its 2015 user guide).

## Changing Ticket Prices

Ticket Prices can be changed by using any of the four methods listed below.

Note that with all of these methods, there is a 60-second delay before the price change is pushed live. During this delay, the price change can be cancelled simply by clicking anywhere on the countdown timer.



Otherwise, the price change is automatically pushed live once the countdown timer reaches zero. The price change will be posted immediately to Vivid, and will populate through to other exchanges within a few minutes.

71.   Like AutoPricer, goPricer allowed users to create rules by specific groups of tickets (as shown by the below portion of its 2015 user guide).

Bulk Editing

After you've selected multiple tickets, you can Bulk Edit in a number of ways:

1. Click 'Bulk Edit' in the top right of the screen

   You can now change your ticket prices, either by dollar or percentage increments. The colors and calculations within the ovals will instantly

72.    Like AutoPricer, goPricer contained several sub-features that allowed users to identify particular features of the comparable tickets on Stubhub, to ensure that their price is not automatically calculated based on particular conditions or outlier tickets.

To further fine tune this feature, there are some additional settings that you can set via the 'Quantity Comparison' tab on the settings page:

- Option to 'Ignore my Listings'. With this setting enabled, the Set as Cheapest button will not price your ticket below other tickets if those tickets are your own inventory.
- Option to 'Ignore Lowball Listings' (and 'Lowball Indicator Threshold'). When this setting enabled, the Set as Cheapest button will ignore listings that undercut the next listing by the specified percentage. For example, lets say your ticket is priced at $80, and the other listings in that category are priced at $40, $70, $85, and $95. With the 'Ignore Lowball Listings' feature enabled, clicking the 'Set as Cheapest' button would price your ticket at $69 (rather than pricing it at $39).

All of the above features are displayed in goPricer's detailed user guide publicly displayed and available on the worldwide web at the following address http://docs.gopricer.com/2015/04/20/detailed-user-guide

**Seat Scouts Has Not Engaged In Any Copying Activities**

73.    The claim that Seat Scouts and Mr. Gainor copied AutoPricer is knowingly false, and was made at a time that Broker Genius had actual knowledge, including receipt of documentation, that evidenced that Seat Scout's did not copy features, components or architecture from Broker Genius.

74.    Mr. Gainor first had access to the AutoPricer product in May 2016. The information known to Broker Genius shows that the AutoPricer features and components that are claimed to have been derived from AutoPricer were actually known to and conceived of by Mr. Gainor prior to that date.  Specifically, the documents show that the architecture, the component menus (dashboards) and system were developed prior to May 2016.

75.    For example, the architecture by which the program communicates and syncs with the broker's POS system (Skybox's Vivid system) on the one end, and a ticket exchange (here StubHub) on the other end, was recorded as conceived at least as early as June 2015.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 97389520 | Vivid API Token and docs | | 1 | 18-Jan-16 | 24-Jan-16 | chore | | accepted | 19-Jun-15 |
| 97522836 | Sync with Vivid Catalog | | 1 | 18-Jan-16 | 24-Jan-16 | feature | 3 | accepted | 22-Jun-15 |
| 97561138 | Build Settings Page and authenticate users | | 1 | 18-Jan-16 | 24-Jan-16 | feature | 3 | accepted | 22-Jun-15 |
| 97313250 | Sync all short (zone) orders from Vivid API | | 1 | 18-Jan-16 | 24-Jan-16 | feature | 3 | accepted | 18-Jun-15 |
| 97134586 | Query stubhub for each event with open zone orders | | 1 | 18-Jan-16 | 24-Jan-16 | feature | 3 | accepted | 16-Jun-15 |

76.    The details to those entries in Pivotal Tracker shows exactly the precise architecture component that Broker Genius contends was copied, with the September 17, 2015 entry titled "Pull in all inventory from Skybox" and detailing that Mr. Gainor's product would pull inventory from the user's POS Skybox inventory through an API.



