**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BROKER GENIUS, INC., | No. 17-CV-8627-SHS |
| *Plaintiff,* | |
| v. | |
| SEAT SCOUTS LLC and DREW GAINOR | |
| *Defendants.* | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF RENEWED**

**MOTION FOR JUDGMENT UNDER RULE 50(b), ALTERNATIVELY MOTION FOR**

**NEW TRIAL UNDER RULES 50(b) AND 59**

HINCKLEY & HEISENBERG LLP
880 Third Avenue, Suite 13
New York, New York 10022
(212) 845-9094

# Contents

I.    PRELIMINARY STATEMENT .......................................................................................... 1

II.   FACTS .......................................................................................................................... 2

    A.    THE TRIAL EVIDENCE CONCERNING DERIVATION ....................................... 2

    B.    THE TRIAL EXAMINATIONS ............................................................................ 3

III.  LAW ............................................................................................................................. 8

    A.    THE STANDARD FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL ............................................................................................................... 8

    B.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE BREACH OF CONTRACT CLAIM ......................................................................................... 8

        1.    Seat Scouts Owed Broker Genius No Contractual Duties, So No Breach Could Be Based on Seat Scouts' Products and Actions ................................................. 8

        2.    The Verdict Was Based On Speculation And Not Competent Evidence .......... 9

    C.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE UNFAIR COMPETITION/MISAPPROPRIATION CLAIM ................................................ 10

        1.    The Claim Is Preempted By The Copyright Act ......................................... 10

        2.    The Claim Also Is Preempted By The Patent Act ....................................... 14

        3.    The Unfair Competion Claim Fails As Broker Genius Has No Proprietary Interest ................................................................................................... 15

        4.    The Unfair Competition Claim Fails Under The "Independent Tort" Doctrine 17

        5.    The Evidence Did Not Support The Misappropriation Claim ....................... 17

    D.    DEFENDANTS ARE ENTITLED TO A NEW TRIAL ........................................ 18

        1.    The Prejudicial Evidence Of Contempt .................................................... 18

        2.    The Court's Limitation On Defendants' Ability To Rebut Plaintiff's False Statements About The Laptop .................................................................. 19

        3.    The Court Conveyed To The Jury Its Own View Of Witness Credibility And Critical Evidence .................................................................................... 20

        4.    The Court's Attempted Curative Instructions Were Insufficient .................... 23

    E.    THE JURY'S AWARD OF DAMAGES WAS EXCESSIVE AND NOT BASED ON THE EVIDENCE ............................................................................................. 24

    F.    THE TRIAL ERRORS WERE NOT HARMLESS ............................................... 25

IV.   CONCLUSION ............................................................................................................. 25

### Cases

*Anderson v. Great Lakes Dredge & Dock Co.*, 509 F.2d 1119, 1131 (2d Cir. 1974)................. 20

*Atari, Inc. v. Games, Inc.*, 2005 WL 447503 (S.D.N.Y. 2005) ................................................... 15

*Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14 Civ. 9687 (VEC), 2016 WL 4916969

  (S.D.N.Y. Feb. 11, 2016) ......................................................................................... 17

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011) ...................... 11

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004).................. 11, 12, 13

*Broker Genius, Inc. v. Volpone*, 313 F.Supp.3d 484 (S.D.N.Y. 2018) ........................................ 21

*Broker Genius, Inc. v. Zalta*, 280 F.Supp.3d 495 (S.D.N.Y. 2017)......................................... 9, 16

*C.A. Inc. v. Rocket Software, Inc.*, 579 F.Supp.2d 355 (E.D.N.Y. 2008) ................................... 12

*Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317 (E.D.N.Y. 2014) .... 14, 15

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 146 (2d Cir. 2012).......................................... 24

*Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc.*, 818 F.2d 1398, 1401 (8th Cir. 1987)....... 20

*Commercial Data Servers, Inc. v. IBM Corp.*, 166 F.Supp.2d 891 (S.D.N.Y.2001).................... 15

*Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234 (1964) ............................................... 10

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir.1992) ..................................... 11

*Demetriades v. Kaufmann*, 698 F. Supp. 521, 526-27 (S.D.N.Y. 1988) ..................................... 15

*Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470, 1475 (Fed.Cir. 1998)....................................... 14

*EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002)............ 8

*Ethox Chem., LLC v. Coca-Cola Co.,* No. CV 6:12-1682-KFM, 2015 WL 12807724 (D.S.C.

  Mar. 3, 2015)............................................................................................................. 14

*Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 398 (S.D.N.Y. 2014)................. 13

*Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415 (1996) ..................................................... 24

*National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841 (2d Cir.1997) .................................. 13

*O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1308 (5th Cir. 1977)................................................ 24

*RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14 Civ. 6294 (LTS) (HBP), 2015 WL
    5008762, at *5-6 (S.D.N.Y. Aug. 24, 2015) ........................................................................ 17

*Rivas v. Brattesani*, 94 F.3d 802 (2nd Cir.1996) ...................................................................... 24

*Santa Maria v. Metro-N. Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996) ............................. 20

*ScentSational Techs., LLC v. PepsiCo, Inc.*, No. 13 Civ. 8645 (KMK), 2017 WL 4403308
    (S.D.N.Y. Oct. 2, 2017) ...................................................................................................... 17

*Schroeder v Pinterest Inc.*, 133 A.D.3d 12, 30 n.11 (1st Dep't 2015).................................. 15, 18

*Sears, Roebuck & Co.*, 376 U.S. 225 (1964) ............................................................................. 10

*Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 98 (2d Cir.1998) .......................................... 21

*Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970)...................................................................... 8

*Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) ...... 16

*Sorias v. Nat'l Cellular USA, Inc.*, 124 F.Supp.3d 244 (E.D.N.Y. 2015).................................... 15

*Strauss v. Hearst Corp.*, No. 85-cv-10017, 1988 WL 18932, at *8 (S.D.N.Y. Feb. 19, 1988).... 12

*Suffolk Cnty. v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984)................................. 8

*Sun Micro Medical Technologies Corp. v. Passport Health Communications, Inc.,* No.
    06CV2083, 2006 WL 3500702, at *11 (S.D.N.Y. Dec. 4, 2006)........................................... 11

*United States v. Filani*, 74 F.3d 378, 386 (2d Cir. 1996)............................................................ 21

*United States v. Tilton*, 714 F.2d 642, 644 (6th Cir.1983)......................................................... 20

*Webber v. Sobba*, 322 F.3d 1032 (8th Cir. 2003) ...................................................................... 25

*Woolcott v. Baratta*, No. 13-CV-2964 JS GRB, 2014 WL 1814130, at *10 (E.D.N.Y. May 7,
    2014) .................................................................................................................................. 12

**Statutes**

17 U.S.C. § 102(a)(8)..................................................................................................... 12

17 U.S.C.A. § 301(a) .................................................................................................... 10

**Rules**

Fed. R. Civ. P. 50(b) ...................................................................................................... 8

Fed. R. Civ. P. 59(a)(1)(A) ............................................................................................ 8

**Treatises**

11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2805...................... 8

9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2524.................... 8

Defendants Seat Scouts LLC and Drew Gainor hereby renew their motion for judgment pursuant to Rule 50(b). Alternatively, Defendants request a new trial pursuant to Rule 59.

