**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BROKER GENIUS INC.,

    *Plaintiff,*

  v.

DREW GAINOR and
SEAT SCOUTS LLC,

    *Defendants.*

Civil Action No. 1:17-cv-08627-SHS

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT OR FOR A NEW TRIAL, PURSUANT TO
FED. R. CIV. P. 50(b) AND 59**

PEARL COHEN ZEDEK LATZER BARATZ LLP
Veronica Mullally Muñoz (MM-9985)
Daniel J. Melman (DM-8239)
Miriam Kurien Tyrell (MT-1029)
1500 Broadway, 12th Floor
New York, NY 10036
(646) 878-0800
VMunoz@PearlCohen.com
DMelman@PearlCohen.com
MTyrell@PearlCohen.com

*Attorneys for Plaintiff*
*Broker Genius Inc.*

Dated: March 5, 2019

## TABLE OF CONTENTS

PAGE

I.    SUMMARY OF ARGUMENT ..................................................................................1

II.   LEGAL STANDARD ..............................................................................................1

   A.   DEFENDANTS DO NOT SATISFY THEIR BURDEN FOR OBTAINING JUDGMENT AS A MATTER
OF LAW ....................................................................................................................... 1

   B.   DEFENDANTS DO NOT SATISFY THE STANDARD FOR A NEW TRIAL ................................... 2

III.  ARGUMENT ...........................................................................................................3

   A.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S
BREACH OF CONTRACT CLAIM ...................................................................................... 3

      i.    *The Breach of Contract Claim was Against Gainor and not Seat Scouts, for
Impermissibly Creating a Derivative Product* ........................................................ 3

      ii.   *The Evidence was Competent and Not Speculative* ....................................... 4

   B.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S
MISAPPROPRIATION OF LABOR, SKILLS, AND EXPENDITURE CLAIM ......................... 6

      i.    *The Copyright Act Does Not Preempt Plaintiff's Misappropriation of Labor, Skills,
and Expenditure Claim* ........................................................................................ 7

        a.    Plaintiff's Misappropriation Claim Does Not Vindicate a Right the Copyright Act
Protects ...................................................................................................... 7

        b.    The Claim's Requirement for Free-Riding Constitutes an Extra Element ................. 9

      ii.   *The Patent Act Does Not Preempt Plaintiff's Misappropriation of Labor, Skills, And
Expenditure Claim* ............................................................................................ 10

      iii.  *Defendants Improperly Create – And Misconstrue – A Requirement for A
"Proprietary" Interest* ...................................................................................... 12

      iv.   *The Claim Does Not Fail Under Any Irrelevant Independent Tort Doctrine* ............... 14

      v.    *The Evidence Was Competent and Sufficient for A Reasonable Jury to Find for
Plaintiff on Its Misappropriation Claim* .............................................................. 15

   C.   DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL ....................................... 16

      i.    *The Contempt Evidence Was Not Unduly Prejudicial* ................................. 16

i

    *ii.*    *The Evidence of the Preliminary Injunction Was Intentionally Introduced by*

*Defendants and They Cannot Now Claim it Was Prejudicial* ............................................. *17*

    *IV.*   *Defendants Were Able to Rebut Plaintiff's Accurate Explanation of The Discovery*

*Improprieties* .................................................................................................................. *18*

    *V.*    *The Court Remained Impartial and Asked Questions Only to Assist the Jury* ............ *18*

    *VI.*  *The Court's Curative Instructions Were Sufficient* ...................................................... *21*

A.    THE JURY'S DAMAGES AWARD WAS NOT EXCESSIVE AND WAS REASONABLY BASED ON THE

EVIDENCE .............................................................................................................................. 23

B.    ANY ERRORS WERE HARMLESS ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**C**ASES

*Anderson v. Great Lakes Dredge & Dock Co.*,
   509 F.2d 1119 (2d Cir. 1974) ................................................................................ 20

*Aronson v. Quick Point Pencil Co.*,
   440 U.S. 257 (1979) ............................................................................................... 12

*Aulet v. Henderson*,
   (E.D.N.Y. May 18, 1988) ....................................................................................... 23

*Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*,
   14-CV-9687 (VEC), 2016 U.S. Dist. LEXIS 18330 (S.D.N.Y. Feb. 11, 2016) ...... 16

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
   650 F.3d 876 (2d Cir. 2010) ............................................................................. 10, 11

*Big Vision Private, Ltd. v. E.I. DuPont de Nemours & Co.*,
   610 Fed. App'x. 69 (2d Cir. 2015) .......................................................................... 14

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d
   127,(2d Cir. 2008) ................................................................................................... 1

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) .................................................................................. 8, 9

*Broker Genius Inc. v. Volpone*,
   313 F. Supp. 3d 484 ......................................................................................... 10, 22

*Broker Genius, Inc. v. Zalta*,
   280 F. Supp. 3d 495 (S.D.N.Y. 2017) ............................................................. 4, 5, 8

*Care Travel Co. v. Pan Am. World Airways*,
   944 F.2d 983 (2d Cir. 1991) ............................................................................. 21, 22

*Carson Optical, Inc. v. Prym Consumer USA, Inc.*,
   11 F. Supp. 3d 317 (E.D.N.Y. Mar. 28, 2014) ....................................................... 13

*Compco Corp. v. Day-Brite Lighting, Inc.*,
   376 U.S. 234 (1964) ................................................................................................. 8

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
   982 F.2d 693 (2d Cir. 1992)..................................................................... 9

*Demetriades v. Kaufmann*,
   698 F. Supp. 521 (S.D.N.Y. Oct. 27, 1988)......................................... 15

*Dow Chem. Co. v. Exxon Corp.*,
   139 F.3d 1470 (Fed. Cir. 1998)........................................................ 7, 12

*Fioto v. Manhattan Woods Golf Enters.*,
   304 F. Supp. 2d 541 .......................................................................... 25

*Fox News Network, LLC v. TVEyes, Inc.*,
   43 F. Supp. 2d 379 (S.D.N.Y. Sept. 9, 2014) ..................................... 8, 9

*Gasperini v. Ctr. For Humanities, Inc.*,
   518 U.S. 415 (1996)............................................................................ 25

*Hall v. Bed, Bath & Beyond, Inc.*,
   705 F.3d 1357 ..................................................................................... 13

*Harper & Row v. Nation Enters.*,
   723 F.2d 195 (2d Cir. 1983)................................................................. 9

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. Feb. 17, 2011)................................... 2

*Int'l News Serv. v. Ass. Press*,
   248 U.S. 215 (1918)............................................................................ 10

*LinkCo, Inc. v. Fujitsu Ltd.*,
   230 F. Supp. 2d 492 (S.D.N.Y. Oct. 29, 2002)................................... 14

*Manganiello v. City of New York*,
   612 F.3d 149 (2d Cir. 2010)............................................................... 20

