UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Broker Genius Inc., <br><br> Plaintiff, <br><br> -against- <br><br> Seat Scouts LLC and Drew Gainor, <br><br> Defendants. | 17-Cv-8627 (SHS) <br><br> <u>OPINION & ORDER</u> |

SIDNEY H. STEIN, U.S. District Judge.

Before the Court is defendants' renewed motion for judgment as a matter of law or a new trial. (Doc. 388.) For the reasons that follow, defendants' motion is denied.

**I. BACKGROUND**

On November 7, 2017, plaintiff Broker Genius Inc. commenced this action against defendants Seat Scouts LLC and Drew Gainor, among others, for monetary damages and injunctive relief. The Court assumes familiarity with the facts underlying this litigation, which are more fully set forth in *Broker Genius v. Volpone*, 313 F. Supp. 3d 484, 511 (S.D.N.Y. 2018). Briefly stated, plaintiff Broker Genius is a technology company serving ticket brokers on the secondary ticket market. Broker Genius's product, AutoPricerV3, is a web application that enables brokers to dynamically and automatically price their inventory of tickets. Defendant Drew Gainor, a former Broker Genius customer, is the cofounder of defendant Seat Scouts, whose Command Center product competes with Broker Genius's product. Broker Genius sued Gainor, Seat Scouts, and others, alleging that they improperly used the knowledge and information that Gainor obtained while he was a Broker Genius customer to develop Command Center in violation of the Terms of Use to which Gainor agreed before using AutoPricerV3.

After discovery proceedings, motion practice, and a five-day fact hearing, the Court granted a preliminary injunction against defendants on May 11, 2018.[1] (Doc. 119.)

---

[1] At the time the preliminary injunction was issued, Guinio Volpone, Ray Volpone, Stuart Gainor, Volpone Software LLC, and Event Ticket Sales LLC were also defendants in this action. They were all dismissed from this case in the Court's subsequent partial grant of defendants' motion to dismiss plaintiff's Second Amended Complaint on May 14, 2018. *Broker Genius v. Seat Scouts*, No. 17-cv-8627, 2018 WL 2214708 (S.D.N.Y. May 14, 2018).

After additional proceedings including another fact hearing, the Court entered an order of contempt against Seat Scouts and Gainor on August 24, 2018 for violating the preliminary injunction. (Doc. 209.)

A ten-day jury trial was held in January 2019, at the conclusion of which the jury awarded $3,000,000 in damages against Gainor on plaintiff's breach of contract claim and $1,500,000 against Seat Scouts and Gainor on plaintiff's unfair competition claim. A judgment to that effect was entered on January 22, 2019 in favor of Broker Genius. (Doc. 353.) The Court then issued a permanent injunction against Seat Scouts and Gainor on February 7, 2019. (Doc. 387.)

Defendants filed their renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) or a new trial pursuant to Fed. R. Civ. P. 50(b) and 59 on February 19, 2019. (Doc. 388.) In this motion, defendants assert several arguments as to why the Court should obviate the jury's verdict and grant judgment as a matter of law in defendants' favor.

With regard to plaintiff's breach of contract claim, defendants argue that they are entitled to judgment as a matter of law because:

1. Broker Genius brought this claim against Gainor, but the evidence at trial showed that only Seat Scouts created Command Center; and
2. The jury's verdict was based solely on speculation because the only witnesses who had personal experience with StageFront, a product that Gainor used before he began using AutoPricerV3, testified that Gainor's knowledge of the six "widgets" at issue predated his use of AutoPricerV3.

With regard to plaintiff's unfair competition claim, defendants argue that they are entitled to judgment as a matter of law because:

1. The unfair competition claim is preempted by the Copyright Act;
2. The unfair competition claim is preempted by the Patent Act;
3. Broker Genius failed to present any evidence showing that it had a proprietary interest in the information that defendants misappropriated;
4. The unfair competition claim fails under the "independent tort" doctrine; and
5. Broker Genius presented insufficient evidence of bad faith and should have been barred from using evidence of the Court's finding of contempt as evidence of bad faith.

In the alternative, defendants seek a new trial on the following grounds:

1. The Court abused its discretion by allowing plaintiff to introduce irrelevant and prejudicial evidence of the Court's findings from the preliminary injunction and contempt proceedings;

2

2. The Court abused its discretion by precluding defendants from introducing Magistrate Judge Netburn's order relating to Gainor's laptop, thereby allowing plaintiff erroneously to suggest to the jury that Gainor disobeyed that order;

3. Defendants were prejudiced by the Court's questioning of Gainor and other defense witnesses; and

4. The damages award was excessive and the damages awarded on the two claims cannot be reconciled under plaintiff's theory of the case.[2]

For the following reasons, defendants' renewed motion for judgment as a matter of law or a new trial is denied.

## II. DISCUSSION

### A. Defendants' Motion for Judgment as a Matter of Law

#### 1. *Legal Standard*

In ruling on a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), "a district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997). The Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Id*. A court "may grant the motion only when there is 'either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence [is] so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir. 1996).

"Because the Rule 50(b) motion is only a renewal of the preverdict [Rule 50(a)] motion, it can be granted only on grounds advanced in the preverdict motion." *Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012). "As to any issue on which proper Rule 50 motions were not made, [judgment as a matter of law] may not properly be granted by the district court." *Id*. An exception to this rule arises when granting a motion for

---

[2] Defendants also argue that "the impact of any or all of these errors cannot be deemed harmless" because the Court did not use a special verdict form. (Doc. 389, Def.'s Mem. at 25.) For the reasons outlined in this opinion, none of the purported errors that defendants identify warrants a new trial. Additionally, the case the defendants cite in support of this argument, *Webber v. Sobba*, refers not to "trial errors" generally, but to errors in the trial court's jury charge. 322 F.3d 1032, 1038 (8th Cir. 2003) (holding that Arkansas law requires reversal where the jury's general verdict gives no indication as to whether it relied on the erroneous instruction.). Defendants do not claim that the Court's jury charge in this case misstated the law in any way. *Webber* is therefore irrelevant to defendants' motion.