77.     Mr. Gainor also recorded in 2015 the system dashboard (list) that allows the user to access the events listing downloaded from Skybox, and then search those events in Event Watcher's dashboard.  A copy of the recordation of that feature from 2015 is shown in the image below:



78.     In addition to linking to the user's POS inventory, Mr. Gainor's program communicated with the secondary market, StubHub, in order to obtain real time pricing information.  In order for the user to specify the tickets on StubHub that the user wished to match, Mr. Gainor's program was designed to permit the user to create a chosen "ticket group" for the event to monitor on StubHub. This feature was identified in Pivotal Tracker on September 21, 2015 as ▾ Compare a Ticket group to available listings on Stubhub .

79.     The entry contains a fuller description of the user's ability to create a ticket group, including selecting the event's zones, sections, and rows.   In addition, the user can identify characteristics of the tickets that they wish to match, including whether the tickets are paper copies that must be mailed, electronic delivery, and ticket splits for breaking batches of tickets into subgroups.



80.     Shown below is a portion of the "History of Autopricer Search" wireframe for Event Watcher, showing the screen by which the user can see his or her inventory above, and below that, a listing of the StubHub lowest comparable tickets.   The next set of filters allow the user to refine those listings by the settings, zones, sections and rows:



81.     The Wireframe shows that Mr. Gainor's program also provided the user with the ability to update a value for his or her inventory based on the StubHub movement of the chosen comparable ticket listings.  This is accomplished by the "create a rule" feature, by which the value of the user can have the ticket price adjusted based on a pricing formula set by the user. For example, the above wireframe shows the user selecting to have his ticket priced "sliced" by $.11 under the StubHub tickets. Event Watcher also allowed the user to create a price floor on that value, below which the price calculation should not fall.

82.     Mr. Gainor's program also had features that allowed the user to select a group of his or her tickets or a season ticket so as to create a rule that will apply to multiple tickets at once.  In Pivotal Tracker entry 103614110, dated September 17, 2015, and titled:

,

83.     Mr. Gainor's program allowed the user to, as the name suggests, create groups to which rules applied, so that the user did not have to create those rules for each individual ticket. That ability is included in the image below, created in 2015.



84.     Mr. Gainor's program Pivotal tracker entry, a portion of which is set forth above, describes the "cascade" of options in the wireframe screen, as the user progresses through the comparable selection to configure rules.  Among the options are options allowing selection of the tickets based on information about the ticket delivery and "splits" of tickets, and other ticket characteristics that the user wishes to exclude.

85.     Mr. Gainor also provided that the user can then edit the rules using rule icons:

86.     Once those comparable characteristics are selected, Mr. Gainor's program had another feature, the "Create Rule" portion of the menu that the user could use to reprice his or her tickets based on movement in the value of the chosen comparable tickets in StubHub. That function is described in 2015 Pivotal Tracker entries as follows.

87.     The program included other features plainly not "copied" from AutoPricer, because they were recorded as predating any access by Mr. Gainor.  For example, when checking on StubHub, Mr. Gainor's program also made sure to exclude the user's own inventory already on StubHub: "We should ALWAYS ignore any tickets owned by us."

> Then based on the rule set up for this ticket group, the ticket group being compared should be updated to be X ($.11) amount  lower than the lowest comparable ticket group found on StubHub as long as the new price would not be lower than the floor set for that ticket group. A ticket at the pricing floor should be flagged.

88.     Critically to the claim that Mr. Gainor copied the autopricing ability from AutoPricer, Mr. Gainor's program provided the user the option to automatically cause the calculated price to be transmitted back to the user's POS (*e.g.,* Skybox) to allow the user to act on the information by repricing his or her inventory on StubHub either automatically or to disable the automatic pricer and reprice his or her tickets manually.  The autopricing feature is

contained in the September 21, 2015 Pivotal Tracker entry 103824172, which describes, among other features, that a user could select ticket groups for automatic price adjustments being pushed through to the Skybox account, and thereby automatically be pushed into the StubHub market at the new price. That automatic push could be disabled by the user, to allow manual pricing.