## I.     PRELIMINARY STATEMENT

Seat Scouts and Gainor are entitled to judgment as a matter of law pursuant to Rule 50(b) for the following reasons. First, the breach of contract claim was founded *entirely* on Seat Scouts' actions – building Command Center, but Seat Scouts was not a party to the contract and had no contractual restrictions.  The court already has held that the Terms of Use do not prohibit Gainor from disclosing information about AutoPricer to third parties, so there could be no breach claim.  Second, the breach of contract verdict was against the weight of the evidence, as Plaintiff's admitted lack of knowledge precluded it from challenging the traceability evidence. Third, Broker Genius' misappropriation claim is pre-empted both by the Copyright Act and the Patent Act. Fourth, the items that Broker Genius alleged to have been misappropriated were – as the court held – in the public domain as a matter of law. A misappropriation claim cannot be based on items already in the public domain.

Defendants are also entitled to a new trial under Rule 59, for several reasons. First, the verdict was against the weight of the evidence, and based on an incorrect legal standard. Second, it was a product of prejudice caused by irrelevant and prejudicial evidence (1) about the court's injunction and preliminary findings, (2) The court's finding of contempt.  Plaintiff's counsel not only used these facts in lieu of the relevant facts, but repeatedly cited to wholly prejudicial evidence from the court's decisions. Third, the court acknowledged that its sharp examination of Gainor "express[ed] my view that he was toying with the questioner," if not being untruthful. All of these prejudicial facts and comments created an unfair trial to Defendants and warrants a new trial.  Fourth, the award of damages was excessive and multiples beyond the actual damages identified by Plaintiff's expert.  Further, the differing verdict on the two causes of action cannot

1

be reconciled.  In any event, the jury fully compensated Broker Genius for its future damages and included the loss of goodwill, and price erosion.  Thus, the entry of a permanent injunction was inconsistent with the award of compensable damages.

## II.    FACTS

### A.    THE TRIAL EVIDENCE CONCERNING DERIVATION

As defined by the court's jury charge[1], the breach of contract claim turned on whether Command Center was traceable to Gainor's use of AutoPricer in May 2016 or if his knowledge of the six component "widgets," and user flow, predated that usage.  The trial evidence established the existence of these components in Gainor's 2015 Event Watcher design documents and the StageFront product used by Gainor and Volpone prior to May 2016.

The only witnesses with personal knowledge about the StageFront product were Gainor, Volpone and Erik Pancheri. Using the StageFront screen shot (DX OG), each established that StageFront contained the same elements as AutoPricer v3. The user starts with the event menu to select the event menu (Gainor Tr. 974), which populates the user's inventory list (Gainor Tr. 975), then selecting comparable tickets on the secondary market filtered by the zone/section/row characteristics (Gainor Tr. 975; Volpone Tr. 1195-96), and the ability to create rules to adjust the prices automatically based on changes to the comparables (Gainor Tr. 976-77; Volpone Tr. 1196-99; Gainor Tr. at 807 ("That was in Stage Front as well as Ticket Evolution.")).  StageFront also provided a ticket group function that permitted the user to "stagger" tickets into the market at defined prices (Gainor Tr. 977; Volpone Tr. 1201-02).  StageFront also enabled creation of season ticket rules (Gainor Tr. 977; Volpone Tr. 1202). Pancheri detailed the exact same user

---

[1] Defendants renew their objections to the court's jury charge that did not incorporate Defendants' proposed substantive instructions on the claims, and its refusal to provide the Special Verdict submitted by Defendants.

flow. (Pancheri Tr. 1400).  The process was "very similar" to the process used in AutoPricer.

Pancheri Tr. at 1404; Pancheri Tr. 1395-98.  The evidence showed that Seat Metrics

independently provided the exact same features and components.  (Volpone Tr. at 1207-08) ("the

exact same widgets that have been discussed in this trial over and over again SeatMetrics had.")

The final category identified by Broker Genius was its "cycle times."  However, those were

in the public domain, and Broker Genius told it to prospective customers (Sherman Tr. 124), and

advertised by Broker Genius (DX NZ) and posted on twitter (DX AE).

Broker Genius presented no contrary testimony from any witnesses to refute Defendants'

evidence.  Its only witness on StageFront and SeatMetrics, Koskinen, expressly testified that he

lacked any personal knowledge of StageFront, and was limited to the available screen shots, and

as to those, was limited in being able to determine functionality. (Koskinen Tr. 414-15, 497-98).

Therefore, Plaintiff was not in a position to refute the testimony of witnesses with knowledge.

## B.    THE TRIAL EXAMINATIONS

In lieu of evidence about traceability, Plaintiff presented a case founded exclusively on

attacking Gainor's credibility on collateral points.  With Gainor's credibility front and center, the

court repeatedly assumed control of cross-examination to express to the jury the court's view of

Gainor's credibility.  Within minutes of Gainor taking the stand, the jury was shown Gainor's

testimony about Command Center:

> Q. And is that [Command Center] software?
>
> A. In my -- I don't know, in my definition, maybe, maybe not.  Again, when I think of software, and this is clearly opinionated, I picture going to the store back in the 90s, getting a product and installing it on a computer.
>
> Q. We're not talking about the 90s, we're talking about --
>
> A. I'm answering your question.
>
> Q. We are talking about when you developed the software to make the Command Center product. Do you understand that?

3

A. We don't call it software.

Q. What do you call it?

A. Web application.

(Gainor Deposition, page 96-97, attached to Heisenberg Dec. Ex A).  Gainor's testimony was not

evasive. He did not deny that the Command Center uses code, or even that others may call it

"software," but merely stated his preference for calling it a web application.  That distinction is

consistent with standard definitions, in which a web application has a more-refined scope.

(Heisenberg Dec. Ex B). Rather than allow (a) Plaintiff's counsel to examine the nuance, or (b)

the jury to reach its own view of Gainor's definitions, the court took over the cross examination.