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997)............................................................. 8, 9

*Patrolmen's Benevolent Ass'n of N.Y. v. City of N.Y.*,
   310 F.3d 43 (2d Cir. 2002)................................................................... 3

*Raedle v. Credit Agricole Indosuez*,
   670 F.3d 411 (2d Cir. 2012)................................................................. 3

*Reeves v. Sanderson Plumbing*,
   530 U.S. 133 (2000)..................................................................................... 2

*Sears, Roebuck & Co., v. Stiffel Co.*,
   376 U.S. 225 (1964)..................................................................................... 7

*Webber v. Sobba*,
   322 F.3d 1032 (8th Cir. 2003) ................................................................... 27

*Yantha v. Omni Childhood Ctr., Inc.*,
   13-CV-1948 (ARR)(JMA), 2013 U.S. Dist. LEXIS 134940 (E.D.N.Y. Sept. 20, 2013)........ 14

## R<span>ULES</span>

Fed. R. Civ. P. 59 ........................................................................................... 2

## I.   SUMMARY OF ARGUMENT

Defendants argue that the trial was unfair because Plaintiff used evidence of the preliminary injunction and "prejudice[d] the jury **with the facts**." ECF 389 at 23-24.  Despite the Court having granted Defendants unopposed motion *in limine* to exclude evidence of the preliminary injunction, Defendants themselves deliberately entered the preliminary injunction into evidence – likely for the very purpose of possibly forming the basis of an argument for a new trial, should the verdict go against them. Tr. 247:14-18; DX-ED.  Defendants purposefully put a full-page press release about the injunction into evidence even though up to then both parties had been diligently redacting documents containing excluded evidence.  Defendants cannot now complain about prejudice when it was Defendants who intentionally opened the door to evidence about the preliminary injunction.  Plaintiff properly presented the facts as they are and they were applied during the Court's careful, impartial management of the trial.  Yet, Defendants now ask the Court to amend or overturn the jury's verdict and damages award, without any compelling reasons to do so.  Defendants' motion should be denied.

## II.   LEGAL STANDARD

### A.   Defendants Do Not Satisfy Their Burden for Obtaining Judgment as a Matter of Law

Defendants do not – and cannot – satisfy the standards for obtaining judgment as a matter of law on any of plaintiff's claims.  A motion for judgment as a matter of law "'may only be granted if there exists 'such a *complete absence of evidence* supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or the evidence in favor of the movant is *so overwhelming* 'that reasonable and fair minded [persons] could not arrive at a verdict against [it].'"  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (affirming denial of motion for judgment as a matter of law) (emphasis added); *see also*

1

*Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000) ("Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"). Defendants have not argued that there is, as is required, a "complete absence of evidence" or otherwise that their own evidence "is so overwhelming" that a reasonable jury could not have arrived at its verdict – after several hours of deliberation – that Defendant Gainor breached his contract with Plaintiff, and both Defendants misappropriated Plaintiff's labor, skills, and expenditures.

Defendants ask the Court to disturb the jury's credibility determinations. *See* ECF 389 at 3-7. Such determinations are squarely within the province of the jury, which the Court may not consider on a motion for a judgment as a matter of law. *See Reeves*, 530 U.S. at 150 ("[I]n entertaining a motion for judgment as a matter of law … [the court] may *not* make credibility determinations or weigh the evidence."). *See* Trial Transcript ("Tr.") at 1542:1-10. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 535 (S.D.N.Y. Feb. 17, 2011). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. Thus, Defendants' repeated references to credibility determinations are misplaced, and they cannot satisfy the standard for judgment as a matter of law.

## B. DEFENDANTS DO NOT SATISFY THE STANDARD FOR A NEW TRIAL

Defendants neither provide nor satisfy the standard for granting a motion for a new trial under Fed. R. Civ. P. 59. A "motion for a new trial 'ordinarily should not be granted unless the

trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is

a miscarriage of justice.'" *See Patrolmen's Benevolent Ass'n of N.Y. v. City of N.Y.*, 310 F.3d 43,

54 (2d Cir. 2002) (Stein, J.) (affirming the district court's denial of a motion for a new trial).

While judges retain discretion to grant such motions, "a verdict generally should not be disturbed

except in an *egregious case*, to correct a *seriously erroneous* result, or to *prevent a miscarriage*

*of justice*." *See Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418-19 (2d Cir. 2012)

(emphasis added).  Defendants have not proven, as they must, that any of these factors is present.

## III.   ARGUMENT

### A.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S BREACH OF CONTRACT CLAIM

Defendants are not entitled to judgment as a matter of law in their favor on Plaintiff's

breach of contract claim because they misconstrue the nature of the claim and disregard the

jury's reasonable crediting of Plaintiff's competent evidence in support of its claim.

#### i.   The Breach of Contract Claim was Against Gainor and not Seat Scouts, for Impermissibly Creating a Derivative Product

Defendants present an inaccurate, implausible, and irrelevant argument that the jury's

finding in favor of Plaintiff for its breach of contract claim against Gainor must be reversed

because Seat Scouts LLC was not a party to the contract.  Yet, judgment on the breach of

contract claim was entered only "against Drew Gainor," and not Seat Scouts.  *See* ECF 353 at 1;

Tr. at 1419:22-1420:1. Notably in their briefing Defendants do not argue that Gainor was not a

party to a valid, enforceable agreement, or that he otherwise did not breach the contract.

Instead, Defendants attempt to draw the Court's attention, belatedly and irrelevantly, to

the Court's decision in *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 521-23 (S.D.N.Y.

2017), in which the Court held that the Terms of Use did not "contain a confidentiality

provision."[1]  That is settled, yet entirely irrelevant to the breach of contract claim against Gainor

on which the jury found in Plaintiff's favor because Gainor violated the Terms of Use when he

created a derivative product of Broker Genius's AutoPricerV3.  In *Zalta*, the Court's ruling

regarding the confidentiality provision was only relevant to a claim that Plaintiff *did not assert* in

the present litigation, and one on which the jury did not hear evidence: misappropriation of trade

secrets.  *Zalta*, 280 F. Supp. 3d at 522.; Tr. at 11:3-12.

      Plaintiff did not bring its breach of contract claim on this element of the Terms of Use.

Instead, Plaintiff sought and received relief on Gainor's improper derivation of not one but two

products based on Broker Genius' AutoPricerV3.  *See* ECF 311 at 1 (citing Aug. 24, 2018 Conf.