3

judgment as a matter of law is "necessary to prevent manifest injustice." *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 127 (2d Cir. 2016).

   2. ***Defendants Are Not Entitled to Judgment as a Matter of Law on Plaintiff's Breach of Contract Claim.***

      a. *The Trial Evidence Showed that Gainor Was Personally Involved in the Production of Command Center.*

Defendants first argue that Gainor is entitled to judgment as a matter of law on the breach of contract claim because "the Command Center product was created by Seat Scouts, not Gainor," but Gainor and Gainor alone was contractually bound by the Terms of Use. (Doc. 398, Reply at 1.) Therefore, they argue, the evidence presented at trial does not support a verdict against Gainor because "the breach of contract claim was founded entirely on Seat Scouts' actions." Def.'s Mem. at 1.

Although defendants are correct that of the two defendants, only Gainor was bound by the Terms of Use, extensive evidence of Gainor's personal involvement in the development of Command Center—including his own testimony—amply supports the jury's verdict against him.

The Terms of Use to which Gainor assented state that AutoPricerV3 users agree not to: "[m]odify, adapt, sub-license, sell, reverse engineer, decompile, or disassemble any portion of the Site or Apps or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the Site or Apps" (PX-3 at BG-SS000004614) or "[r]eproduce, modify, display, publicly perform, distribute or create derivative works of the Site or Apps or the Content," (PX-3 at BG-SS000004614).

The trial evidence showed that Gainor was personally and extensively involved in the development and creation of Command Center. For example, plaintiff offered as an exhibit a note that Gainor had written to himself about ideas for Command Center in January 2017 on the "Evernote" note-taking software. Trial tr. at 802. Gainor testified that Seat Scouts was incorporated in March 2017. *Id*. at 881-82. This exhibit shows that Gainor began brainstorming ideas about how to design Command Center before Seat Scouts even existed, including listing items that would be included in the web application's "main view." PX-18.

Gainor's own testimony also cast him as a key player in the development of Command Center. He testified that when Seat Scouts began building Command Center in 2017, he "created new [design] documents" and "specs" for his team to use. Trial tr. at 721–22. Gainor also testified that he personally directed Seat Scouts' engineers to design Command Center the way they did:

4

> Q. You made your brain dump that we saw in PX-18 and then you made your Pivotal Tracker entry that we just saw in PX-1027 on January 14, correct?
>
> A. Yes, sure. Yes, it looks that way.
>
> Q. The very next day, on January 15, you started to draw this wire frame that we are looking at on the screen, correct?
>
> A. Yes, that appears correct . . . .
>
> Q. [And] this was your first conception of how this feature should look in Command Center, correct?
>
> A. This was the first time I put it on paper for my engineers that were going to be building Command Center, that's correct.

*Id*. at 805. Additionally, Gainor testified that he reviewed his "wire frames" with his team of engineers at the newly-incorporated Seat Scouts in the spring of 2017 and "just tried to give them an idea of . . . what an autopricer was and what it is that they were going to be expected to build, answer any questions they might have, and handed everything off to them to build the product." *Id*. at 883. Finally, Gainor took credit for building Command Center while he was on the witness stand, testifying that "[a]utopricing was the simplest tool I built in my entire 18 years of being in this industry." *Id*. at 724.

Based on the uncontroverted evidence that Gainor was personally involved in creating Command Center, the jury reasonably found that Gainor breached the Terms of Use by building a product derived from AutoPricerV3.

> b. *Defendants' Argument that the Breach of Contract Verdict Was Based on Speculation Alone Is Procedurally Barred.*

Second, defendants argue that Gainor is entitled to judgment as a matter of law on the breach of contract claim because the verdict was based on speculation alone. Def.'s Mem. at 9. Specifically, defendants contend that the trial evidence showed that Gainor's use of the product StageFront prior to his use of AutoPricerV3 demonstrates that his knowledge of the six "widgets" in Command Center (which Broker Genius claims are derived from those in AutoPricerV3) predated his use of Broker Genius's product.[3] Def.'s Mem. at 9-10. Defendants claim this evidence was uncontradicted because the witnesses

---

[3] Defendants also "incorporate the prior arguments that the 'derivative works' language [in the Terms of Use] called for the Copyright Act meaning, and that it was error for the Court to define its meaning as a matter of law." Def.'s Mem. at 9 n.2. In the Court's Opinion and Order granting plaintiff's motion for a preliminary injunction, the Court found that the "derivative works" language does not import the copyright law framework into the contract's prohibition against creating and distributing derivative works. *Broker Genius Inc. v. Volpone*, 313 F. Supp. 3d 484, 500–01 (S.D.N.Y. 2018).

who testified that StageFront included these features—Gainor, Guinio Volpone (Gainor's business partner at Seat Scouts), and Eric Pancheri (a customer of both Broker Genius and Seat Scouts at various times)—were the only witnesses who had ever used StageFront. *Id.*

Because defendants did not raise this argument in their Rule 50(a) motion, they cannot now raise it in their renewed motion pursuant to Fed. R. Civ. P. 50(b). *Lore*, 670 F.3d at 153.