> Clicking on "Disable Pricer for this ticket group" should disable the auto pricer for this ticket group.

89. In addition to automatic pricing, the user could select to disable the automatic pricing and manually select the prices. The Pivotal Tracker entry for Mr. Gainor's program, titled "Compare a Ticket Group to available listings on StubHub," shows the following abilities:

**DESCRIPTION**

Request all listings for an event on Stubhub:
/search/inventory/v1

Look at all listings returned from Stubhub that match the "sectionName", "row", "splitVector", "listingAttributeList", "deliverytypelist". We should ALWAYS ignore any tickets owned by us.

Then based on the rule set up for this ticket group, the ticket group being compared should be updated to be X ($.11) amount lower than the lowest comparable ticket group found on Stubhub as long as the the new price would not be lower than the floor set for that ticket group. A ticket at the pricing floor should be flagged.

The ticket group price can be updated in Skybox using this endpoint: PUT https://skybox.vividseats.com/api-docs/index.html#!/inventory/update_put_2
Value is "listPrice"

If the ticket group being updates i currently on hold:
status (InventoryStatus, optional) = ['On Hold'],
then we must add notes to the hold with the original price that exists prior to updating the price:
/holds/{hold-id}
notes (string, optional),

The problem is we only ever want to update the notes of a hold

At the conclusion, the Pivotal Tracker shows Mr. Gainor's autopricer design was complete by September 29, 2015:



90.     The above entries from before any access to Broker Genius' AutoPricer product shows that Seat Scouts is not offering a "copy-cat" of AutoPricer, and that Broker Genius' claims to the contrary are knowingly false and defamatory.

91.     The false claims about its own product, as well as its false claims against Seat Scouts, reduced consumers' incentive to select Command Center rather than AutoPricer.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF THE LANHAM ACT)**

92.     Seat Scouts repeats and realleges the preceding paragraphs 1 through 91 of its Counterclaim as if fully set forth herein.

93.     Broker Genius' conduct in making false and misleading claims about its own products and about Seat Scout's product violates 15 U.S.C. § 1125(a) (the "Lanham Act").

94.     Broker Genius made false statements or fact about its own products or Seat Scouts in its advertisements, on its own website, and on social media such as Facebook and Twitter.

95.     Broker Genius made its statements in commerce and in furtherance of its own commercial activities.

96.     Those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience.

97.     The deception is material because it is likely to influence buying decisions.

98.     Moreover, as explained herein, the statements were not only false and material but likely to induce reasonable reliance because those consumers are unlikely to know the falsity of Broker Genius' claims.

99.     Because of the contractual provisions Broker Genius required in its customer contracts, the impact of the false claims have and will continue for a significant length of time and that rivals are unable to offset the false impression with their own advertising.

100.    Broker Genius caused its falsely advertised goods and services to enter interstate commerce.

101.    Seat Scouts has been or is likely to be injured as a result of these activities either through direct diversion or sales from Seat Scouts to Broker Genius, or by injuring the goodwill its products enjoy with the buying public.

102.    Seat Scouts is entitled to treble damages under the Lanham Act as a result of Broker Genius' conduct.

103.    Seat Scouts is entitled to an award of its attorney's fees under the Lanham Act as a result of Broker Genius' conduct.

## SECOND CAUSE OF ACTION
## (NEW YORK UNFAIR COMPETITION)

104.    Seat Scouts repeats and realleges the preceding paragraphs 1 through 103 of its

Counterclaim as if fully set forth herein.

105.    New York General Business Law section 349 prohibits "deceptive acts or

practices in the conduct of any business, trade or commerce or in the furnishing of any service"

in the State of New York.

106.    New York General Business Law section 350 prohibits "false advertising in the

conduct of any business."