The court twice cut off Gainor's attempted explanations, and instead stated its own view that

Gainor was being evasive:

> THE COURT: Mr. Gainor, you listened to that just now, right?
>
> THE WITNESS: Yes, I did.
>
> THE COURT: Would you agree with me that you were doing everything you could to avoid giving a direct answer to the question?
>
> THE WITNESS: I honestly think --
>
> THE COURT: Yes or no. Would you agree with me that you were doing everything you could to avoid giving a direct answer to the questioner during that deposition?
>
> THE WITNESS: No, I don't agree with that.
>
> THE COURT: Explain.  Let me ask another question. It was your testimony when that was taken that you did not know what software was, is that correct?
>
> THE WITNESS: No. I explained I didn't understand how she was asking me about software. It was very vague, the way she was asking me.
>
> THE COURT: In other words, how you define software is a vague question to you, is that right?
>
> THE WITNESS: It depends on the context, in my opinion.
>
> THE COURT: What about the context in a deposition when you are being asked a question under oath, is that a vague question then?
>
> THE WITNESS: The way she asked it, it was. The way she led up to that, in my opinion -- I am not saying it's accurate.

Gainor Tr. 698.  Similarly, the court seized on Gainor's cautious statement that he "probably"

4

communicated with his engineers "about the code" – counsel was unclear whether he was being

asked if he had spoken *about* the actual code language itself (which he stated he had not), or

about the features the coders should build (which he stated that he had). The court mis-phrased

Gainor's answer to suggest he had denied every using the word "code" a question that was not

asked and an answer Gainor never gave:

> THE COURT: I was just listening to that, as you were.  I gather that you don't
> know whether you communicated with your engineers regarding code, software
> code that they were writing.  Is that correct? Because you said possibly.
>
> THE WITNESS: We don't refer directly to code. I talk about features with them.
> That's why I didn't understand her question.
>
> THE COURT: I see. You have never used the word code with your engineers, is
> that right?
>
> THE WITNESS: I might have. I don't know.
>
> THE COURT: You can't remember, is that right?
>
> THE WITNESS: I'm sure I have. I don't recall.

The court them unfairly suggested Gainor's statement that he had written HTML code 16

years ago, somehow impugned his earlier testimony about haven spoken with engineers:

> THE COURT: You say you possibly communicated with your engineers
> regarding code. Have you ever written code, sir, in your 18 years?
>
> THE WITNESS: Not in probably about the last 16 years.
>
> THE COURT: In order words, you have written code in your 18 years.
>
> THE WITNESS: Very basic websites.
>
> THE COURT: What is that code? Is that code software?
>
> THE WITNESS: It was HTML. I wouldn't consider it software.
>
> THE COURT: Software to you is going to Comp USA and buying something
> like a game, is that it?
>
> THE WITNESS: What I was trying to explain is, I picture software as something
> you can install locally on a computer, not a web application, like we were
> designing.  That's all I was trying to clear up.

Gainor Tr. 699-00.  If the court's dismissive asides were not sufficiently obvious to the jury, it

finished its cross-examination by suggest that Gainor's answers were inconsistent with his oath:

THE COURT: You were under oath then, right?

THE WITNESS: Yes.

THE COURT: You are under oath now, right?

THE WITNESS: Correct.

Gainor Tr. 700.

Apart from calling Gainor's testimony evasive and potentially untruthful, the court also used its questioning to repeatedly stress for the jury the court's own view of the relationship between certain events.  When Gainor testified that he was able to create the 2017 wireframes based on his prior knowledge, evidenced by his 2015 Event Watcher wireframes and use of the "very similar" StageFront product, the court resumed its cross-examination, repeatedly tying Gainor's knowledge to his use of AutoPricer v3, even misstating and exaggerating Gainor's use of Broker Genius:

> THE COURT: Why did it take you pretty much no time at that point to create new ones?
>
> THE WITNESS: Because I've been in the industry 18 years; and any time I spec out wire frames for anything ticket related, it doesn't take me very long based on all the experience I have from Ticket Evolution.
>
> THE COURT: And you had already been a customer of Broker Genius at that point for more than a year; correct?
>
> THE WITNESS: No, I believe I was a customer for about six months or so. But it was prior to when I redid the documents in 2017, yes.
>
> THE COURT: It was prior to when you redid the documents in 2017, when you did new wire frames.
>
> THE WITNESS: Yes.
>
> THE COURT: In 2017 you had already been a customer of Broker Genius; correct?
>
> THE WITNESS: Yes, your Honor.
>
> THE COURT: So again, why didn't you use the wire frames and specs for autopricer functionality in 2017 that you had designed but forgotten about -- designed in 2015?
>
> THE WITNESS: Because I hadn't remembered at the time that I had them. I created a lot of different specs and a lot of different --

6

THE COURT: So if I understand you, even though you created the designs and specs wire frames for the autopricer functionality in Event Watcher in 2015, and I think you said you were dying to build it out, you forgot you had those in 2017.

THE WITNESS: A couple years later, yes.

Gainor Tr. at 722-723.  The next day's news reports highlighted the court's adversarial role:

"Ticket Resale Exec Spars With Judge At Tech Poaching Trial."

Law360, New York (January 9, 2019, 9:50 PM EST) -- The co-founder of Seat Scouts denied pilfering software from competitor Broker Genius Inc. as he sparred with his rival's counsel — and at times with U.S. District Judge Sidney H. Stein — in front of a Manhattan federal jury Wednesday over technology that lets resale brokers automatically reprice tickets.

…..As Gainor and Munoz sparred over that and other details — such as what "software" actually is — Judge Stein began to press Gainor as well, asking him his reasons for doggedly parsing terms like "software," "development" and "web application" in front of the jury and during his deposition testimony.

"Would you agree with me that you were doing everything you could to avoid giving a direct answer in that deposition?" Judge Stein said.

"No," Gainor replied, insisting his views on what software actually is are constrained and that he didn't understand the questions he was asked. "I picture software as something you install locally on a computer."

"You are under oath now, right?" the judge asked as a follow-up.

"Yes," Gainor replied.

(Heisenberg Dec. Ex. C).

Finally, on the issue of the timing of Gainor's disclosure of Event Watcher and Gainor's delegation of document production to counsel, the court interposed its own negative characterization that suggested to the jury a dereliction and insufficiency to Gainor's conduct:

A. In general we talked about [the case]. We obviously -- I'll refrain. But, yes, we talked at a high level, not about the details of getting ready for this. We assumed, because we knew we did nothing wrong, that the attorneys that we were working with, who we gave access to everything, would take care of everything they were supposed to.