Tr. at 8:13)). Yes, it was Seat Scouts that ultimately offered these products.  *Id*.  But that does not

mean, however, that Gainor was not involved with Seat Scouts or that it was not *his own*

unlawful copying and derivation that led to the creation and commercialization of the violative

Command Center and Event Watcher platforms.  Gainor began his unlawful copying and

derivation even before Seat Scouts was founded.  *See* Tr. at 981:11-13.  Gainor's own documents

presented to the jury showed that he began collecting information about the features of Broker

Genius' product while he was an active user of the Broker Genius product (PX-18) and that after

Seat Scouts was incorporated he led a team of Seat Scouts' employees in continuing to derive the

Command Center product from Broker Genius' AutoPricerV3. PX-1027. Moreover, Gainor is

not only a part owner he is also the "Co-Founder and CEO of Seat Scouts LLC." PX-142; Tr. at

6:19-20.  Defendants implausibly and self-servingly attempt to draw legal distinctions between

Gainor and Seat Scouts and their conduct where there is no practical difference.

      *ii.   The Evidence was Competent and Not Speculative*

---

[1] Contrary to what Defendants argue, Gainor was not "free to disclose the user interface to others." (ECF 389 at 9) Rather, he was expressly prohibited from allowing anyone "to view or use" or  "access" his Broker Genius account. PX 3 at BG-SS00004612, 4614.

Plaintiff presented competent direct and circumstantial evidence from which the jury drew its reasonable inference that Gainor breached his binding agreement with Broker Genius not to create a derivative product. Defendants are wrong that Plaintiff did not provide such evidence. *See e.g.*, PX-7; PX-8; PX-9; PX-18; PX-48; PX-81; PX-107; PX-114; PX-142; PX-496; PX-1027. Defendants assert that trial evidence it presented in the form of testimony from Gainor, Volpone and Pancheri shows that the StageFront product had certain features of AutoPricer V3 in it as early as 2015. ECF 389 at 2. Defendants further assert that this so-called evidence "establishes" that this was true. *Id.* But, both Volpone and Gainor testified using 2017 screen shots which they alleged were the same as screenshots from 2015 and it was subsequently proven that screen shots from 2015 were different and did not have the same features. DX-OG. Furthermore, Mr. Volpone testified at trial that he had used StageFront but at deposition had testified that he had never used an autopricer. Tr. 1225: 8-20. Both Gainor and Volpone gave inconsistent self-serving testimony at trial. Tr. 965:3-6, 966:7-19, 991:14- 993: 22. The jury was free to assess what weight to accord it and their credibility or lack thereof. Notably there was no witness from StageFront to support Defendants' claims. With regard to Pancheri the jury most likely found him biased towards Defendants because he agreed to testify for Defendants and had had two long conversations with Gainor (15 minutes) and his counsel, Mr. Heisenberg (45 minutes) in preparation for testifying at deposition. Tr. 1405:15 – 1407-7. In any event, Pancheri's deposition testimony offered at trial was that he had not used StageFront in 2015 despite his testimony being offered to establish what the product looked like in 2015. Tr. at 1400:2-8. There was no credible evidence that StageFront had features of AutoPricerV3 in 2015.

Further, the jury was free not to, as Defendants characterize it, "violate their duty and speculate" (ECF 389 at 10), but rather to make credibility determinations. Such credibility

5

determinations go to the *very core* of the jury's role, as the Court instructed the jury. *See* Tr.

1546:3-10 ("The process of drawing inferences from facts that are in evidence is not guesswork.

It's not speculation."). While the Court acts as a gatekeeper in making admissibility

determinations – which, Defendants do not question – it is entirely for the jury to make

determinations as to what and how much to credit different evidence with which they are

presented. *See id*. at 1546:15-19; 1549:12-15. The Court duly and repeatedly instructed the jury

as to its role, and its unique authority to make credibility determinations. The Court also

effectively and repeatedly explained which evidence was eligible to be weighted, namely, that

any lawyer's words was not testimony to be credited. This does not, however, prohibit jurors

from listening to closing arguments (to which Defendants did not object) and making their own

reasonable inferences based on the law as they were instructed, the facts as they found them, and

their innate common sense.

   B.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF
        LAW ON PLAINTIFF'S MISAPPROPRIATION OF LABOR, SKILLS, AND
        EXPENDITURE CLAIM

   Defendants again mischaracterize Plaintiff's claim for misappropriation of labor, skills,

and expenditures. *See* ECF 331. As they have done before, Defendants gloss over the

distinctions between unfair competition claims, and cite inapposite precedent. Furthermore,

against the law of the case determined by the Court's previous rulings on the same subject

matter, Defendants again seek to convert this common law case into one for copyright and/or

patent infringement. *See* Tr. 26:12-14 (THE COURT: Remember, ladies and gentlemen, this is

not a patent case. This has nothing to do with the requirements for patents. MR. HINCKLEY:

Exactly. This is not a patent case, this is not a copyright case, and this is not a trade secret

case."); *see also*, ECF 268; ECF 276; Tr. 8:9-12, 8:19-9:4; ECF 272; Tr. 11:3-12.   Defendants'

motion on this ground must be denied.

i.   *The Copyright Act Does Not Preempt Plaintiff's*
*Misappropriation of Labor, Skills, and Expenditure Claim*

The Copyright Act does not preempt Plaintiff's claim for misappropriation of labor,

skills, and expenditures because Plaintiff's claim is not equivalent to rights federal copyright law

protects.  The claim of misappropriation of labor, skills, and expenditures does fall within the

broader category of unfair competition claims.  This alone does not render the claim preempted.

*See generally, Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1471, 1478 (Fed. Cir. 1998)

("Because Dow's state law unfair competition claim was not coterminous with a claim of

inequitable conduct and was not otherwise preempted by the federal patent laws, we reverse the

district court's dismissal of that claim and remand for further proceedings.")

a.   Plaintiff's Misappropriation Claim Does Not Vindicate a
Right the Copyright Act Protects

A claim for misappropriation of labor, skills, and expenditures is one that seeks to

vindicate a party's right for its investments not to be unfairly exploited.  Defendants inaccurately

present Plaintiff's claim as "directly one of copying".  ECF 389 at 18.  Yet, even Defendants

agreed that Plaintiff's claim was not about *copying* code or individual aspects (*see* Tr. 24:5-6

"remember, not one bit of code is copied, not one bit"); rather, it was about enforcing contractual

language with meaning *independent from* the Copyright Act that forbid users from creating

derivative products and it was about protecting the extensive and expensive investment Broker

Genius made in the development of a valuable idea and functionality.  Tr. at 1443:17-1444:6.

Defendants cite to several cases that center on claims meaningfully different from

Plaintiff's misappropriation claim.  First, Defendants rely on *Sears, Roebuck & Co., v. Stiffel*

*Co.*, 376 U.S. 225 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964), and other cases in which the claim is a true substitute for federal copyright protection, and in which the material in question was in the public domain.  *See, e.g., Sears*, 376 U.S. 225; *Compco*, 376 U.S. 234.  Again, the tort of misappropriation of labor, skills, and expenditures does not function as a substitute or alternative for federal copyright law.  And, the Court has already held, and a jury has similarly found, that Broker Genius's AutoPricerV3, user experience, and user interface were ***not in the public domain*** such that limiting the derivation of ideas from Broker Genius would be an improper abridgement of federal copyright law.  *See Zalta*, 280 F. Supp. 3d at 499-500.