This is not a situation in which the Court must grant judgment as a matter of law in order to prevent "manifest injustice." *Crawford*, 815 F.3d at 127. Broker Genius presented extensive evidence from which the jury reasonably concluded that Command Center was derived from AutoPricerV3. *See, e.g.*, PX-8 (Gainor EverNote dated September 18, 2016 stating "Picking comparable sections on broker genius using the map is way simpler"); PX-48 (instant message conversation between Seat Scouts' Director of Operations Brendan O'Donoghue and Gainor in which O'Donoghue states "btw I got access to Broker Genius" and "We can perhaps do a call later this week and all see it and walk through it together so we can see the competition"); PX-114 (instant message from Gainor to Seat Scouts employees Joe Ellis and Don Pflaster stating "Up until recently I had access to anther [sic] app but that was disabled since I stopped using it. Let em [sic] check one other right quick"); PX-142 (email from Gainor to Ellis stating, with regard to Broker Genius' offer to show him new AutoPricerV3 features, "Im [sic] gonna email back and tell him he probably doesn't want to demo me. Id [sic] rather get one through someone :-)"); PX-496 (Gainor EverNote from May 24, 2016, the same day he received a Broker Genius demo, recording AutoPricerV3's cycle times).

The fact that Gainor, Volpone, and Pancheri were the only witnesses who claimed to have firsthand experience using StageFront does not change this calculus. The jury was entitled to discount their testimony and rely instead on plaintiff's substantial evidence that Gainor used AutoPricerV3 as a model for Command Center.

### 3. *Defendants Are Not Entitled to Judgment as a Matter of Law on Plaintiff's Unfair Competition Claim.*

#### a. *Defendants Waived Their Copyright Act Preemption Argument by Failing To Raise It Prior to the Filing of the Joint Pretrial Order.*

Defendants argue that plaintiff's unfair competition claim is preempted by the Copyright Act. Def.'s Mem. at 10–14. Because federal preemption is an affirmative defense, defendants were required to present it in their responsive pleading.[4] Fed. R. Civ.

---

[4] Although federal preemption is not listed among the affirmative defenses set forth in Fed. R. Civ. P. 8(c), that list is not exhaustive and courts have characterized federal preemption as an unenumerated

6

P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."). Since they failed to do so, and in fact did not raise it until the parties filed their joint pretrial order, defendants have waived this defense.[5] *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (An affirmative defense raised for the first time on summary judgment is subject to waiver); *In re Cross Media Mktg. Corp.*, 367 B.R. 435, 446 (Bankr. S.D.N.Y. 2007) ("Defendants cite to the Eleventh Circuit to support the proposition that failure to assert an affirmative defense in an answer can be cured by inserting the defense in the pretrial order. As shown in [*Saks v. Franklin Covey Co.*], these

---

affirmative defense. *See, e.g.*, *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (ERISA preemption); *Delville v. Firmenich Inc.*, 920 F. Supp. 2d 446, 466-67 (S.D.N.Y. 2013) (ERISA preemption); *Spear Mktg., Inc. v. BancorpSouth Bank*, 844 F.3d 464, 468 (5th Cir. 2016) (Copyright Act preemption).

[5] One exception exists to the general rule that a federal preemption defense may be waived if it is not included in the defendant's responsive pleading: if the defense implicates a choice-of-forum (jurisdictional) question rather than a choice-of-law question, it is a non-waivable defense that may be raised at any time. *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 390–94 (1986). Copyright Act preemption, however, is not jurisdictional in nature pursuant to the U.S. Supreme Court's reasoning in *International Longshoremen's Association v. Davis*. In *Davis*, the Court found that certain state law claims were preempted by the National Labor Relations Act (NLRA) because the NLRA stripped federal and state courts of jurisdiction over certain labor-related claims in favor of the National Labor Relations Board (NLRB), a "specific and specially constituted tribunal" to which Congress delegated "primary interpretation and application of [the NLRA's] rules." *Id*. at 404. The *Davis* Court made sure to state explicitly that "our decision today does not apply to pre-emption claims generally but only to those pre-emption claims that go to the State's actual adjudicatory or regulatory power as opposed to the State's substantive laws." *Id*. at 391 n.9. Section 301 of the Copyright Act, the provision that sets out that Act's preemptive effect, does not dictate the forum for bringing claims "within the general scope of copyright" and "within the subject matter of copyright," but rather dictates the law that must be applied. 17 U.S.C. § 301. It is therefore not jurisdictional as it does not "oust the . . . court as a forum." *Sweeney v. Westvaco Co.*, 926 F.2d 29, 39 (1st Cir. 1991) (Breyer, J.) (interpreting *Davis* as resting on the Court's belief that Congress intended the NLRA to "oust the state court as a forum" to ensure that the NLRB could "develop and apply nationally uniform labor-relations principles and practice."); *see also Fryer v. A.S.A.P. Fire & Safety Corp.*, 658 F.3d 85, 90 (1st Cir. 2011) ("Here, the preemption defense is not jurisdictional because a successful preemption defense . . . would dictate only a change in law, not a change in forum."); *Johnson v. Armored Transport of California, Inc.*, 813 F.2d 1041, 1044 (9th Cir. 1987) (holding that a preemption defense was waivable where "even if [defendant's] preemption argument were valid, it would not force [plaintiff] to bring this action in a different forum . . . [but rather would cause plaintiff's state law claim to be] recharacterized as a federal claim"). Additionally, both the First Circuit and the Eighth Circuit have declined to consider Copyright Act preemption arguments when those arguments were not raised prior to appeal. *Curet-Velazquez v. ACEMLA de Puerto Rico, Inc.*, 656 F.3d 47, 52-53 (1st Cir. 2011) *cert. denied* 566 U.S. 922 (2012); *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 n.6 (8th Cir. 1995). This suggests that nether the First Circuit nor the Eighth Circuit considers Copyright Act preemption to be a jurisdictional argument, as challenges to subject-matter jurisdiction can be raised at any time, including for the first time on appeal. *See Capron v. Van Noorden*, 2 Cranch 126, 2 L.Ed. 229 (1804).

cases do not reflect the prevailing view of this circuit."); *see also* 2 Moore's Federal Practice - Civil § 8.08 (2019).