107.    New York General Business Law Section 351 defines "false advertising" in

pertinent part:

> The term "false advertising" means advertising, including labeling,
> of a commodity, or of the kind, character, terms or conditions of
> any employment opportunity if such advertising is misleading in a
> material respect.   In determining whether any advertising is
> misleading, there shall be taken into account (among other things)
> not only representations made by statement, word, design, device,
> sound or any combination thereof, but also the extent to which the
> advertising fails to reveal facts material in the light of such
> representations with respect to the commodity or employment to
> which the advertising relates under the conditions prescribed in
> said advertisement, or under such conditions as are customary or
> usual.

108.    Broker Genius is engaged in the conduct of business, trade, and commerce within

the state of New York.

109.    Broker Genius provides computer assisted services for the resale of event tickets

including sporting events and theater tickets within the state of New York.

110.    Broker Genius' services and its advertising of those services are consumer

oriented.

111.    Broker Genius' advertising as outline above, and in particular its statements that it is the inventor, pioneer or creator of autopricing technology are deceptive and materially misleading.

112.    Broker Genius' conduct as described above was knowing and willful.

113.    Seat Scouts has been injured as a result of Broker Genius' false and deceptive statements.

114.    Seat Scouts is entitled to enhanced damages and an award of attorney's fees pursuant to the General Business Law.

115.    Broker Genius has violated Sections 349 and 350 of the General Business Law.

## THIRD CAUSE OF ACTION
### (TRADE DEFAMATION)

116.    Seat Scouts repeats and realleges the preceding paragraphs 1 through 115 of its Counterclaim as if fully set forth herein.

117.    Broker Genius' statements as described above negatively reflect on the quality and condition of the products offered by its competitors, including Seat Scouts.

118.    Broker Genius' statements that it is the inventor of autpricing technology in the ticket industry are false.

119.    Broker Genius' published its statements that it is the inventor of autopricing technology in the ticket industry were published to the public and in particular to individuals and businesses engaged in the resale of tickets to the public.

120.    Broker Genius made its statements with malice or actual malice and with the specific intent of discouraging others from competing with Broker Genius in the market for autopricing services.

121.    Seat Scouts has suffered special damages as a result of Broker Genius' conduct including the loss of sales and customers:

## **JURY DEMAND**

Seat Scouts LLC and Drew Gainor request a trial by jury on all issues so triable with respect to their counterclaim and with respect to Broker Genius's claims in at Second Amended Complaint.

**WHEREFORE,** Defendants demand judgment against Plaintiff dismissing the Second Amended Complaint with prejudice, and awarding Defendants' their attorneys' fees and costs of suit, and judgment on Seat Scout's counterclaim as follows:

A.  Damages, in an amount to be determined at trial, but believed to be no less than $2 million;

B.  Trebling the damage award as provided in the Lanham Act, 15 U.S.C.§ 1125, and the New York General Business Law;

C.  Enjoining Broker Genius from making further claims that it invented, created or pioneered the field of dynamic ticket pricing or dynamic automatic ticket pricing.

D.  Requiring Broker Genius to place corrective advertisements remediating the false claims and impressions.

E.  Awarding Seat Scouts its attorneys' fees and costs of suit because Broker Genius's actions were engaged in bad faith, with the claims being knowingly false; and

F.   For such other and further relief as the Court may deem just and appropriate.

Dated: June 11, 2018
        New York, New York

                                          NESENOFF & MILTENBERG, LLP


                                          By_____
                                                Andrew T. Miltenberg
                                                Stuart Bernstein
                                                Jeffrey S. Berkowitz
                                          363 Seventh Avenue, 5th Floor
                                          New York, New York 10001
                                          212-736-4500

                                          and

                                          HINCKLEY & HEISENBERG LLP
                                          880 Third Avenue, Suite 13
                                          New York, New York 10022
                                          212-845-9094
                                          Counsel to Defendants