THE COURT: You feel you've done nothing wrong, *so it didn't really matter*, is that what you're saying?

THE WITNESS: I didn't say that it didn't matter. I knew we had done nothing wrong.

7

Gainor Tr. at 729 (emphasis added).

## III.   LAW

### A.   THE STANDARD FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL

In ruling on a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), a court must determine "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached." 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2524 (1995) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970)).

The federal rules allow a motion for a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). This includes "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party; and [the motion] may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Id*.; 11 Wright & Miller, *Federal Practice & Procedure* § 2805.

### B.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE BREACH OF CONTRACT CLAIM

#### 1.   Seat Scouts Owed Broker Genius No Contractual Duties, So No Breach Could Be Based on Seat Scouts' Products and Actions

"It goes without saying that a contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). "[A]bsent a contractual relationship there can be no contractual remedy." *Suffolk Cnty. v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984). The contract created a personal obligation by Gainor, with the license

8

drafted by Broker Genius being limited to the user and his or her account ("you"). (See PX 15 at 3-4). Broker Genius recognized that Seat Scouts was not bound by the contract and did not name Seat Scouts in the breach claim.  In fact, Seat Scouts did not exist at the time Gainor was alleged to have accepted the terms of use in May 2016.  Broker Genius advanced no legal theory to bind Seat Scouts to any duties. Broker Genius' only response was that it would be improper for Gainor to have disclosed the information to Seat Scouts.  That theory is one that the court already rejected:

> it is clear that Broker Genius's Terms of Use agreement is not suitable for that task because it simply does not contain a confidentiality provision. ….While the user restrictions of the Terms of Use do expressly bar users from showing others the AutoPricer v.3 user interface—including, one would infer, through a series of screenshots—they do not amount to a confidentiality or non-disclosure clause that notifies users of the secrecy of any aspect of AutoPricer v.3 or precludes them from describing to others the software's functions, structure, and appearance.

*Broker Genius, Inc. v. Zalta*, 280 F.Supp.3d 495, 521-23 (S.D.N.Y. 2017). Thus, Gainor was free to disclose the user interface to others, including Seat Scouts.  Even though Seat Scouts was not restricted in any way, Broker Genius' claim was based solely on Seat Scout's product, Command Center and Event Watcher.  Consequently, the breach of contract claim was deficient as a matter of law, and judgment should be entered in favor of Gainor.

## 2. The Verdict Was Based On Speculation And Not Competent Evidence[2]

The trial evidence, summarized above, showed Gainor's knowledge of the six "widgets" predated his use of AutoPricer v3.  Each user, Gainor, Volpone and Pancheri, testified to the existence of the widgets and the same process and user flow.  Plaintiff was unable to rebut the

---

[2] Defendants incorporate the prior arguments that the "derivative works" language called for the Copyright Act meaning, and that it was error for the Court to define its meaning as a matter of law. Defendants were precluded from offering the interpretation of the "derivative works."  Sherman Tr. at 191.

evidence because its witnesses lacked any actual knowledge of the StageFront product. The only witness with any knowledge was Koskinen, and his basis of knowledge was limited to the available screen shots. Even as to those, he could not draw conclusions on items not depicted. Koskinen Tr. 497-98 ("we really can't go through a detailed understanding of how the product operates and what happens after you click those things" because of the limitations of screenshots.). Thus, by his own admission, Koskinen was unable to provide a knowledgeable opinion about StageFront. See Rule 702(b) (an expert's testimony must be "based on sufficient facts or data"). Consequently, the *only competent trial evidence* concerning StageFront and its features was by its users, who stated that it possessed the components found in Command Center. Broker Genius could offer no contradiction. Given Plaintiff's lack of evidence and the admitted inability to address the competent evidence introduced at trial, Plaintiff's only response was to invite the jury to violate their duty and speculate.

> So we don't know if Mr. Pancheri's testimony about his supposed use of Stage Front was because Drew Gainor offered him a discount, offered him Command Center for free. I am almost certain that Mr. Heisenberg said, It would be really nice if you said this, this, and this. It would be really nice if you said it had groups, seasons, percentage.

Summation Tr. at 1528. This speculation is not evidence, and in fact, was wholly improper false narrative by counsel. It makes plain that Broker Genius lacked any actual evidence to counter the actual evidence on this point.

## C.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE UNFAIR COMPETITION/MISAPPROPRIATION CLAIM

### 1.   The Claim Is Preempted By The Copyright Act

Defendants renew the motion for judgment on the misappropriation claim, based on pre-emption. The Copyright Act provides the exclusive means to prosecute actions equivalent claims of copying, specifically barring state common law claims such as the misappropriation

claim. 17 U.S.C.A. § 301(a)("no person is entitled to any such right or equivalent right in any

such work under the common law or statutes of any state). In *Sears, Roebuck & Co.*, 376 U.S.

225 (1964) and *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234 (1964), the Supreme

Court explained that:

> when an article is unprotected by a patent or a copyright, state law may not forbid
> others to copy that article. To forbid copying would interfere with the federal
> policy ... of allowing free access to copy whatever the federal patent and
> copyright laws leave in the public domain.

*Compco Corp.*, 376 U.S. at 237, 84 S.Ct. 779. The Copyright Act is the exclusive means to

protect owners from copying. *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876,

893 (2d Cir. 2011); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir.1992).

Under the pre-emption test,

> Such a claim is preempted (i) if it seeks to vindicate "legal or equitable rights
> that are equivalent" to one of the bundle of exclusive rights already protected by
> copyright law under 17 U.S.C. § 106—the "general scope requirement"; and (ii)
> if the work in question is of the type of works protected by the Copyright Act
> under 17 U.S.C. §§ 102 and 103—the "subject matter requirement.".

*Barclays Capital*, 650 F.3d at 892, (quoting 17 U.S.C. § 301); *Sun Micro Medical*

*Technologies Corp. v. Passport Health Communications, Inc.,* No. 06CV2083, 2006 WL

3500702, at *11 (S.D.N.Y. Dec. 4, 2006).

The test for preemption is a two-step process. The first requirement, known as the "general

scope" requirement "is satisfied only when the state-created right may be abridged by an act that

would, by itself, infringe one of the exclusive rights provided by federal copyright law."

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,* 373 F.3d 296, 305 (2d Cir. 2004). Such acts

include reproduction, adaptation, performance, distribution or display. *See id.* The second step is

to determine whether the misappropriation claims fits within the Copyright Act's general scope.