Defendants quote heavily from  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004), *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997) ("*NBA*"), and *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 2d 379 (S.D.N.Y. Sept. 9, 2014).  *See* ECF 389 at 10-13.  These cases, however, concerned entirely different claims.   In *Briarpatch,* 373 F.3d 296, the court held the Copyright Act preempted the plaintiff's *unjust enrichment* claim because it centered on the uncompensated taking of plaintiff's copyrighted work.  *Briarpatch*, 373 F.3d at 306.  Unlike in *Briarpatch*, 373 F.3d 296, Plaintiff did not pursue a copyright claim nor did it seek to vindicate a right within the scope of federal copyright law.  Instead, as the Court has found, it sought to remedy the exploitation of its labor, skills, and expenditures.  Simply because those investments resulted in the creation of a possibly copyrightable work and were protected by a contract that used the term "derive" does not *ipso facto* render this claim preempted.

Similarly, in *NBA,* 105 F.3d 841, and *TVEyes*, 43 F. Supp. 2d 379, the "crux" of the matters was an *entirely different* tort, misappropriation of <u>hot news</u>, which fundamentally

involves copying, one of the bundle of rights the Copyright Act clearly encompasses. *NBA*, 105 F.3d at 843; *TVEyes*, 43 F. Supp. 2d at 398; *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992) ("Section 301 [of the Copyright Act] thus preempts only those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law" such as "acts of reproduction, performance, distribution or display."); *Harper & Row v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983) *rev'd on other grounds*, 471 U.S. 539 (1985) ("When a state law violation is predicated upon an act incorporating elements *beyond mere reproduction or the like*, the rights involved are not equivalent and preemption will not occur.").

> b. The Claim's Requirement for Free-Riding Constitutes an
> Extra Element

These cases clarify that a party's free-riding is an extra element that saves a claim from preemption by the Copyright Act. *See Int'l News Serv. v. Ass. Press*, 248 U.S. 215 (1918); *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 905 (2d Cir. 2010) ("And, according to our decision in *NBA*: 'An indispensable element of a [non-preempted] *INS* 'hot-news' claim is free-riding by a defendant on a plaintiff's product, enabling the defendant to produce a directly competitive product for less money because it has lower costs.'").

In *NBA*, 105 F.3d 841, *Barclays*, 650 F.3d 876, and *TVEyes*, 43 F. Supp. 2d 379, the parties' claims were preempted because the courts all held that there was no free-riding as required to avoid preemption. Here, the very opposite is true and Gainor and Seat Scouts' acts of misappropriation and exploitation exemplify the very essence of "free-riding": reaping where they had not sown beginning with Gainor's "general plan to access competitors' products under false pretenses in order to gain knowledge in the service of his own product". *See Broker Genius Inc. v. Volpone*, 313 F. Supp. 3d 484, 506 (S.D.N.Y. May 11, 2018); *Barclays*, 650 F.3d at 895

("the *INS* Court emphasized the unfairness [and exemption from preemption] of INS's practice of pirating AP's stories. It condemned, in what sounded biblical in tone, the defendant's 'reap[ing] where it ha[d] not sown.'").

Gainor and Seat Scouts both engaged in *exactly* the behavior the Court in *INS,* 248 U.S. 215, so sternly condemned when they gained access under false pretenses to Plaintiff's platform (PX-7; PX-8; PX-9; PX-18; PX-48; PX-107; PX-114; PX-142) – the result of many years and millions of dollars of investments – and took those elements they did not independently create and passed them off as their own. *Barclays*, 650 F.3d at 903 ("The *INS* Court defined ['free-riding' and] the 'hot news' tort in part as 'taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and … appropriating it and selling it as [the defendant's] own.'").

Thus, while Plaintiff certainly was required to – and did – present competent evidence of Defendants' many expressions of bad faith, this alone does not mean Plaintiff relies on the bad faith element to be an "extra element" for purposes of preemption.  Instead, the claim of misappropriation of labor, skills, and expenditures is distinct from the rights the Copyright Act protects – and Defendants' actions are so clearly akin to those "quintessentially unfair" acts, that Plaintiff's claim cannot be preempted.

> ii.  *The Patent Act Does Not Preempt Plaintiff's Misappropriation of Labor, Skills, And Expenditure Claim*

Plaintiff's misappropriation of labor, skills, and expenditures claim survives Defendants' continued attempt to contort state law claims into federal patent claims.  Defendants again misconstrue the nature of a misappropriation of labor, skills, and expenditures claim, and their argument fails as a basis for a motion for judgment as a matter of law.

First, Defendants cite to *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979), within *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1474 (Fed. Cir. 1998), as conclusive evidence that a contract law claim is necessarily preempted "merely because the contract relates to intellectual property which may or may not be patentable".  *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 301 (1979).  This case is similar to *Aronson*, 440 U.S. 257.  Two parties, operating at arms-length, finding enough value in the product and arrangement of the components to privately contract for them and even sign on as a subscriber.  Simply attempting – and even failing – to achieve patent protection for an invention does not vitiate private parties' contractual obligations.  *See id.* at 266 ("Enforcement of these contractual obligations, freely undertaken in arms'-length negotiation and with no fixed reliance on a patent or a probable patent grant, 'will encourage invention in areas where patent law does not reach …. Competition is fostered and the public is not deprived of the use of valuable, if not quite patentable invention.").

Next, Defendants cite *Dow Chem.,* 139 F.3d 1470, for the proposition that "[f]ederal patent law preempts a state law claim that 'offer[s] patent-like protection to intellectual property inconsistent with the federal scheme.'" ECF 389 at 14 (citing *Dow Chem.*, 139 F.3d at 1475)  Yet, the *Dow Chem.* court ultimately held that federal patent law *did not* preempt the state tort at issue – intentional interference with contractual relations – because:

> it is not premised upon bad faith misconduct in the PTO, but rather is premised upon bad faith misconduct in the marketplace. … Accordingly, because it requires entirely different elements to establish a prima facie state tort action for intentional interference with contractual relations, it plainly is not a preempted alternative or additional state law remedy for inequitable conduct.  Rather it is a long-established independent tort remedy for improprieties in the marketplace.

*Id*. at 1477 (noting the different elements and remedies between the federal and state actions). Indeed, the *Dow Chemicals* Court continued and held that "state law governs the maintenance of orderly contractual relations and this function is not preempted merely because patents and

patent issues are presented in the substance of those contracts.  Thus, far from creating a new cause of action, we are merely not intervening to restrict a well-established state cause of action." *Id*. at 1478.