### b. *Defendants Waived Their Patent Act Preemption Argument by Failing to Raise It Prior to the Rule 50(a) Motion.*

Defendants also argue that Broker Genius's unfair competition claim is preempted by the Patent Act. Def.'s Mem. at 14–15. Like Copyright Act preemption, Patent Act preemption is an affirmative defense. However, defendants failed to include it in their responsive pleading, and in fact did not raise it prior to their Rule 50(a) motion. Trial tr. at 1421. They have therefore waived this affirmative defense. *See Saks*, 316 F.3d at 349.

### c. *Plaintiff Presented Ample Evidence from Which the Jury Could Conclude that Broker Genius Had a Proprietary Interest in the Misappropriated Information.*

Defendants next argue that they are entitled to judgment as a matter of law on plaintiff's unfair competition claim because Broker Genius does not have a proprietary interest in AutoPricerV3's user experience and user interface (UX/UI), the "central piece" of Broker Genius's unfair competition claim. Def.'s Mem. at 15–16. Defendants advance two bases for this argument: first, that the Court has already held that Broker Genius has no proprietary interest in the AutoPricerV3 UX/UI in *Broker Genius v. Zalta*, 280 F. Supp. 3d 495, 520 (S.D.N.Y. 2017); and second, that the evidence presented at trial showed that the features allegedly copied by defendants were freely disclosed to the public. *Id*. at 16.

Defendants are correct that, in order to succeed on an unfair competition claim based on a theory of misappropriation of labor, skills, and expenditures, Broker Genius needed to demonstrate that it had a proprietary interest in the information that was misappropriated.[6] *Schroeder v. Pinterest Inc.*, 133 A.D. 3d 12, 30–31 (N.Y. App. Div. 2015) ("Like the other misappropriation causes of action, this claim cannot be premised upon misappropriation of publicly-available information."). Defendants' argument fails, however, because (1) the Court has never held in this or any other case that Broker Genius does not have a proprietary interest in AutoPricerV3's UX/UI and (2) plaintiff presented ample evidence at trial for the jury to conclude that Broker Genius did have a proprietary interest in AutoPricerV3's UX/UI.

### i. The Court's Decision in *Broker Genius v. Zalta* Does Not Preclude the Jury's Finding that Broker Genius Had a Proprietary Interest in AutoPricerV3's UX/UI.

In *Zalta*, the Court held that the measures Broker Genius took to protect the confidentiality of AutoPricerV3 were not sufficient to bring AutoPricerV3's UX/UI under

---

[6] The Court instructed the jury to this effect. Trial tr. at 1561–62.

the protection of trade secret law. *Zalta*, 280 F. Supp.3d at 520. In reaching this conclusion, the Court noted that every AutoPricerV3 user was given "unfettered access" to the UX/UI as well as the software architecture of AutoPricerV3. *Id*. The Court also found that "[w]hile the user restrictions of the Terms of Use do expressly bar users from showing others the AutoPricer v.3 user interface . . . they do not amount to a confidentiality or non-disclosure clause that notifies users of the secrecy of any aspect of AutoPricer v.3 or precludes them from describing to others the software's functions, structure, and appearance." *Id*. at 522.

These findings, however, do not add up to the conclusion that Broker Genius had no proprietary interest in AutoPricerV3's UX/UI. *See* trial tr. at 1422 ("THE COURT: It can still be proprietary and not a trade secret"). Broker Genius did not place AutoPricerV3 into the stream of commerce such that anyone was entitled to view and copy it. Rather, Broker Genius required each prospective client to agree to the Terms of Use, which places "restrictions on the reproduction [and] the display of" the product. *Zalta*, 280 F. Supp.3d at 522. It therefore cannot be said that AutoPricerV3 was publicly available. *See Schroeder*, 133 A.D. 3d at 30–31.

> ii. Plaintiff Presented Ample Evidence at Trial for the Jury to Conclude that Broker Genius Had a Proprietary Interest in AutoPricerV3's UX/UI.

The Court instructed the jury that, in order to prevail on its misappropriation claim, Broker Genius needed to show that it had a proprietary interest in the misappropriated technology. Trial tr. at 1561–62. The Court also instructed the jury that Broker Genius's claim of misappropriation of labor, skills, and expenditures could not "be based on misappropriation of publicly available information." *Id*. at 1562.

At trial, Broker Genius's CEO Sam Sherman testified that Broker Genius created AutoPricerV3 and required customers to agree to the Terms of Use before they were able to access the product. *Id*. at 69–73. James McGowan, Broker Genius's Chief Technology Officer, corroborated Sherman's testimony that customers could only access AutoPricerV3 if they first agreed to the Terms of Use. Trial tr. at 599–600. The fact that Broker Genius expended labor, skill, and expenditures to create AutoPricerV3 and took precautions to avoid its public disclosure establishes Broker Genius's proprietary interest. *See Schroeder*, 133 A.D.3d at 30–31; *Demetriades v. Kaufmann*, 698 F.Supp. 521, 526–27 (S.D.N.Y.1988).