11

#### a)   The Misappropriation Claim Is In The Subject Matter Of the Copyright Act

"The subject matter requirement is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Id*.  Here, the first step is satisfied by the misappropriation claim, which relates entirely to the User Interface and its recorded form reduced to the tangible medium.  See 17 U.S.C. § 102(a)(8). "A work need not consist entirely of copyrightable material in order to meet the subject matter requirement, but instead need only fit into one of the copyrightable categories in a broad sense." *Briarpatch Ltd.,* 373 F.3d at 305.  The Terms of Use expressly invoke the copyright claim for the items now alleged to have been misappropriated, namely the Site, Apps and Content. (PX 3, ECF No. 108-1 at p.4) ("We own a copyright in the Site or Apps and Content.") Thus, the first prong of pre-emption test, the "subject matter" requirement, is satisfied.

#### b)   The Misappropriation Claim Is In The General Scope Of The Copyright Act

The second requirement, known as the "general scope" requirement is satisfied when the state-created claim involves "an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law. In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution or display." *Id.*  See also *C.A. Inc. v. Rocket Software, Inc.*, 579 F.Supp.2d 355 (E.D.N.Y. 2008); *Woolcott v. Baratta*, No. 13-CV-2964 JS GRB, 2014 WL 1814130, at *10 (E.D.N.Y. May 7, 2014) ("Woolcott's 'conversion' claim is one of wrongful use or reproduction, not one of wrongful physical possession, and it is therefore not qualitatively different than her copyright claim."); *Strauss v. Hearst Corp.*, No. 85-cv-10017, 1988 WL 18932, at *8 (S.D.N.Y. Feb. 19, 1988) (holding that the plaintiff's claim for the defendant's wrongful use of the plaintiff's photographs was preempted by federal copyright

law).

Broker Genius' claim is founded expressly on the reproduction of "copyrighted material" –
the creation of a "derivative work." Second Amended Complaint ¶63. The claim is directly one
of copying, as stated in Broker Genius' opening statement that "the only people that have ever
tried to copy this AutoPricer Version 3 have previously been clients of Broker Genius." (Tr. 15).

### c) The Misappropriation Claim Is Not Qualitatively Different

Finally, the court also must evaluate whether the claim is qualitatively different from the
copyright claim. The Second Circuit has stated that "we take a restrictive view of what extra
elements transform an otherwise equivalent claim into one that is qualitatively different from a
copyright infringement claim." *Briarpatch Ltd.,* 373 F.3d at 305.

A claim for misappropriation of labor, skills and expenditures does not constitute an
additional element:

> Thus, the misappropriation claim also is preempted by the Copyright Act. "The
> broad misappropriation doctrine relied upon ... is therefore equivalent to the
> exclusive rights in copyright law ... Indeed because the copyright act itself
> provides a remedy for wrongful copying, such unfairness may be seen as
> supporting a finding that the Act preempts the tort." Barclays Capital, Inc., 650
> F.3d at 895. See also Walker v. Time Life Films, Inc., 784 F.2d 44, 53 (2d
> Cir.1986) ("Walker's cause of action for unfair competition is preempted by the
> federal copyright laws to the extent it seeks protection against copyright of
> Walker's book" dismissing common law unfair competition claim as arising out
> of defendant's alleged copyright); Levine v. Landy, 832 F.Supp.2d 176, 191
> (N.D.N.Y.2011) (plaintiff's claim is "essentially a copyright infringement claim
> with the added allegation that after unlawfully copying, distributing, and/or
> publishing the photographs, defendants stamped their own name or copyright on
> the works, rather than plaintiff's" and was thus preempted). This claim is also
> preempted by the Copyright Act and therefore must fail no matter what kind of
> evidence Fox News could or has produced to support it.

*Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 398 (S.D.N.Y. 2014).

Moreover, the additional "bad faith" aspect of copying also does not create a further "extra
element" to avoid preemption.  That argument has been rejected on multiple prior occasions.

13

*National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 851 (2d Cir. 1997) ("[a]n action will not be saved by preemption by elements such as awareness or intent, which alter 'the action's scope but not its nature'."). Accord *Fox News*, 43 F. Supp. 3d at 400 ("Fox News goes to great length to argue that TVEyes acted in bad faith and that TVEyes' 'bad faith' constitutes the extra element to take Fox News' claim outside the Copyright Act. Under this analysis, however, elements of a tort that address the mens rea or intent of the tortfeasor cannot constitute an 'extra element' for purposes of evading preemption.")

### 2.    The Claim Also Is Preempted By The Patent Act

Federal patent law preempts a state law claim that "offer[s] patent-like protection to intellectual property inconsistent with the federal scheme." *Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470, 1475 (Fed.Cir. 1998).

> A state law claim is preempted if it " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 1377 (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)).

*Ethox Chem., LLC v. Coca-Cola Co.,* No. CV 6:12-1682-KFM, 2015 WL 12807724, at *5 (D.S.C. Mar. 3, 2015), *aff'd sub nom. Ethox Chemicals LLC v. Coca-Cola Co.*, 683 F. App'x 958 (Fed. Cir. 2017).  Where, as here, the tortious conduct is based upon copying of an unpatented product the misappropriation law also is preempted. *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 329 (E.D.N.Y. 2014).

> Because of this, "[a] state may not, through its law banning unfair competition undermine federal patent rights by prohibiting the copying of an article that is protected by neither a federal patent nor a federal copyright." 20th Century Wear, Inc. v. Sanmark–Stardust, Inc., 747 F.2d 81, 92 n. 15 (2d Cir.1984); cf. Gemveto Jewelry Co. v. Jeff Cooper Inc., 800 F.2d 256, 259 (Fed.Cir.1986) (vacating injunction predicated upon a state unfair competition claim where the method of implementing the injunction was broader than permissible "in view of the Sears and Compco decisions which hold that copying of the article itself that is unprotected by the federal patent and copyright laws cannot be protected by state law"). Accordingly, plaintiffs' claim of unfair competition based on the

14

> allegation that defendants copied an unpatented product of plaintiffs is preempted and cannot serve as a basis for a cognizable claim under state law.

*Id.,* at 334–35.  By statute, a claim cannot be stated based on copying unpatented products.

> [F]ederal patent laws limit the states' ability to regulate unfair competition. … Thus, where state law offers "patent-like protection for ideas deemed unprotected under the present federal scheme, [state law] conflicts with the strong federal policy favoring free competition of ideas." ***Consistent with the preemptive effect of federal patent law, the copying of a product that is not patented that exists in the public domain is not actionable***.