The other cases Defendants cited rejected attempts to protect *patented* design features, rather, than as here, <u>unpatented features not in the public domain</u>.  *See Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 330 (E.D.N.Y. Mar. 28, 2014).  In *Carson*, ., 11 F. Supp. 3d 317, plaintiffs attempted to vindicate misappropriation of labor, skills, and expenditures of patented design features.  *Id*.  The *Carson* court however, explicitly distinguished this from cases in which parties misappropriated those aspects before or in the *absence of patent protection*.  *See Carson*, F. Supp. 3d at 332 (distinguishing *Hall v. Bed, Bath & Beyond, Inc*., 705 F.3d 1357, 1371-72 (Fed. Cir. 2013) ("all state regulation of potentially patentable but unpatented subject matter is not *ipso facto* pre-empted by the federal patent laws in the complex balance between the policy of unencumbered movement of unpatented ideas, and principles of morality and fairness that are within state authority.")).  The tort of misappropriation of labor, skills, and expenditures is designed precisely to protect investments in unpatentable innovations that do "not rise to the level of misappropriation of trade secrets or ideas." *See LinkCo, Inc. v. Fujitsu Ltd*., 230 F. Supp. 2d 492, 501 (S.D.N.Y. Oct. 29, 2002).

> iii.  *Defendants Improperly Create – And Misconstrue – A Requirement for A "Proprietary" Interest*

Defendants' most recent iteration of the same failed argument does not hold water here either.  *See* ECF 334.  Defendants have concocted a wholly nonexistent element to add to the claim of misappropriation of labor, skills, and expenditures.

Defendants improperly assert as they have before that a misappropriation claim must be based on "proprietary information."  *See* ECF 285 at 16-17; ECF 318 at 4; ECF 389 at 15.

Courts applying New York law rejected this, holding that the labor, skill, and expenditures that went into developing the product, business model, software, or design, for example, is a sufficient property interests to support a misappropriation of skill and expenditures claim. *See, e.g., Big Vision Private, Ltd. v. E.I. DuPont de Nemours & Co*., 610 Fed. App'x. 69, 71 (2d Cir. 2015) ("Although a plaintiff need not establish misappropriation of a trade secret, then, to state a claim for unfair competition, it must establish that a defendant misappropriated or misused the plaintiff's property **or** the fruit of its labors and expenditures.") (emphasis added); *Yantha v. Omni Childhood Ctr., Inc*., 13-CV-1948 (ARR)(JMA), 2013 U.S. Dist. LEXIS 134940, at *16-17 (E.D.N.Y. Sept. 20, 2013) ("New York courts have found that persons have a property interest in their labor, skill, expenditure, name, and reputation."); *Demetriades v. Kaufmann*, 698 F. Supp. 521, 526-27 (S.D.N.Y. Oct. 27, 1988) ("Moving well beyond the confines of trade secrets and the like, New York's courts have construed the existence of protectable property interests deriving from an individual's "labor, skill, expenditure, name and reputation." … "There can be little doubt that the design features in question are the product of plaintiffs' skill and labor, thereby bringing the subject matter of this claim within the all-encompassing definition of 'property' fashioned by the New York judiciary."); Tr. 17:6-15.

Following this precedent, the Court recognized Plaintiff's significant property interest in its labor, skills, expenditures, name, and reputation. These interests served as a basis for the Court to enter a preliminary and subsequently a permanent injunction against Defendants. In fact, *Demetriades,* 698 F. Supp. 521, upon which Defendant heavily relies, overtly differentiates claims of misappropriation of labor, skills, and expenditures from other claims ***and*** it held that plaintiffs did state a valid cause of action under the "commercial immorality branch of New York's unfair competition law. *Demetriades*, at 528. Defendants also rely, again, on *Schroeder*

13

to try and undercut Plaintiff's claim by arguing that Plaintiff had placed its goods into the "public domain." ECF 389 at 16. Defendants overlook however, that the Court and the jury found that Plaintiff *did not* disclose all of its design features, functionalities, and combination of elements publicly. Defendants' own brief suggests as much: "information was made available to all ***users*** with no confidentiality obligation." *Id*. (emphasis added). Although there may have been no confidentiality provision for purposes of trade secret protection, clearly there were limitations as only *users* could access the entire platform and only after assenting to the Terms of Use. *See* Tr. at 69:9-16. Further, the Court already ruled that although "the '918 Patent Application describes in some detail the way in which AutoPricer v.3 functions … it does not disclose each of the claimed secrets or the unique combination of features that comprise the software." *Zalta*, 280 F. Supp. at 518.

### iv.   The Claim Does Not Fail Under Any Irrelevant Independent Tort Doctrine

Plaintiff's misappropriation claim is qualitatively different from its breach of contract claim and thus is not subject to the so-called "independent tort doctrine." Unlike in the cases Defendants cite, here, Defendants' conduct underlying the breach of contract and misappropriation of labor, skills, and expenditures claims was different. The Terms of Use – the basis of the breach of contract claim – explicitly prohibited the derivation of ideas but did not overtly prohibit the exploitation of Plaintiff's investment of labor, skills, and expenditures, which requires an element of bad faith. Indeed, courts – even those to which Defendants cite – recognized this as a distinct element and allowed misappropriation and breach of contract claims to proceed together. *See Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, 14-CV-9687 (VEC), 2016 U.S. Dist. LEXIS 18330, at *35 (S.D.N.Y. Feb. 11, 2016) (allowing misappropriation of trade secrets and confidential information to proceed with contract claims where the plaintiff

14

alleged "that [the defendant] discovered the trade secret and confidential information by improper means and bad faith."). Like in *Bancorp*, the misappropriation and contract claims were validly brought together because Defendants' bad faith and bad acts were both based on and ancillary to the contract and fell "below the generally accepted standards of commercial morality and reasonable conduct." *See id*.

> v. *The Evidence Was Competent and Sufficient for A Reasonable Jury to*
> *Find for Plaintiff on Its Misappropriation Claim*

Defendants again ask the Court to overturn a jury's reasonable credibility determinations and application of the law as instructed to the facts as presented, without any compelling reason to do so. Their only strategy is to ask the Court to set aside its deep knowledge of this case, and to set aside it's both heightened and common sense.

First, as the Court is well aware, Plaintiff could not have included in its Second Amended Complaint (ECF 108) that Defendants would be held in contempt of a preliminary injunction order *which had yet to be entered*. Defendants' argument is nonsensical. While the evidence that Defendants were held in contempt of the Court's preliminary injunction was relevant to proving bad faith, it was certainly not the only evidence Plaintiff put forth demonstrating both Defendants' bad faith and commercially immoral behaviors. *See* Tr. 853:7-854:4; 883:1-4; PX-7; PX-9; PX-48; PX-107; PX-114; PX-142.