Contrary to defendants' assertions, the fact that Broker Genius gave brief "demos," or demonstrations, of AutoPricerV3 to prospective customers does not preclude this finding. Def.'s Mem. at 16. Sherman testified that these "demos," which typically lasted ten minutes, were not sufficient for someone to "effectively use" AutoPricerV3. Trial tr. at 275. Rather, it would take "hours" to become an expert in the technology. *Id*. at 276

9

("[After a demo, customers will] understand some of the high-level concepts. But they would not be able to be a proficient user of the technology and understand how each of the components interact with each other and the various ways that they can use those components."). The jury was entitled to conclude from this testimony that offering prospective customers brief demonstrations did not amount to placing AutoPricerV3 in the public domain.

Additionally, although Sherman testified that Broker Genius publicly disclosed various AutoPricerV3 functions in the course of advertising the product, trial tr. at 142–45, there is no reason to believe that these selective disclosures abrogated Broker Genius's proprietary interest in the UX/UI.

The Court declines to grant judgment as a matter of law on this ground because the record reflects substantial evidence supporting the jury's finding that Broker Genius had a proprietary interest in AutoPricerV3's UX/UI. *See Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir. 1996).

> d. *Defendants' Argument that the Unfair Competition Claim Fails Under the "Independent Tort" Doctrine Is Procedurally Barred.*

Because defendants did not make this argument in their Fed. R. Civ. P. 50(a) motion, they cannot now raise it in their renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). *Lore*, 670 F.3d at 153.

> e. *Defendants' Argument that Broker Genius Presented Insufficient Evidence of Bad Faith Is Procedurally Barred.*

Finally, defendants argue that the trial evidence cannot support the jury's verdict on the unfair competition claim because Broker Genius provided no evidence that defendants acted in bad faith in obtaining access to AutoPricerV3. Def.'s Mem. at 17–18. Specifically, defendants contend that (1) Broker Genius has no evidence that Gainor signed up for AutoPricerV3 under false pretenses, and (2) Broker Genius presented no evidence that Seat Scouts was involved in obtaining the allegedly misappropriated information. *Id*.

Because defendants did not raise this argument in their Rule 50(a) motion, they cannot now raise it in their renewed motion pursuant to Fed. R. Civ. P. 50(b). *Lore*, 670 F.3d at 153.

This is not a situation in which the Court must grant judgment as a matter of law in order to prevent "manifest injustice." *Crawford*, 815 F.3d at 127. Contrary to defendants' argument, the "bad faith" element of the misappropriation of labor, skill and expenditures claim need not coincide with the means by which the defendant came into possession of the misappropriated information, as demonstrated by the facts in *Schroeder*

*v. Pinterest, Inc*. In that case, the alleged misappropriation occurred when one of the defendants, Cohen, absconded with the ideas, technology, and business plans of his former business partner, Schroeder, in spite of the fact that Cohen had signed a contract pursuant to which he agreed not to take Schroeder's ideas. *Schroeder*, 133 A.D. 3d at 16–20. Schroeder did not allege that Cohen joined his team and signed the contract under false pretenses. Nevertheless, the court found that Schroeder's allegations, if true, were sufficient to show that Cohen had acted in bad faith. *Id*. at 31.

Similarly, even if the jury credited Gainor's testimony that he initially became a Broker Genius customer in good faith because he wanted to use AutoPricerV3 to price his ticket inventory, trial tr. at 725-27, it still was entitled to find that he acted in bad faith by subsequently using the information he learned as Broker Genius's customer to create Command Center in spite of his contractual obligation not to do so.

Defendants' argument is also unavailing as to Seat Scouts' liability. Defendants cite *Shroeder* for the proposition that "[a] misappropriation claim does not exist against an entity that had no role in obtaining the allegedly misappropriated technology item, and merely because the entity used it." Def.'s Mem. at 18 (citing *Schroeder*, 133 A.D. 3d at 31). This overstates *Schroeder*'s holding. While the Appellate Division did dismiss Schroeder's misappropriation of labor, skills, and expenditures claim against Pinterest (the recipient of the allegedly stolen information), it did so because it rejected the argument "that bad faith is established merely because Pinterest may have known that the ideas given to them by Cohen were not his own." *Schroeder*, 133 A.D. 3d at 31.

By contrast, Broker Genius presented extensive evidence from which the jury was entitled to conclude that others at Seat Scouts knew that Gainor wrongfully derived the idea for Command Center from AutoPricerV3, including various emails and instant messages between Gainor and his staff. *See, e.g.*, PX-114 (instant message exchange in which Gainor responded to a Seat Scouts employee's inquiry about whether he knew of any other sites using StubHub charts by stating "Up until recently I had access to another app but that was disabled since I stopped using it. Let em [sic] check one other right quick."); PX-142 (email from Gainor to Joe Ellis forwarding an email from a Broker Genius employee asking if Gainor would be interested in "re-exploring" Broker Genius and commenting "Im [sic] gonna email back and tell him he probably doesn't want to demo me. Id [sic] rather get one through someone :-)").

Further, as noted above, in one instant message exchange on October 11, 2017, Seat Scouts' Director of Operations Brendan O'Donoghue sent a message to Gainor and others stating "btw I got access to Broker Genius . . . We can perhaps do a call later this week and all see it and walk through it together so we can see the competition." PX-107. From this, the jury was entitled to conclude that Seat Scouts employees were accessing AutoPricerV3 and incorporating information derived from it into Command Center.

11

### B. Defendants' Motion for a New Trial

#### 1. *Legal Standard*

Fed. R. Civ. P. 59(a)(1) states that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Rule 59(a) "has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003). "That being said, for a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e. it must view the jury's verdict as against the weight of the evidence." *Id.* at 245.