*id*, 11 F. Supp. 3d at 331 (emphasis added). *See also Sorias v. Nat'l Cellular USA, Inc.*, 124

F.Supp.3d 244, 262 (E.D.N.Y. 2015) ("Plaintiffs here allege a claim for unfair competition based

only on the . . . aspects of the patent that are unprotected by federal patent law because they are

not actionable trade secrets . . . Plaintiffs' unfair competition claim, therefore, is necessarily

preempted by federal patent law.")  Broker Genius' claims of bad faith similarly do not save a

claim from preemption under the Patent Act.

> plaintiffs' allegations of defendants' bad faith premised on the unlawful copying, misappropriating, knocking off, and stealing of Carson's patented designs are insufficient to transform the nature of these claims from patent infringement to an independent common law claim of unfair competition.

*Carson Optical*, 11 F. Supp. 3d at 331.

3.      **The Unfair Competition Claim Fails As Broker Genius Has No Proprietary Interest**

Under New York law, a misappropriation claim can only be founded on proprietary

information.  *Atari, Inc. v. Games, Inc.*, 2005 WL 447503 (S.D.N.Y. 2005)("the party bringing

the claim must own a trademark, trade name, trade secret or other proprietary information to

misappropriate.").  Accord *Commercial Data Servers, Inc. v. IBM Corp.*, 166 F.Supp.2d 891,

895 (S.D.N.Y.2001) (finding that misappropriation of technological innovation stated no unfair

competition claim since no patent had been issued).  Once the information is publicly disclosed it

can no longer support a misappropriation claim. *Schroeder v Pinterest Inc.*, 133 A.D.3d 12, 30

15

n.11 (1st Dep't 2015). The Appellate Division cited *Demetriades v. Kaufmann*, 698 F. Supp.

521, 526-27 (S.D.N.Y. 1988), which also involved misappropriation claims based on items that

had become public:

> Once title [to the house] has passed, the developer has, in essence, placed his or
> her goods into the public domain, and whatever abstract property interest may
> previously have been asserted in the home's features is lost.  ... Thereafter, the
> duplication of the home's interior features by another, it seems to us, cannot be
> prevented by the developer under a theory of unfair competition, nor would such
> duplication be compensable in damages.

*Id*., at 527 (emphasis added).  This holding, cited by *Schroeder*, confirms that a misappropriation

claim cannot be asserted once the information is publicly available.

The trial evidence did not support a claim based on any non-public information. The court

has already held *as a matter of law* that all of the information was made available to all users

with no confidentiality obligation. *Broker Genius, Inc. v. Zalta*, 280 F.Supp.3d 480, 520

(S.D.N.Y. 2017). While Defendants sought the express inclusion of this as an element of the

claim, the Court declined, and Plaintiff's summation of the elements notably omitted this.

Even if not precluded as a matter of law, the factual evidence showed the public

disclosures. Sherman confirmed that the "central piece" of its claim was the user interface and

user experience.  Sherman Tr. 261. The features allegedly copied were disclosed to the public.

Sherman Tr. at 135, 139 (ticket group functionality is disclosed); Sherman Tr. 143-144 (the cycle

times were disclosed to customers, including Gainor, without any contractual restrictions);

Sherman Tr. at 133-134 ("the steps of the process for creating the rule, going through each of the

particular components that we saw in the openings, the event list, the inventory list, interacting

with the zone, section, row picking of comparables and the creation of a rule is something that

you disclosed freely to any potential users without any restrictions on them to maintain that as

confidential").

### 4.     The Unfair Competition Claim Fails Under The "Independent Tort" Doctrine

The misappropriation claim fails under the independent tort doctrine. When the plaintiff is "essentially seeking enforcement of the bargain," rather than a separate duty, "the action should proceed under a contract theory." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365, 1369 (1992). Where the unfair competition claim is based entirely on conduct proscribed by contract the unfair competition claim is dismissed as duplicative of the breach claim. See, e.g., *ScentSational Techs., LLC v. PepsiCo, Inc.*, No. 13 Civ. 8645 (KMK), 2017 WL 4403308, at *18 (S.D.N.Y. Oct. 2, 2017) (granting motion for summary judgment where  unfair competition claim was premised solely on defendants' breach of confidentiality agreements); *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14 Civ. 9687 (VEC), 2016 WL 4916969, at *9 (S.D.N.Y. Feb. 11, 2016) (dismissing unfair competition claim where it was "entirely based on alleged conduct that is proscribed by the 2010 NDA."); *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14 Civ. 6294 (LTS) (HBP), 2015 WL 5008762, at *5-6 (S.D.N.Y. Aug. 24, 2015) (same). Here, Broker Genius expressly invoked the contract as the basis for the misappropriation claim, and the misappropriation claim failed on that basis.

### 5.     The Evidence Did Not Support The Misappropriation Claim

#### a)     Seat Scouts' Mere Use Of Allegedly Misappropriated Technology Does Not Sustain A Claim

The court allowed Plaintiff to introduce evidence of the court's prior finding that Defendants were in contempt of the injunction.  Tr. at 17. It did so claiming it was relevant to a legal theory that had not been advanced in the pleadings, namely that the May 2018 violation of the injunction supplied the bad faith required to support the misappropriation claim. The theory was never identified in the Second Amended Complaint, which was filed in February 2018 and therefore did not, and could not, plead this legal theory.  Allowing the most prejudicial evidence

17

in founded solely on a theory advanced literally on the eve of trial was prejudicial.

Apart from the pleading failure, the new theory was an insufficient basis for liability, and the evidence and jury instructions allowing this theory created error. A misappropriation claim does not exist against an entity that had no role in obtaining the allegedly misappropriated technology item, and merely because the entity used it. *Schroeder*, 133 A.D.3d at 31, 17 N.Y.S.3d at 693. The Appellate Division dismissed the misappropriation of skills and expenditures claim against Pinterest because even though it used the information, there was no evidence it had "obtained the information in bad faith." *Id.* Here, Seat Scouts did not exist at the time of any misappropriation, so there is no basis for alleging it had obtained the information in bad faith.

### b) There Was No Evidence Of Any Bad Faith In Gainor Obtaining Access To AutoPricer

At trial, Sherman acknowledged that he had no information that Gainor signed up under false pretenses. Sherman Tr. 170 ("At that time I don't know if he was planning on using it improperly. We had no reason to suspect that at the time.") Therefore, there was a lack of any evidence to support the misappropriation claim on grounds other than the later use of the information.

## D.  DEFENDANTS ARE ENTITLED TO A NEW TRIAL

### 1.  The Prejudicial Evidence Of Contempt

The court's ruling denying Defendants' motion *in limine* left Plaintiff to inflame the jury not only of the fact of contempt, but also of the court's statements about the case, witnesses and counsel in the orders. Although Defendants sought further limitations, the court declined to clarify the use of its findings. This created multiple opportunities for Plaintiff to misuse the rulings to advise the jury of the court's views, with lengthy recitations from the contempt.