Second, Defendants try to portray Seat Scouts as an entirely innocent and distinct entity, separate and apart from any of Gainor's misdeeds, which they claim could *only* have been proven had Mr. Sherman known at the time Gainor signed up that "Gainor signed up under false pretenses." ECF 389 at 18. Again, the inference Defendants ask the Court to draw belies common sense: of course a businessperson would not give access to somebody thought to be signing up under false pretenses. And, the very fact that Sherman did not know until later that

15

Gainor obtained access under false pretenses supports Plaintiff's case that Gainor used deceptive practices to exploit the fruits of Plaintiff's labor.  In addition to Gainor gaining access to Broker Genius under false pretenses, he and other Seat Scouts employees *continued* to act in bad faith while Gainor was a founding officer and CEO of Seat Scouts, working with other Seat Scouts employees to reap where they had not – and could not have – sown.  The misappropriation was not a one-shot incident of bad faith and bad acts, it was ongoing, and also occurred during Seat Scouts' existence.  Plaintiff presented voluminous, competent evidence to support its claim of misappropriation of labor, skills, and expenditures against both Defendants, and the jury used its common sense to weigh this evidence in finding in Plaintiff's favor on this count.

C. Defendants Are Not Entitled To A New Trial

Defendants claim: "Plaintiff cannot complain about a new trial when it took every opportunity to prejudice the jury ***with the facts***."  (ECF 389 at 23-24) (emphasis added).  While Plaintiff does not "complain," it does oppose a new trial precisely for the reason Defendants highlighted: Plaintiff presented the jury *with the facts* and the jury applied the law as the Court instructed it to those facts.  Defendants may not have wanted *those facts* to be heard and the jury may not have decided as Defendants hoped, but the Court cannot now overlook "*the facts*" and overturn the jury's verdict because, with the benefit of hindsight, Defendants perceive  certain aspects of the trial as  unfair.  Defendants are not entitled to a new trial.

*i. The Contempt Evidence Was Not Unduly Prejudicial*

Defendants ask the Court to adopt an inaccurate and novel definition for "prejudice" and "prejudicial," namely that any fact that they perceive as not in their favor be excluded as prejudicial.  ECF 389 at 18.  Defendants rightly characterize their being held in contempt as "the fact of contempt," and indeed it is only one of many indisputable facts demonstrating

Defendants' bad faith and bad acts.  The parties submitted extensive motions *in limine*, and letters to the Court regarding the contours of admitting any evidence of the contempt hearing. *See* ECF 295; ECF 311; ECF 344; ECF 345; ECF 346. The Court made its informed decision to admit such evidence, and still acted *sua sponte*[2] without Defendants having objected, to limit questioning regarding findings within the contempt ruling.  *See* ECF 389 at 19 (citing Tr. 989-990).  The Court's action in this regard is evidence, developed *supra*, that the Court acted impartially to ensure a fair trial for all parties.  Instead, the Court only admitted evidence of the finding of contempt as a continuation of its "finding of fact based on clear and convincing evidence 'that Event Watcher is the same as Command Center,'" (ECF 311 at 1 (citing Aug. 24, 2018 Conf. Tr. at 8:13)), and for purposes of impeachment as necessary.

> ii. *The Evidence of the Preliminary Injunction Was Intentionally Introduced by Defendants and They Cannot Now Claim It Was Prejudicial*

Defendants complain at length that "the trial was unfairly prejudiced by the repetitive evidence of the injunction and the contempt" (ECF 389 at 20). Defendants protest that Plaintiff "took every opportunity to prejudice the jury with the facts."  (ECF 389 at 23-24).  But, Plaintiff did no more than fairly present *the facts* to the jury.   Plaintiff did not oppose Defendants' motion to exclude the preliminary injunction evidence and adhered carefully to the Court's *in limine* evidentiary rulings at trial and worked diligently with counsel to redact documentary evidence and avoid introducing the fact of the injunction. *See e.g.,* Tr. 77:6-8; 780:19-21; 999:17-21. Rather, it was Defendants who put the preliminary injunction into evidence despite the Court having granted their motion to exclude it. Tr. 247:2-18; DX-ED.  That seemingly inexplicable maneuver was not accidental – such full-page press release about the preliminary injunction cannot easily be missed.  DX-ED at BG-SS000083487.  Nor was there any attempt to shut down

---

[2] As just one example of the Court's impartial interjections to ensure testimony ran smoothly, the court often "sustained" objections Defendants did not make.  *See, e.g.*, Tr. at 52:9; 111:22-23; 763:21-22; 766:16; 1022:17.

use of the preliminary injunction evidence by Plaintiff.  When Defendants now complain that "the bell could not be unrung" (ECF 389 at 24)  – they should acknowledge their role as the bell ringer and not expect to be rewarded for their ploy with a new trial.  Introducing the preliminary injunction into evidence was a gamble Defendants chose to take likely to bolster an argument for a new trial as a safety net if the verdict went against them.   For Defendants to now complain that they were somehow prejudiced by evidence they themselves introduced and intentionally opened the door to is asinine.

IV.   *Defendants Were Able to Rebut Plaintiff's Accurate Explanation of The Discovery Improprieties*

Defendants cannot rebut evidence that Defendant Gainor withheld his laptop in direct contravention of the Court's orders.  They could not do so not because of any purportedly improper ruling by the Court, but because those are the facts as they stand, even if they are not as Defendants would like them to be.  The jury had the unique responsibility to draw inferences from the competent evidence, and simply because they may have drawn an adverse inference from these facts does not give Defendants grounds for a new trial.  *See* Tr. at 679:14-15; 679:2-9.

V.   *The Court Remained Impartial and Asked Questions Only to Assist the Jury*

Defendants cannot satisfy their burden, of showing the court's occasional clarifying questioning of witnesses on both sides "was so prejudicial that it denied [Defendants] a fair, as opposed to a perfect, trial."  *Manganiello v. City of New York*, 612 F.3d 149, 169 (2d Cir. 2010). In *Manganiello*, the Second Circuit affirmed the district court's denial of a motion for a new trial, where, like here, "the court was attempting to gain clarification for the jury and to prevent the trial from becoming bogged down in repetitious or inappropriate advocacy. And the court so informed the jury." *Id.*  Importantly, Defendants never asked for a mistrial or otherwise asked to strike testimony or the Court's questioning (or explanations) that counsel perceived as unfair.

18

Defendants' counsel did raise his concerns with the Court out of the presence of the jury (Tr. 742:11-744:13) and if he really believed the Court's conduct was prejudicial, the time to ask for a new trial was then. Instead, Defendants' counsel agreed that the Court's curative instructions would be adequate (Tr. 744:4-12) and allowed the investment of judicial and the parties' resources to continue and the trial to proceed to its conclusion. Only now, with a verdict against them, do Defendants seek a "do over" ignoring that they already had a fair, if not perfect, trial.