#### 2. *The Court Acted Within Its Discretion in Admitting the Evidence of Contempt.*

Defendants argue that the Court's denial of defendants' motion *in limine* to exclude evidence of the Court's contempt finding against defendants allowed plaintiff to "inflame the jury" by "advising the jury of the court's views." Def.'s Mem. at 18. Defendants also protest that this ruling meant that evidence of the Court's findings of fact at the preliminary injunction hearing would also come in, as there was no way to introduce the Court's contempt finding without also informing the jury that the Court had ruled against defendants when it issued the preliminary injunction. Def.'s Reply at 12.

The Court denied defendants' motion *in limine* to exclude the evidence of contempt because it found that this evidence was relevant to the bad faith element of the misappropriation claim and its probative value was not substantially outweighed by danger of unfair prejudice. *See Patsy's Italian Rest., Inc. v. Banas*, 2008 U.S. Dist. LEXIS 108439, *11 (E.D.N.Y. Mar. 24, 2008) (denying defendants' motion to exclude a prior contempt order because "it would bolster plaintiffs' claims of willful infringement given [the defendant's] prior conduct."). The Court stated that plaintiff would only be permitted "to educe the fact that [the contempt finding] was a determination, not to have a lot of questioning about what went into [the contempt finding]." Motions in *limine* argument (Jan. 2, 2019) tr. at 17. The Court further stated that plaintiff would not be permitted to reference the preliminary injunction. *Id.*

As defendants note, plaintiff's counsel pushed the boundaries of this ruling by attempting to delve into the Court's findings in relation to plaintiff's motion for contempt. *See, e.g.*, trial tr. at 989 ("Q: Let me read you what Judge Stein said about goPricer in his preliminary injunction order. He said—MR HEISENBERG: Objection, your Honor. THE

12

COURT: Sustained."). The Court sustained defense counsel's objections and often cut plaintiff's counsel off even when defense counsel did not object to the line of inquiry. *See, e.g.*, *id*. at 989-90 ("Q: And you were held in contempt because the judge held – THE COURT: That's been established. Move on."). In instances when defense counsel failed to object, defendants cannot now complain that the Court abused its discretion in permitting plaintiff's counsel to introduce evidence or make arguments about the Court's contempt finding. *See, e.g.*, *id*. at 1534 (no objection from defense counsel when plaintiff's counsel argued in summation: "Seat Scouts were held in contempt for violating the preliminary injunction. That is Judge Stein's acknowledgement under the law of Seat Scouts' bad faith.").

Defendants' argument that it was impossible for the fact of contempt to be introduced without also informing the jury of the Court's preliminary injunction ruling is also faulty. The Court took pains to avoid alerting the jury to the fact that the preliminary injunction involved any merits determination by the Court, instructing the jury on more than one occasion that the preliminary injunction was issued simply "to maintain the status quo during the existence of this lawsuit." *Id*. at 285, 287, 290. In fact, the Court issued this instruction after each instance that defendants cite from Sherman's testimony as examples of plaintiff's misusing the Court's rulings. Def.'s Mem. at 19.

Nevertheless, *defendants* were the first to introduce evidence of the preliminary injunction when, during their cross-examination of Sherman, they introduced an exhibit that included a Broker Genius press release announcing that "Broker Genius won a preliminary injunction against Seat Scouts, requiring them to shut down their Command Center product." Trial tr. at 175; DX-ED at BG-SS000083487. Using that exhibit, plaintiff's counsel subsequently elicited testimony about the preliminary injunction from Sherman on redirect examination. Defense counsel did not object until after Sherman had testified that Broker Genius "won" the preliminary injunction after a five-day hearing at which he and Gainor both testified. *See* trial tr. at 285–88.

In any event, "[a] new trial is warranted only where the introduction of inadmissible evidence is a clear abuse of discretion, and where that abuse of discretion is prejudicial to the ultimate result of trial." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir. 1996). A new trial should only be granted if the Court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id*.

Broker Genius presented more than ample evidence to support the jury's findings on both counts, including uncontroverted testimony that Gainor was a Broker Genius customer before he founded Seat Scouts and built Command Center; documents and testimony supporting Gainor's assent to AutoPricerV3's Terms of Use; and extensive testimony from plaintiff's expert witness Eric Koskinen that Command Center was derived from AutoPricerV3. Due to the weight of the evidence against Gainor and Seat

13

Scouts, it most certainly cannot be said that "the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id*.

### 3. The Court Acted Within Its Discretion in Placing Limits on Defendants' Discussion of Gainor's Laptop.

Defendants next argue that the Court abused its discretion when it prevented them from reading into the record Magistrate Judge Netburn's order instructing Gainor to search his laptop for various information. Def.'s Mem. at 19–20. Because the jury's judgment could not have been "swayed in a material fashion" by the exclusion of this evidence, the Court declines to grant a new trial on this ground. *Donovan v. Incorporated Village of Malverne*, 344 Fed. App'x 625. 627 (2d Cir. 2009) (citing *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)).

Defendants argue that Broker Genius biased the jury against them by suggesting that Gainor did not comply with Magistrate Judge Netburn's discovery order to produce the laptop, even though Judge Netburn did not order the production of the laptop at all. After the exchanges to which defendants object (trial tr. at 734–41), the Court instructed the jury that Gainor complied with the order—of the district court, not the Magistrate Judge—to turn over the laptop. Trial tr. at 679 ("THE COURT: Ladies and gentlemen of the jury, I wish to inform you . . . that at one point in this case I directed, I ordered, Mr. Gainor to turn over his laptop to the lawyers for Broker Genius. And after I so-ordered him, he complied."). This instruction clearly informed the jury that defendants complied with this Court's order to turn over Gainor's laptop.