18

Sherman Tr. 285, 287, 288-89.  Knowing how prejudicial this evidence was to the case, Broker

Genius' counsel deliberately engaged on a path of presenting the court's own views in lengthy

questions, so that even when the objections to questions were sustained, the jury was apprised of

the court's view:

> Q. And in his ruling the judge said, your lawyers' arguments were disingenuous
> on that basis, correct?
>
> THE COURT: Sustained.
>
> Q. And you were held in contempt because the judge held --
>
> THE COURT: That's been established. Move on.

Tr. 989-990.  When thwarted, Plaintiff's counsel presented the improper information to the jury

just by repackaging the improper question.

> Q. Let me read you what Judge Stein said about goPricer in his preliminary
> injunction order. He said --
>
> MR. HEISENBERG: Objection, your Honor.
>
> THE COURT: Sustained.
>
> Q. Don't you know that Judge Stein found that goPricer was not an autopricer
> like Core, like Seat Trax?
>
> MR. HEISENBERG: Objection.
>
> THE COURT: Sustained.

Tr. 989-990.

### 2. The Court's Limitation On Defendants' Ability To Rebut Plaintiff's False Statements About The Laptop

Plaintiff's counsel also presented the prejudicial evidence in long rambling recitations of

discovery disputes that falsely suggested Defendants' non-compliance with the Magistrate

Judge's discovery orders (see, e.g., Tr.at 734). After allowing multiple statements that Gainor

had hidden the laptop in violation of the court directions, Defendants sought to rebut the false

impression by introducing the actual order to show its actual provisions. The Defense's request

to read the actual discovery ruling for the jury so that it could actually understand the discovery

requests on the laptop was rejected.  Tr. at 741-42 ("I'm not going to allow the Netburn order in. I think it's adequate the way it is.")

### 3. The Court Conveyed To The Jury Its Own View Of Witness Credibility And Critical Evidence

Not only was the trial unfairly prejudiced by the repetitive evidence of the injunction and the contempt, but the court's own questioning of witnesses independently warrants a new trial. Perhaps inadvertently, the court conveyed its clear opinions of both the case and of the witnesses on multiple occasions, exceeding its permitted bounds in questions.

> While participation by the trial judge in interrogation of witnesses may properly be done to clarify both legal and factual issues and thus minimize possible confusion in the jurors' minds, 'such intervention should not become the rule,' *United States v. D'Anna,* 450 F.2d 1201, 1206 (2d Cir. 1971), and must not be indulged in to the point where the atmosphere ceases to be one of 'impartiality and detachment,' *Pariser v. City of New York,* 146 F.2d 431, 433 (2d Cir. 1945).
>
> Those questions, however, "may not ... convey the court's view about the merits of a party's claim," *Berkovich,* 922 F.2d at 1025, inasmuch as the judge "may not impose his own opinions on the jury." *Care Travel Co.,* 944 F.2d at 991.

*Anderson v. Great Lakes Dredge & Dock Co.*, 509 F.2d 1119, 1131 (2d Cir. 1974).  The reason for this is because of the strong respect and deference jurors have for judges, who control the judicial process and are deemed to have superior knowledge over the facts and the law.  For that reason, "[a] trial judge must be especially cautious and circumspect in language and conduct during a jury trial."  *Santa Maria v. Metro-N. Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996) quoting *Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc.*, 818 F.2d 1398, 1401 (8th Cir. 1987); *United States v. Tilton*, 714 F.2d 642, 644 (6th Cir.1983) (explaining that "potential prejudice lurks behind every intrusion into a trial made by a presiding judge").

> As the only disinterested lawyer whose only interest is to see that justice is done, and especially as one who, in the eyes of the jury, occupies a position of preeminence and special persuasiveness, the district judge must be assiduous in performing his function as governor of the trial dispassionately, fairly and impartially.

20

> "Where both sides are represented by eminently competent counsel we think it
> important that the court minimize its own questioning of witnesses, to the end
> that any such judicial departure from the normal course of trial be merely helpful
> in clarifying the testimony rather than prejudicial in tending to impose upon the
> jury what the judge seems to think about the evidence." Groce v. Seder, 267 F.2d
> 352, 355 (3 Cir. 1959).

> More objectionable was the fact that the district judge's questions were usually
> leading in form. It must be remembered that this was a trial before a jury, and the
> impact of a question by the court on both the witness and the jury, together with
> the natural reluctance of counsel to object to The court's questions, which is even
> greater when the questioning is in the presence of a jury, should not be
> underestimated. See, In re United States, 286 F.2d 556 (1 Cir. 1961).

*Pollard v. Fennell*, 400 F.2d 421, 424-26 (4th Cir. 1968).  The Second Circuit recognized

that a trial court may ask questions for such purposes as "`clarifying ambiguities, correcting

misstatements, or obtaining information needed to make rulings.'" *United States v. Filani*, 74

F.3d 378, 386 (2d Cir. 1996)(quoting *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir.1985)).

Nonetheless, reversal is required when the trail court "t[ook] over the role of the prosecutor and

display[ed] bias" (*Id*. at 385) by intensely cross-examining the defendant, questioned his story,

and demonstrated his disbelief in the defendant's testimony. 74 F.3d at 385-86; *Shah v. Pan Am.

World Servs., Inc.*, 148 F.3d 84, 98 (2d Cir.1998) ("We will reverse on the basis of a judge's

improper remarks if the judge expresses [his] opinion on an ultimate issue of fact in front of the

jury or [argues] for one of the parties.")

     Here, the court is on record both on the ultimate issue of fact, and in believing that "Gainor

was evasive" on several topics. *Broker Genius, Inc. v. Volpone*, 313 F.Supp.3d 484, 506

(S.D.N.Y. 2018). Regrettably, and presumably entirely unintentionally, the court conveyed that

view during witness examination.  Within a few minutes of Gainor's cross-examination, the

court assumed control of Gainor's cross-examination to ask a lengthy series of leading questions.

The questions were not for the purpose of Gainor "clarifying" factual issues, as the court actually

twice cut off Gainor's answers that would have clarified his explanation.  Instead, the court

21

acknowledged its purpose was to express and unfavorable view of Gainor's testimony.

> THE COURT: Well, I was very surprised by the – very surprised by the deposition testimony, when he clearly was toying with the questioner.
>
> …..
>
> THE COURT: Well, I was expressing my view that he was toying with the questioner, yes.