Defendants rely on inapposite cases in which a judge's questioning was so egregious and so clearly partial as to be in stark contrast to the Court's conduct. Defendants rely first on *Anderson v. Great Lakes Dredge & Dock Co.*, 509 F.2d 1119, 1121 (2d Cir. 1974)31 (2d Cir. 1974), in which the Second Circuit found a judge's questioning improper when the judge asked jurors what specific questions they wanted answers to, and then immediately posed those questions to the testifying witness. *Id*. at 1121. Further, the judge in *Anderson* repeatedly and openly maligned a testifying witness in telling him at one point: "You are not sorry. That is hypocritical. You are just using your mouth. I repeat, your denial is false." *Id*. at 1127-28 n.5-6 (noting that the attorney "respectfully ask[ed] for a mistrial."). Defendants point to no similarly aggressive questioning here - because there was none.

Defendants also rely on *Care Travel Co. v. Pan Am. World Airways*, 944 F.2d 983, 991 (2d Cir. 1991), in which the Second Circuit affirmed the judgment favoring plaintiff-appellee because the judge's questioning, similar to the Court's questioning here, was permitted "to clarify both legal and factual issues and thus minimize possible confusion in the jurors' minds" to abide by his "duty to see that the facts are clearly presented" and that "the law is properly administered." *Id*. at 991. Like here, the *Care Travel* defendants-appellants unsuccessfully argued that the court's questioning and explanation of a particular legal theory "conveyed to the

19

jury [the judge's] opinion that the testimony of plaintiff's witness … was worthy of belief while that of defendant's witness … was not."  *Id.*

Defendants excerpt a portion of trial testimony in which the Court phrased questions including the phrase "Would you agree with me."  *See* ECF 389 at 22.  The Court posed these questions after an evasive witness repeatedly failed to provide a straightforward answer, denying the jury its ability to glean essential facts regarding Defendant Gainor and his knowledge of software.  These questions did not impose the Court's ultimate view of the facts or the witness on the jury.  Indeed, the Court went so far as to clarify to the jury what treating a witness as "hostile" meant, and that it in no way indicated his view of the witness. Tr. 695:12-21.  Defendants themselves acknowledge that when Defendant Gainor persisted in providing non-answers, couching his answers in qualifiers based on "context," the Court – as it had the right to do – simply followed the witness's prompt by asking about the "context of a deposition."  Such questioning is a far cry from the *ad hominem* attacks on a witness held to be improper in *Anderson* , and well within the range of questioning and explanation courts in the Second Circuit have held were proper.  *See, e.g., Care Travel*, 944 F.2d at 991.

Defendants point to the Court's decision in *Volpone*, 313 F. Supp. 3d at 506  to try and support their argument that the Court "conveyed [its] view" that "[Defendant] Gainor was evasive."  Yet, Defendants overlook that within that very decision the Court ultimately credited portions of Defendant Gainor's testimony.  *Id.* at 505, 507. Next, Defendants point to the Court's comment, ***while the jury was excused***, that Defendant Gainor "clearly was toying with the questioner."  ECF 389 (citing Tr. at 742-43).  Just because the Court may have held that view as to one portion of Defendant Gainor's testimony – and "*deposition* testimony" – does not mean that the Court "expressed" an impermissibly biased view to the jury – which it did not.  *Id.*  To

20

the contrary, these stated opinions bolster the Court's need to assist the jury by attempting to draw from Defendant Gainor a truthful, accurate, and straightforward answer to factual questions.  The Court only attempted to elicit such answers when, like with Defendants' expert Marina Nitze, witnesses sought to avoid giving direct answers to direct questions.  *See* ECF 389 at 23.

Defendants wrongly perceive the Court's reminder that Defendant Gainor was testifying under oath as evidence that the trial was fundamentally unfair.   Courts in this Circuit have held that a judge's reminding the key witness that she was testifying under oath, in the presence of the jury, "did not violate [her] right to a fair trial."  *See Aulet v. Henderson*, 1988 U.S. Dist. LEXIS 7133 (E.D.N.Y. May 18, 1988) ("The trial judge did not explicitly state that he thought Mrs. Trinidad was not telling the truth or that petitioner was guilty.").  Similarly, the Court did not disagree with Defendant Gainor's testimony in front of the jury, or express that he was lying. Those determinations were rightly left for the jurors.  The Court did, however, appropriately, clarify whether Defendant Gainor had testified under oath during his deposition and whether he was aware he was testifying under oath during his trial testimony.   Such clarifications are permissible and well within a judge's "charge[] to see that the law is properly administered, ... a duty which he cannot discharge by remaining inert."  *See, Care Travel*, 944 F.2d at 991.

VI.     *The Court's Curative Instructions Were Sufficient*

The Court's curative instructions were nearly identical to those which this Circuit has already held to be sufficient and permissible.  Even assuming, *arguendo*, that the Court was required to give "curative" instructions, its instructions were sufficient.  Moreover, when the Court – outside of the jury's presence – asked Defendants "what [they] would like [the Court] to do?" (Tr. 744:4), the Court offered to "remind the jury that they are the finders of fact; and they,

not the Court, decide the credibility of the witnesses and who to believe and who not to believe;

and that I have no views on the facts of this case. Would you like me to do that?"  *Id*. at 744:5-9.

Defendants assented (*Id*. at 744:10 "Yes, your Honor").  At that point Defendants were free to

ask for a specific kind of instruction or other remedy to their perceived problem such as a

mistrial.  But they did not.  (*Id*. at 744:12 "Thank you.").  Immediately upon the jury's return, the

Court issued this instruction:

> THE COURT: Ladies and gentlemen of the jury, I wish to remind you of something
> that I told you when we first started, that is, you are the decider of the facts here.
> The eight of you will decide what actually happened. I do not decide the facts. I
> have no view of the facts here. You decide who to believe and who not to believe,
> and you decide what parts of the testimony – how much weight to put on whatever
> parts of the person's testimony that you do believe.  Do you understand? You can
> reject some, you can accept some. And that that you accept, you can weight it just
> however you think is appropriate. I will ask questions – and you've seen me do it –
> of witnesses. Sometimes I'm more active, sometimes I'm less active. But the
> reasons for my questions almost always are to help elicit things that I think may be
> unclear to the jury, or I just may have a question about what the evidence is. But I
> assure you, I have no view of the facts here. That's your job. My job is the legal
> things that happen at sidebar and when I sustain/overrule objections. Did [sic] you
> decide the facts, I don't.