In any event, whether defendants complied with their discovery obligations as to the laptop is peripheral to the main issues in this case. There is no likelihood that the "jury's judgment would be swayed in a material fashion" by the exclusion of the specifics of Magistrate Judge Netburn's order. *Donovan*, 344 Fed. App'x at 627.

### 4. The Court's Questioning of Gainor Does Not Entitle Defendants to a New Trial.

Defendants also argue that they are entitled to a new trial because the Court's questioning of several defense witnesses, most notably Gainor, conveyed to the jury its "clear opinions of both the case and of the witnesses." Def.'s Mem. at 20. The Court's questioning of Gainor[7] does not warrant a new trial because it did not approach the level

---

[7] Although defendants also reference the Court's allegedly inequitable treatment of its expert witness, Marina Nitze, as compared with plaintiff's expert witness, Eric Koskinen, defendants' complaint hinges on the restrictions that the Court placed on Nitze in encouraging her to respond to questioning with "yes" or "no" answers. Def.'s Mem. at 23. Because placing such limits on voluble witnesses such as Nitze does not

14

of improper questioning that would have denied defendants a fair trial. Additionally, there is no reason to believe that the jury failed to follow the Court's instructions not to infer anything from the questions it asked.

### a. Legal Standard

In reviewing a trial judge's conduct, the question is "whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." *United States v. Rosa*, 11 F.3d 315, 343 (2d Cir. 1993); *accord Manganiello v. City of New York*, 612 F.3d 149, 169 (2d Cir. 2010).

### b. The Court's Questioning of Gainor Does Not Warrant a New Trial.

The Second Circuit has considered whether trial judges' questioning denied litigants fair trials on a number of occasions. In one such case, *United States v. Filani*, the Second Circuit focused on the fact that the judge's "active[] question[ing]" of several witnesses "served [mostly] to discredit defendant." 74 F.3d 378, 381 (2d Cir. 1996). In that case, the only witness for the defense was the defendant himself; "[t]hus, the outcome of the trial hinged on [the defendant's] credibility." *Id*. The trial judge asked numerous questions that "betray[ed] a tone of incredulity" and could "even be described as argumentative." *Id*. at 381–82. The trial judge also questioned the defendant extensively about his finances and continually confused the defendant's explanation of the amounts owed on his houses, thereby "detracting from defendant's credibility." *Id*. Additionally, the trial judge "corrected a mistake defendant made and forced him to admit his error before the jury." *Id*. at 382. The judge also asked other witnesses questions "with the obvious purpose of challenging the defendant's theory of the case." *Id*. Based on this conduct, the Second Circuit held that the judge failed to "maintain an appearance of impartiality and detachment," vacated the conviction, and remanded the case for a new trial. *Id*. at 385–87.

Here, the Court's questioning of Gainor is markedly different from *Filani* in two important respects. First, the judge in *Filani* directly questioned the defendant's account of key facts in the case, poking holes in his explanation as to why he was in possession of drugs when he was apprehended by law enforcement officers. By contrast, the Court's questioning of Gainor pertained mainly to Gainor's definition of the term "software," which is peripheral at best to the issues presented in this case. Second, the defendant was the only defense witness in *Filani*, while defendants in this case called several witnesses

---

amount to the Court "becom[ing] an advocate," this is not grounds for a new trial. *See United States v. Filani*, 74 F.3d 378, 385 (2d Cir. 1996).

(Guinio Volpone, Marina Nitze, and Eric Pancheri) in addition to Gainor.[8] *See also Shah v. Pan American World Services, Inc.*, 148 F.3d 84 (2d Cir. 1998).

In addition, after defense counsel challenged the Court's questioning of Gainor, the Court gave the following instruction:

> Ladies and gentlemen of the jury, I wish to remind you of something that I told you when we first started, that is, you are the decider of the facts here. The eight of you will decide what actually happened. I do not decide the facts. I have no view of the facts here. You decide who to believe and who not to believe, and you decide what parts of the testimony -- how much weight to put on whatever parts of the person's testimony that you do believe. Do you understand? You can reject some, you can accept some. And that that you accept, you can weight it just however you think is appropriate. I will ask questions -- and you've seen me do it – of witnesses. Sometimes I'm more active, sometimes I'm less active. But the reasons for my questions almost always are to help elicit things that I think may be unclear to the jury, or I just may have a question about what the evidence is. But I assure you, I have no view of the facts here. That's your job. My job is the legal things that happen at sidebar and when I sustain/overrule objections. Did [sic] you decide the facts, I don't.

Trial tr. at 745–46. The Second Circuit has noted that "it is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge." *Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006); *see Manganiello*, 612 F.3d at 170 ("We have no doubt the court's cautionary instructions [to draw no inferences from the court's rulings] were heeded [by the jury]."). There is no reason to believe that the jury did not follow the Court's instructions in this case.

### 5. *The Permanent Injunction and the Damages Awarded by the Jury Were Appropriate Given the Evidence at Trial.*

Defendants argue that the jury's $4.5 million award in plaintiff's favor included "future damages for loss of good will and other items such as . . . price erosion" in addition to the lost profits that Broker Genius's expert, Stephen Dell, quantified at trial as $898,706. Def.'s Mem. at 24–25. Defendants contend that because these future injuries were all covered by the jury's award, there was no reason for the Court to issue a permanent injunction.

Defendants also contend that the jury's award of $3 million on the breach of contract claim cannot be reconciled with its award of $1.5 million on the unfair

---

[8] Gainor was called as a witness for the plaintiff but was treated as a hostile witness. Trial tr. at 695.

competition claim because "Broker Genius presented no theory under which the injury was divisible." *Id*. at 25.