Tr. at 742-743.  This was clear during the court's prolonged leading questioning:

> THE COURT: Would you *agree with me* that you were doing everything you could to avoid giving a direct answer to the question?
>
> THE WITNESS: I honestly think --
>
> THE COURT: Yes or no. Would you *agree with me* that you were doing everything you could to avoid giving a direct answer to the questioner during that deposition?
>
> THE WITNESS: No, I don't agree with that.
>
> THE COURT: Explain.  Let me ask another question. It was your testimony when that was taken that you did not know what software was, is that correct?

When Gainor accurately responded that the definition of software is dependent upon the context, the court did not ask him to explain the contexts, but instead turned the answer to the "context of a deposition."  The court concluded its cross-examination by suggesting that Gainor was breaching his oath to testify truthfully:

> THE COURT: You were under oath then, right?
>
> THE WITNESS: Yes.
>
> THE COURT: You are under oath now, right?
>
> THE WITNESS: Correct.

The significance of the court's plainly negative view of Gainor's testimony was clear from the headline of the press story, "Ticket Resale Exec Spars With Judge At Tech Poaching Trial."[3] The story highlighted the court's cross-examination, writing "Judge Stein began to press Gainor

---

[3] The court did not subject Plaintiff's witnesses to such questioning, or even a comment on testimony, even when the testimony was of questionable veracity.  See e.g., Sherman Tr. at 106-07.

as well" and focused on the court's own views: "'Would you agree with me that you were doing everything you could to avoid giving a direct answer in that deposition?' Judge Stein said." The article also quoted the court's accusation that Gainor was being untruthful: "'You are under oath now, right?' the judge asked as a follow-up." (Heisenberg Dec. Ex. C).  It is respectfully submitted that no matter how inadvertent the court's expression of its view, the harm to a fair and balanced trial was done and could not be undone.

The court, again potentially unintentionally, expressed displeasure with Defendants' other main witness, chastising Nitze for her answers. See, e.g., Nitze Tr. 1262, 1269-70, 1319.  The court's admonition to confine answers to "yes or no" was in contrast with Plaintiff's witnesses, who labored under no comparable restrictions, even when they refused to answer question that specifically asked to answer yes or no answers. *E.g.*, Koskinen Tr. 462-463, 521; Sherman 199.

The court also interrupted Defendants' cross-examination of Koskinen at several points. For example, a well-established basis for showing expert witness bias is by their compensation. At deposition, Koskinen said he had potentially been paid $400,000, a figure that dwarfed his academic salary. When counsel asked Koskinen to confirm his deposition answer, the court interrupted the question and assumed examination, changing the question from $400,000 to $100,000.  When Koskinen still claimed it would be "too hard" to estimate, the court validated Koskinen's claimed indifference to his financial compensation by saying the answer was "fine," and in fact, normal: "What they say about computer scientists is true."  (Tr. at 477-479). The court also precluded examination about Koskinen's failure to conduct a reasonable investigation, precluding basic questions showing Koskinen's failure to review relevant evidence. Tr. 482-483 (directing counsel to "move on.").

### 4.    The Court's Attempted Curative Instructions Were Insufficient

Plaintiff cannot complain about a new trial when it took every opportunity to prejudice the

jury with the facts.  Even as objections were sustained, Plaintiff's counsel made sure that the jury

was exposed to the court's highly-prejudicial views of the merits, the witnesses, and counsel.

The damage to a fair trial -- fully-intended and deliberately introduced by Plaintiff counsel –

could not be reversed with simple limiting instructions. Once done, the bell could not be unrung.

*O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1308 (5th Cir. 1977) ("There must be a line drawn in

any trial where, after repeated exposure of a jury to prejudicial information, a judge realizes that

cautionary instructions will have little, if any, effect in eliminating the prejudicial harm.")

The combined impact of all of the court's questions, expressions of surprise, views on the

relevant testimony and facts, conveyed to the jury the court's clear view of the evidence.

> In the instant case, after reviewing the record as a whole, we are left with the firm
> conviction that, by its comments, however well intended, the district court
> conveyed to the jury the impression that it held a fixed and unfavorable opinion
> of defendants, their counsel, and their position.

*Rivas v. Brattesani*, 94 F.3d 802, 807 (2nd Cir.1996).  We respectfully urge the because of

Plaintiff's deliberate intended goal of prejudicing the jury, it would be wholly-appropriate to

require a new trial.

## E.   THE JURY'S AWARD OF DAMAGES WAS EXCESSIVE AND NOT BASED ON THE EVIDENCE

A new trial is also required when damages are excessive. See *Gasperini v. Ctr. For

Humanities, Inc.*, 518 U.S. 415, 437 n.22 (1996); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d

135, 146 (2d Cir. 2012).  In this case, the verdict exceeded the damages that its expert, Dell,

quantified at trial – a total of $898,706. (Tr. 1133). The additional items of damages identified by

Broker Genius – loss of goodwill and future price erosion "into perpetuity" (Tr. at 1138) – are all

items compensated in the $4.5 million judgment. Broker Genius sought such future damages

through the testimony of Lucier, Dell and Ellman. The jury was directed in the jury charge to

award an amount that fully compensated Broker Genius for future damages, including future

damages for loss of goodwill and other items such as the price erosion. Hence, the verdict fully compensated Broker Genius for all future injuries, and there is no basis for finding further "irreparable" injuries upon which a permanent injunction could be based.

Finally, the verdict also cannot be reconciled, with the jury awarding $3 million on the contract claim, and a separate $1.5 for the unfair competition.  Broker Genius presented no theory under which the injury was divisible, and there is no rational basis for separate determinations. Either the injury was redundant and overlapping, or error.

## F.    THE TRIAL ERRORS WERE NOT HARMLESS

In this case the impact of the conduct cannot be deemed harmless. Because no special verdict was provided, the impact of any or all of these errors cannot be deemed to be harmless and require reversal. *Webber v. Sobba*, 322 F.3d 1032, 1038 (8th Cir. 2003) ("[B]ecause we have no way of knowing that the general verdict for Sobba was not a product of the improper joint-enterprise instruction, we cannot say that the improper instruction on the joint-enterprise defense was harmless error").

## IV.    CONCLUSION

Plaintiff's claims are insufficient and judgment should be entered for Defendants. Alternatively, the judgment should be vacated and a new trial ordered.

Dated: New York, New York
February 19, 2019

HINCKLEY & HEISENBERG LLP

By:

Christoph Heisenberg

880 Third Avenue, Suite 13
New York, New York 10028
Phone: (212) 845-9094