*Id*. at 745:18-746:12. Again, Defendants could have requested a sidebar, sought further

instruction, or that the instruction be repeated, which it was.  *Id*. at 1542:22-1543:6.  Defendants

did not, even after the Court urged Defendants not to be "delicate" (743:20-21).  Now, they

claim the Court's behavior was so biased and intrusive that they were denied a fair trial.  In truth,

the Court acted only to move the proceedings and elicit the truth so the jury could make its

determination.

> This Circuit has held instructions such as these are "helpful and not over the line":

> I have asked more questions in this case than I would normally ask in a case to be
> tried by a jury, but as the case unfolded it seemed to me that there was some rather
> difficult issues and I felt that sometimes things were not entirely clear to me and I
> felt they might not be entirely clear to you, and the purpose of a trial is to make the
> facts clear to the jury, make the issues clear and then how the jury decides those

> issues on the basis of the facts is up to the jury.  Nothing I have said has been
> intended to indicate to you how you should resolve the issues before you. It has
> always been intended – what I have done in the case, has been intended to draw out
> the facts, help to illustrate the issues in a more clear and precise way so that you
> can decide the answers to the ultimate questions.

*Care Travel*, 944 F.2d at 993 n.4.  The similarities in the cases are overwhelming, and like in

*Care Travel*, the Court's behavior was permissible and its instructions were helpful.

### A.   The Jury's Damages Award Was Not Excessive and Was Reasonably Based on The Evidence

A jury's verdict "can be set aside as clearly excessive or inadequate only when 'the

verdict is so disproportionate to the injury and its consequences as to shock the conscience of the

court.'"  *See Fioto v. Manhattan Woods Golf Enters.*, 304 F. Supp. 2d 541 (S.D.N.Y. Feb. 4,

2004).  Although Defendants rely on *Gasperini*, they provide no evidence that the jury's award

was excessive, or that it "deviates materially" from other similar cases.  *Gasperini v. Ctr. For

Humanities, Inc.*, 518 U.S. 415 (1996).  And, if they truly objected to the jury charge regarding

the misappropriation of labor, skills, and expenditures, Defendants "should … have objected to

the charge as [the Court] drafted it."  Tr. at 1585:3-5 (THE COURT: "Remember it was I who

raised it as I was reading the charge."); Tr, at 1572:12-18.[3]  They did not.  They waited until the

jury had begun its deliberations and had already asked for particular records regarding damages,

just before rendering its verdict.  Tr, at 1580:10-1587:9.

To the contrary, Defendants themselves concede that the jury had an evidentiary basis on

which to award damages as it did.  They just do not agree with that award.  It would be improper

to grant a new trial on this ground. As Defendants themselves note, Plaintiff presented damages

testimony from *three* witnesses, "Lucier, Dell and Elman", and "[t]he jury was directed in the

---

[3] Where a party does not object to an instruction, the level of review is "'fundamental error;' that is, an error 'so serious and flagrant that it goes to the very integrity of the trial.'"  *See Patrolmen's Benevolent Ass'n*, 310 F.3d at 54.

jury charge to award an amount that fully compensated Broker Genius for future damages, including future damages for loss of goodwill and other items such as price erosion." *See* ECF 389 at 24-25.

Their only argument seems to be, then, that the jury could not possibly have awarded damages for a completely distinct claim based on distinct behavior, and that Broker Genius was "fully compensated … and there is no basis for finding further 'irreparable' injuries upon which a permanent injunction could be based." *Id*. at 25.  Broker Genius was not fully compensated such that a permanent injunction is baseless; and, the jury's award is entirely irrelevant to the permanent injunction, as Plaintiff's witnesses emphasized that Broker Genius' losses cannot be fully captured in monetary damages alone and will continue into the future.  *See* Tr. at 1048:8-18; 1057; 1137:12-15.   Mr. Dell testified that the price erosion injury would continue in perpetuity – that along with loss of goodwill causes Broker Genius irreparable harm.  Tr. at 1138:2-1139:5.

Plaintiff brought two claims with distinct legal elements and supporting facts.  Plaintiff presented evidence that Broker Genius invested approximately $4 million in developing its AutoPricerV3, which Defendants misappropriated when they engaged in commercially immoral free-riding.  *See id*.  The jury's award of $1.5 million is well below the amount Defendants avoided expending when they misappropriated Plaintiff's labor, skills, and expenditures.  Indeed, even combining the two awards the total amount awarded is only in the region of what it cost Broker Genius to develop AutoPricerV3 and does not fully compensate Broker Genius for what the damages it suffered, and will suffer, because Seats Scouts brought Command Center to market. Tr. 1056:20-1057:20. The jury weighed the harms caused by the Defendants and apportioned the damages due to Broker Genius for the various misconduct.

24

Aside from their self-serving *ipse dixit*, Defendants provide no support for their bald assertion that "the verdict cannot be reconciled." Indeed, the jury had a "rational basis for separate determinations" of damages awards because they were presented with, and clearly credited (*see* Tr. at 1574:6-12), Plaintiff's extensive evidence on the two claims, and their two sets of damages. The jury chose to credit this competent evidence in awarding damages, and the Court should not disturb the jury's damages award.

    B. ANY ERRORS WERE HARMLESS

Assuming, *arguendo*, that "the conduct" – apparently both in isolation and together – constituted error, it was harmless, and should not be the basis to alter or overturn the jury's verdict. Defendants' cited support is distinguishable, and irrelevant. In *Webber v. Sobba*, 322 F.3d 1032, 1038 (8th Cir. 2003), the appeal court held that a jury instruction on a joint-enterprise defense was erroneous and determined it was not harmless error because the court could not tell from the general verdict form how the jury had applied the instruction. In contrast, Defendants' point to nothing that a Special Verdict form was necessary to determine but rather refer only to the "the conduct" determinations which rested mostly with the jury for credibility assessments – for which a Special Verdict is neither necessary or appropriate.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Defendants' motion for judgment as a matter of law, or for a new trial.

PEARL COHEN ZEDEK LATZER BARATZ LLP

By:    /s/ Veronica Mullally Muñoz
        Veronica Mullally Muñoz (MM-9985)
        Daniel J. Melman (DM-8239)
        Miriam Kurien Tyrell (MT-1029)
        1500 Broadway, 12th Floor
        New York, NY 10036
        (646) 878-0800
        VMunoz@PearlCohen.com
        DMelman@PearlCohen.com
        MTyrell@PearlCohen.com

        *Attorneys for Plaintiff*
        *Broker Genius Inc.*

Dated: March 5, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 5, 2019, a copy of the foregoing PLAINTIFF BROKER

GENIUS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'

RENEWED MOTION FOR JUDGMENT OR FOR A NEW TRIAL, PURSUANT TO FED.

R. CIV. P. 50(b) AND 59 was served upon all parties and counsel of record via the Court's

CM/ECF system.

Dated:  March 5, 2019

By:  /s/ Miriam Kurien Tyrell
Miriam Kurien Tyrell