### a. The Permanent Injunction Was Consistent with the Jury's Award.

Defendants' argument that the jury's award obviated the need for an injunction is flawed for two reasons. First, there is no way to know whether the award included future price erosion and loss of goodwill. Although Dell's estimate of lost profits was $898,706, Broker Genius's CFO John Lucier testified that Broker Genius missed its projected revenue for 2018 by $9 million. Trial tr. at 1056–57. Lucier also testified that, in the years before 2018, Broker Genius's projected revenues had been "pretty accurate." *Id*. at 1056. The jury could have awarded damages based on Lucier's testimony rather than Dell's testimony, or some combination of the two. It is certainly within the ambit of the jury to consider the evidence and reach a conclusion based on it. It is not for the Court to attempt to determine the exact components of the jury's award.

Second, even if the award did include future price erosion and loss of goodwill, the Court found that a permanent injunction was warranted based on the evidence presented at trial. Specifically, the Court found that "Broker Genius suffered irreparable harm, including price erosion, loss of goodwill, damage to its reputation, and loss of business opportunities" as a result of defendants' conduct, and "no adequate remedy at law exists to remedy these injuries, as Broker Genius cannot be compensated through monetary damages alone." (Doc. 387, Permanent Injunction at 2.) This finding was based in part upon the fact that "defendants' past conduct demonstrates that they are likely to continue offering products derived from Auto Pricer V3 to consumers absent an injunction." *Id*. The Court's decision to issue the permanent injunction was therefore proper. *See New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) ("Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.").

### b. There Is No Indication that the Jury Deviated from the Court's Instructions Not To Award Damages More Than Once for the Same Injury.

Defendants' argument that the jury's award of $3 million on the breach of contract claim and $1.5 million on the unfair competition claim is "redundant and overlapping, or error" is also flawed because the Court instructed the jury not to award compensatory damages more than once for the same injury. Trial tr. at 1563–64. Specifically, the Court instructed:

> [D]o not award compensatory damages more than once for the same injury. For example, if Broker Genius were to prevail on both claims and establish a one-dollar injury, you cannot award plaintiff one dollar compensatory damages on each claim. In the example I've given you, plaintiff is only entitled to be made whole again, that is, to be given the one dollar. Plaintiff is not entitled to recover

more than plaintiff lost. Of course, if different injuries are attributed to the two different claims, then you must compensate the plaintiff fully for all of the plaintiff's injuries, if you find any.

*Id.* The jury is presumed to have followed the Court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987). This charge was sufficient to ensure that the jury understood that it could not award duplicative damages even if there was some overlap in injury resulting from the two claims. *See Grisanti v. Cioffi*, 2001 WL 777435 at *2 (D. Conn. Jun. 14, 2001).

### III. CONCLUSION

Defendants' renewed motion for judgment as a matter of law pursuant to Rule 50(b) is denied on the grounds that considering the evidence in the light most favorable to Broker Genius, *see Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997), there is absolutely no reason to overturn the jury's considered judgment based on substantial supporting evidence. Defendants' alternative request for a new trial pursuant to Rule 59(a)(1) is denied because the Court cannot conclude that the jury reached a "seriously erroneous result" or "the verdict is a miscarriage of justice." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003). Far from being "seriously erroneous," the jury's verdict was consistent with and supported by the evidence adduced at trial.

Dated: New York, New York
July 10, 2019

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

more than plaintiff lost. Of course, if different injuries are attributed to the two different claims, then you must compensate the plaintiff fully for all of the plaintiff's injuries, if you find any.

*Id.* The jury is presumed to have followed the Court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987). This charge was sufficient to ensure that the jury understood that it could not award duplicative damages even if there was some overlap in injury resulting from the two claims. *See Grisanti v. Cioffi*, 2001 WL 777435 at *2 (D. Conn. Jun. 14, 2001).

### III. CONCLUSION

Defendants' renewed motion for judgment as a matter of law pursuant to Rule 50(b) is denied on the grounds that considering the evidence in the light most favorable to Broker Genius, *see Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997), there is absolutely no reason to overturn the jury's considered judgment based on substantial supporting evidence. Defendants' alternative request for a new trial pursuant to Rule 59(a)(1) is denied because the Court cannot conclude that the jury reached a "seriously erroneous result" or "the verdict is a miscarriage of justice." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003). Far from being "seriously erroneous," the jury's verdict was consistent with and supported by the evidence adduced at trial.

Dated: New York, New York
    July 10, 2019

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

more than plaintiff lost. Of course, if different injuries are attributed to the two different claims, then you must compensate the plaintiff fully for all of the plaintiff's injuries, if you find any.

*Id.* The jury is presumed to have followed the Court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987). This charge was sufficient to ensure that the jury understood that it could not award duplicative damages even if there was some overlap in injury resulting from the two claims. *See Grisanti v. Cioffi*, 2001 WL 777435 at *2 (D. Conn. Jun. 14, 2001).

### III. CONCLUSION

Defendants' renewed motion for judgment as a matter of law pursuant to Rule 50(b) is denied on the grounds that considering the evidence in the light most favorable to Broker Genius, *see Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997), there is absolutely no reason to overturn the jury's considered judgment based on substantial supporting evidence. Defendants' alternative request for a new trial pursuant to Rule 59(a)(1) is denied because the Court cannot conclude that the jury reached a "seriously erroneous result" or "the verdict is a miscarriage of justice." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003). Far from being "seriously erroneous," the jury's verdict was consistent with and supported by the evidence adduced at trial.

Dated: New York, New York
    July 10, 2019

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.